**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| DIOGENES LIMITED, | ) | |
| COLOSSUS (IOM) LIMITED, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | C.A. No. _____ |
| DRAFTKINGS, INC., | ) | |
| a Delaware corporation, | ) | |
| | ) | |
| Defendant. | ) | **JURY TRIAL DEMANDED** |

**COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiffs Diogenes Limited and Colossus (IOM) Limited (collectively, "Plaintiffs" or

"Colossus") hereby brings this Complaint for patent infringement against DraftKings Inc., a

Delaware corporation ("Defendant" or "DraftKings"), and alleges as follows:

**NATURE OF THE ACTION**

1.      This is a civil action for patent infringement arising under the patent laws of the

United States, 35 U.S.C. § 271 *et seq.*, by Colossus against Defendant for infringement of U.S.

Patent Nos. 8,721,439 (the "'439 patent"); 9,117,341 (the "'341 patent"); 9,275,516 (the "'516

patent"); 9,424,716 (the "'716 patent"); 9,704,338 (the "'338 patent"); 10,970,969 (the "'969

patent"); and 10,997,822 (the "'822 patent"); (collectively, the "Asserted Patents").

**PARTIES**

2.      Diogenes Limited is a company incorporated pursuant to the laws of the Isle of Man

with its principal address at PO Box 227, Clinch's House, Lord Street, Douglas, IM99 1RZ, Isle

1

of Man.  Diogenes Limited is the owner by assignment of all right, title, and interest to the Asserted Patents.

3.    Colossus (IOM) Limited is a company incorporated pursuant to the laws of the Isle of Man with its principal address at PO Box 227, Clinch's House, Lord Street, Douglas, IM99 1RZ, Isle of Man.  Colossus (IOM) Limited is the exclusive licensee of the Asserted Patents in connection with various rights including use and sublicensing for business purposes.  Sublicensees are required to mark in accordance with 35 U.S.C. § 287.

4.    On information and belief, DraftKings is a corporation duly organized and existing under the laws of the State of Delaware, having executive offices at 222 Berkeley Street, Boston, Massachusetts 02116, and having regular and established places of business at 221 River Street, Hoboken, New Jersey 07030; 111 River Street, Hoboken, New Jersey 07030; and 1133 Boardwalk, Atlantic City, New Jersey 08401.

## JURISDICTION AND VENUE

5.    This Court has subject matter jurisdiction over this patent infringement action under 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the patent laws of the United States, Title 35 United States Code, including 35 U.S.C. § 1, *et seq*. This complaint includes claims for patent infringement arising under the patent laws of the United States, including 35 U.S.C. § 271, *et seq*.

6.    Defendant is subject to personal jurisdiction in this District because, based on information and belief, it is deemed to reside in this judicial district by virtue of being incorporated in the State of Delaware.  Accordingly, this Court may properly exercise personal jurisdiction over Defendant.

7.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c), and/or 1400(b), at least because Defendant is deemed to reside in this judicial district by virtue of being incorporated in the State of Delaware.

## COLOSSUS'S BUSINESS

8.     Colossus provides technology and intellectual property for use in betting and gaming. An overview of relevant services is described on the website located at https://corporate.colossusbets.com.

9.     Colossus's related company, ColossusBets Limited ("CBUK"), operates a platform for pool betting transactions, which includes the website located at www.colossusbets.com and a smartphone application, which allows users to create an account and place bets on the outcome of events selected by the operator. *See* About You, Colossus Terms of play & Policies, www.colossusbets.com/help/1-about-you/.

10.    For example, users may bet on the outcome of multiple related events that are pre-selected by CBUK ("Legs") and decided over a set period of time ("Game Period"). At any point during the Game Period, CBUK may offer users the opportunity to sell to CBUK the whole or a portion of a bet which may still be eligible for a winning dividend. *See* Cashing Out, Colossus Terms of play & Policies, www.colossusbets.com/help/5-cash-out/.

## THE ASSERTED PATENTS

11.    The inventions claimed in the Asserted Patents relate to specific improvements in computer technologies related to distributed gaming and distributed gaming utilizing desktop computers, mobile devices, and specialized kiosks.  Remote wagering presents unique technical problems for gaming operators and developers to ensure that all features available to visitors of a casino can be implemented remotely using different devices in communication with one another.

3

12.     The Asserted Patents relate to novel systems, methods, and apparatuses for remote gaming that allow a user to submit a wager via a wagering input device and dispose of that wager prior to conclusion of the wagering event in order to lock in a profit or limit losses.  The claims of the Asserted Patents embody an inventive concept that is patent-eligible, providing significant improvements over the prior art and enabling non-conventional combinations of features not present in the prior art.

13.     The Asserted Patents are directed to subject matter that is rooted in technology and discloses technological solutions to a technological problem in the field of remote gaming systems. These problems did not exist without the advent of remote, network-based gaming using wagering input devices communicating with a server.

14.     To solve these problems, the Asserted Patents require the use of technology to perform tasks that cannot be classified as mathematical concepts, certain methods of organizing human activity, or mental processes.  For example, the claims of the Asserted Patents include wagering input devices that are connected to a server via a communications interface.  The wagering input devices include a display and a user input that allows users to enter wager on a wagering event and transmit it over the communications interface to a server.  The server is configured to receive information about the wager and wagering event in real time, continuously recalculate the user's odds of winning the wager and generate a cash out offer.  The server is further configured to transmit those odds and/or the cash out offer to the wagering input device.  The user can view the cash out offer on the display and select the offer via the user input.  The acceptance of the cash out offer is then transmitted to the server, which issues an award to the user in several different formats.  The confirmation of the cash out and an indication of the award is displayed to the user via the display of the wagering input device.

4

*US Patent No. 8,721,439*

15.    On May 13, 2014, the United States Patent and Trademark Office ("USPTO") duly and legally issued the '439 patent entitled "Wagering Apparatus, Methods and Systems" to Bernard J. Marantelli.  The '439 patent has 30 claims.  A true and correct copy of the '439 patent is attached to this Complaint as **Exhibit 1** (hereinafter referred to as the "'439 patent").

16.    The inventions of the '439 patent resolve technical problems related to how to enable a user of a remote wagering input device in communication with a sever via a communications interface to submit a wager on a wagering event via a user interface and dispose of that wager prior to a conclusion of the wagering event.  *See, e.g.,* '439 patent, 1:52-3:21.  For example, claim 1 of the '439 patent includes initiating at least one of the buy-out offer and partial buy-out offer to any number of the one or more players that are eligible to win at least one jackpot for at least a portion of said at least one jackpot, said buy-out offer being initiated at any time before the multi-outcome wagering event has been completed.

17.    The technological improvements described and claimed in the '439 patent were neither conventional nor generic at the time of their invention, but rather required novel and non-obvious solutions to problems and shortcomings in the art at the time.  *See id*. at 1:6-48.  For example, claim 1 of the '439 patent includes initiating at least one of the buy-out offer and partial buy-out offer to any number of the one or more players that are eligible to win at least one jackpot for at least a portion of said at least one jackpot, said buy-out offer being initiated at any time before the multi-outcome wagering event has been completed.

18.    The inventions claimed in the '439 patent cover more than just the performance of well-understood, routine or conventional activities known in the art.  *See id*. at 1:52-3:21. For example, claim 1 of the '439 patent includes initiating at least one of the buy-out offer and partial

buy-out offer to any number of the one or more players that are eligible to win at least one jackpot for at least a portion of said at least one jackpot, said buy-out offer being initiated at any time before the multi-outcome wagering event has been completed.

19.     The '439 patent claims provide technological solutions to technological problems. The written description of the '439 patent describes in technical detail each of the elements of the claims.  *See id*. at 1:52-3:21 and Figs. 1-3.  For example, claim 1 of the '439 patent includes providing one or more wagering input devices in communication with a system controller through which the one or more players may participate in the multi-outcome wagering event.

20.     Each of the claims of the '439 patent capture the improvements described and illustrated in the specification.  *See id*. at 1:52-3:21. For example, claim 1 of the '439 patent includes initiating at least one of the buy-out offer and partial buy-out offer to any number of the one or more players that are eligible to win at least one jackpot for at least a portion of said at least one jackpot, said buy-out offer being initiated at any time before the multi-outcome wagering event has been completed.

21.     The written description describes each of the elements such that persons of ordinary skill in the art understand what the claims and their elements cover and how the non-conventional and non-generic combination of claim elements differ markedly from, and improved upon, the art. *See id*. at 1:52-3:21. For example, claim 1 of the '439 patent includes initiating at least one of the buy-out offer and partial buy-out offer to any number of the one or more players that are eligible to win at least one jackpot for at least a portion of said at least one jackpot, said buy-out offer being initiated at any time before the multi-outcome wagering event has been completed.

22.     Viewed in light of the specification of the '439 patent, the claims are neither directed to any mathematical concepts, certain methods of organizing human activity, nor mental

processes.  *See id*. at 1:52-3:21. For example, claim 1 of the '439 patent includes initiating at least one of the buy-out offer and partial buy-out offer to any number of the one or more players that are eligible to win at least one jackpot for at least a portion of said at least one jackpot, said buy-out offer being initiated at any time before the multi-outcome wagering event has been completed.

23.     The claims of the '439 patent are neither directed to the use of a general-purpose computer nor generalized steps to be performed on a computer using conventional activity.  *See id*. at 1:52-3:21 and Figs.1-3.  For example, claim 1 of the '439 patent includes providing one or more wagering input devices in communication with a system controller through which the one or more players may participate in the multi-outcome wagering event.

24.     The claims of the '439 patent do not preempt the field of their inventions or preclude the use of other methods and systems because the claims recite specific elements that include more than the performance of well-understood, routine, and conventional activities previously known to the art.  *See id*. at 1:52-3:21.  For example, claim 1 of the '439 patent includes initiating at least one of the buy-out offer and partial buy-out offer to any number of the one or more players that are eligible to win at least one jackpot for at least a portion of said at least one jackpot, said buy-out offer being initiated at any time before the multi-outcome wagering event has been completed.

### *US Patent No. 9,117,341*

25.     On August 25, 2015, the USPTO duly and legally issued the '341 patent entitled "Wagering Apparatus, Methods and Systems" to Bernard J. Marantelli.  The '341 patent has 40 claims.  A true and correct copy of the '341 patent is attached to this Complaint as **Exhibit 2** (hereinafter referred to as the "'341 patent").

26.     The inventions of the '341 patent resolve technical problems related to how to enable a user of a remote wagering input device in communication with a sever via a communications interface to submit a wagering on a wagering event via a user interface and dispose of that wager prior to a conclusion of the wagering event. *See* '341 patent, 1:52-3:21. For example, claim 31 of the '341 patent includes a system controller configured to communicate with the one or more wagering input devices, said system controller configured to initiate one or more of at least one of a buy-out offer and a partial buy-out offer to any number of the one or more players before the wagering event has been completed.

27.     The technological improvements described and claimed in the '341 patent were neither conventional nor generic at the time of their invention, but rather required novel and non-obvious solutions to problems and shortcomings in the art at the time. *See id.*at 1:6-48. For example, claim 31 of the '341 patent includes a system controller configured to communicate with the one or more wagering input devices, said system controller configured to initiate one or more of at least one of a buy-out offer and a partial buy-out offer to any number of the one or more players before the wagering event has been completed.

28.     The inventions claimed in the '341 patent cover more than just the performance of well-understood, routine or conventional activities known in the art. *See id.* at 1:52-3:21. For example, claim 31 of the '341 patent includes a system controller configured to communicate with the one or more wagering input devices, said system controller configured to initiate one or more of at least one of a buy-out offer and a partial buy-out offer to any number of the one or more players before the wagering event has been completed.

29.     The '341 patent claims provide technological solutions to technological problems. The written description of the '341 patent describes in technical detail each of the elements of the

claims.  *See id.* at 1:52-3:21 and Figs. 1-3.  For example, claim 31 of the '341 patent includes a system controller configured to communicate with the one or more wagering input devices, said system controller configured to initiate one or more of at least one of a buy-out offer and a partial buy-out offer to any number of the one or more players before the wagering event has been completed.

30.     Each of the claims of the '341 patent capture the improvements described and illustrated in the specification.  *See id.* at 1:52-3:21.  For example, claim 31 of the '341 patent includes a system controller configured to communicate with the one or more wagering input devices, said system controller configured to initiate one or more of at least one of a buy-out offer and a partial buy-out offer to any number of the one or more players before the wagering event has been completed.

31.     The written description describes each of the elements such that persons of ordinary skill in the art understand what the claims and their elements cover and how the non-conventional and non-generic combination of claim elements differ markedly from, and improved upon, the art. *See id.* at 1:52-3:21. For example, claim 31 of the '341 patent includes a system controller configured to communicate with the one or more wagering input devices, said system controller configured to initiate one or more of at least one of a buy-out offer and a partial buy-out offer to any number of the one or more players before the wagering event has been completed.

32.     Viewed in light of the specification of the '341 patent, the claims are neither directed to any mathematical concepts, certain methods of organizing human activity, nor mental processes.  *See id.* at 1:52-3:21. For example, claim 31 of the '341 patent includes a system controller configured to communicate with the one or more wagering input devices, said system

9

controller configured to initiate one or more of at least one of a buy-out offer and a partial buy-out offer to any number of the one or more players before the wagering event has been completed.

33.     The claims of the '341 patent are neither directed to the use of a general-purpose computer nor generalized steps to be performed on a computer using conventional activity.  *See id*. at 1:52-3:21 and Figs.1-3.  For example, claim 31 of the '341 patent includes a system controller configured to communicate with the one or more wagering input devices, said system controller configured to initiate one or more of at least one of a buy-out offer and a partial buy-out offer to any number of the one or more players before the wagering event has been completed.

34.     The claims of the '341 patent do not preempt the field of their inventions or preclude the use of other methods and systems because the claims recite specific elements that include more than the performance of well-understood, routine, and conventional activities previously known to the art.  *See id*. at 1:52-3:21. For example, claim 31 of the '341 patent includes a system controller configured to communicate with the one or more wagering input devices, said system controller configured to initiate one or more of at least one of a buy-out offer and a partial buy-out offer to any number of the one or more players before the wagering event has been completed.

### *US Patent No. 9,275,516*

35.     On March 1, 2016, the USPTO duly and legally issued the '516 patent entitled "Wagering Apparatus, Methods and Systems" to Bernard J. Marantelli.  The '516 patent has 75 claims.  A true and correct copy of the '516 patent is attached to this Complaint as **Exhibit 3** (hereinafter referred to as the "'516 patent").

36.     The inventions of the '516 patent resolve technical problems related to how to enable a user of a remote wagering input device in communication with a sever via a

communications interface to submit a wagering on a wagering event via a user interface and dispose of that wager prior to a conclusion of the wagering event. *See* '516 patent, 1:52-3:21. For example, claim 68 of the '516 patent includes a server system controller configured to communicate with one or more wagering devices, said server system controller programmed to cause the wagering devices to determine whether one or more tickets have the potential to correctly select the outcome of at least one wagering event, thereby qualifying any of the one or more players to win the jackpot or a portion thereof; generate and cause display of a cash out option to fully or partially end the wager to any of the one or more players that are qualified to win the jackpot or a portion thereof.

37.     The technological improvements described and claimed in the '516 patent were neither conventional nor generic at the time of their invention, but rather required novel and non-obvious solutions to problems and shortcomings in the art at the time. *See id*.at 1:6-48. For example, claim 68 of the '516 patent includes a server system controller configured to communicate with one or more wagering devices, said server system controller programmed to cause the wagering devices to determine whether one or more tickets have the potential to correctly select the outcome of at least one wagering event, thereby qualifying any of the one or more players to win the jackpot or a portion thereof; generate and cause display of a cash out option to fully or partially end the wager to any of the one or more players that are qualified to win the jackpot or a portion thereof.

38.     The inventions claimed in the '516 patent cover more than just the performance of well-understood, routine or conventional activities known in the art. *See id*. at 1:52-3:21. For example, claim 68 of the '516 patent includes a server system controller configured to communicate with one or more wagering devices, said server system controller programmed to

cause the wagering devices to determine whether one or more tickets have the potential to correctly select the outcome of at least one wagering event, thereby qualifying any of the one or more players to win the jackpot or a portion thereof; generate and cause display of a cash out option to fully or partially end the wager to any of the one or more players that are qualified to win the jackpot or a portion thereof.

39.     The '516 patent claims provide technological solutions to technological problems. The written description of the '516 patent describes in technical detail each of the elements of the claims.  *See id.* at 1:52-3:21 and Figs.1-3.  For example, claim 68 of the '516 patent includes a server system controller configured to communicate with one or more wagering devices, said server system controller programmed to cause the wagering devices to determine whether one or more tickets have the potential to correctly select the outcome of at least one wagering event, thereby qualifying any of the one or more players to win the jackpot or a portion thereof; generate and cause display of a cash out option to fully or partially end the wager to any of the one or more players that are qualified to win the jackpot or a portion thereof.

40.     Each of the claims of the '516 patent capture the improvements described and illustrated in the specification.  *See id.* at 1:52-3:21.  For example, claim 68 of the '516 patent includes a server system controller configured to communicate with one or more wagering devices, said server system controller programmed to cause the wagering devices to determine whether one or more tickets have the potential to correctly select the outcome of at least one wagering event, thereby qualifying any of the one or more players to win the jackpot or a portion thereof; generate and cause display of a cash out option to fully or partially end the wager to any of the one or more players that are qualified to win the jackpot or a portion thereof.

EAST/186510661

41.     The written description describes each of the elements such that persons of ordinary skill in the art understand what the claims and their elements cover and how the non-conventional and non-generic combination of claim elements differ markedly from, and improved upon, the art. *See id.* at 1:52-3:21.  For example, claim 68 of the '516 patent includes a server system controller configured to communicate with one or more wagering devices, said server system controller programmed to cause the wagering devices to determine whether one or more tickets have the potential to correctly select the outcome of at least one wagering event, thereby qualifying any of the one or more players to win the jackpot or a portion thereof; generate and cause display of a cash out option to fully or partially end the wager to any of the one or more players that are qualified to win the jackpot or a portion thereof.

42.     Viewed in light of the specification of the '516 patent, the claims are neither directed to any mathematical concepts, certain methods of organizing human activity, nor mental processes.  *See id.* at 1:52-3:21.  For example, claim 68 of the '516 patent includes a server system controller configured to communicate with one or more wagering devices, said server system controller programmed to cause the wagering devices to determine whether one or more tickets have the potential to correctly select the outcome of at least one wagering event, thereby qualifying any of the one or more players to win the jackpot or a portion thereof; generate and cause display of a cash out option to fully or partially end the wager to any of the one or more players that are qualified to win the jackpot or a portion thereof.

43.     The claims of the '516 patent are neither directed to the use of a general-purpose computer nor generalized steps to be performed on a computer using conventional activity.  *See id.* at 1:52-3:21 and Figs.1-3.  For example, claim 68 of the '516 patent includes a server system controller configured to communicate with one or more wagering devices, said server system

13

controller programmed to cause the wagering devices to determine whether one or more tickets have the potential to correctly select the outcome of at least one wagering event, thereby qualifying any of the one or more players to win the jackpot or a portion thereof; generate and cause display of a cash out option to fully or partially end the wager to any of the one or more players that are qualified to win the jackpot or a portion thereof.

44.     The claims of the '516 patent do not preempt the field of their inventions or preclude the use of other methods and systems because the claims recite specific elements that include more than the performance of well-understood, routine, and conventional activities previously known to the art.  *See id*. at 1:52-3:21.  For example, claim 68 of the '516 patent includes a server system controller configured to communicate with one or more wagering devices, said server system controller programmed to cause the wagering devices to determine whether one or more tickets have the potential to correctly select the outcome of at least one wagering event, thereby qualifying any of the one or more players to win the jackpot or a portion thereof; generate and cause display of a cash out option to fully or partially end the wager to any of the one or more players that are qualified to win the jackpot or a portion thereof.

*US Patent No. 9,424,716*

45.     On August 23, 2016, the USPTO duly and legally issued the '716 patent entitled "Wagering Apparatus, Methods and Systems" to Bernard J. Marantelli.  The '716 patent has 108 claims.  A true and correct copy of the '716 patent is attached to this Complaint as **Exhibit 4** (hereinafter referred to as the "'716 patent").

46.     The inventions of the '716 patent resolve technical problems related to how to enable a user of a remote wagering input device in communication with a sever via a communications interface to submit a wagering on a wagering event via a user interface and

14

dispose of that wager prior to a conclusion of the wagering event.  *See* '716 patent, 1:52-3:21.  For example, claim 54 of the '716 patent includes a system controller configured to communicate with the one or more wagering input devices, said system controller configured to initiate and cause display of at least one of a buy-out offer and a partial buy-out offer via the one or more wagering input devices to any number of the one or more players eligible to win before the one or more wagering events have been completed.

47.     The technological improvements described and claimed in the '716 patent were neither conventional nor generic at the time of their invention, but rather required novel and non-obvious solutions to problems and shortcomings in the art at the time.  *See id.*at 1:6-48.  For example, claim 54 of the '716 patent includes a system controller configured to communicate with the one or more wagering input devices, said system controller configured to initiate and cause display of at least one of a buy-out offer and a partial buy-out offer via the one or more wagering input devices to any number of the one or more players eligible to win before the one or more wagering events have been completed.

48.     The inventions claimed in the '716 patent cover more than just the performance of well-understood, routine or conventional activities known in the art.  *See id.* at 1:52-3:21.  For example, claim 54 of the '716 patent includes a system controller configured to communicate with the one or more wagering input devices, said system controller configured to initiate and cause display of at least one of a buy-out offer and a partial buy-out offer via the one or more wagering input devices to any number of the one or more players eligible to win before the one or more wagering events have been completed.

49.     The '716 patent claims provide technological solutions to technological problems. The written description of the '716 patent describes in technical detail each of the elements of the

claims.  *See id*. at 1:52-3:21 and Figs. 1-3.  For example, claim 54 of the '716 patent includes a system controller configured to communicate with the one or more wagering input devices, said system controller configured to initiate and cause display of at least one of a buy-out offer and a partial buy-out offer via the one or more wagering input devices to any number of the one or more players eligible to win before the one or more wagering events have been completed.

50.    Each of the claims of the '716 patent capture the improvements described and illustrated in the specification.  *See id*. at 1:52-3:21.  For example, claim 54 of the '716 patent includes a system controller configured to communicate with the one or more wagering input devices, said system controller configured to initiate and cause display of at least one of a buy-out offer and a partial buy-out offer via the one or more wagering input devices to any number of the one or more players eligible to win before the one or more wagering events have been completed.

51.    The written description describes each of the elements such that persons of ordinary skill in the art understand what the claims and their elements cover and how the non-conventional and non-generic combination of claim elements differ markedly from, and improved upon, the art. *See id*. at 1:52-3:21.  For example, claim 54 of the '716 patent includes a system controller configured to communicate with the one or more wagering input devices, said system controller configured to initiate and cause display of at least one of a buy-out offer and a partial buy-out offer via the one or more wagering input devices to any number of the one or more players eligible to win before the one or more wagering events have been completed.

52.    Viewed in light of the specification of the '716 patent, the claims are neither directed to any mathematical concepts, certain methods of organizing human activity, nor mental processes.  *See id*. at 1:52-3:21.  For example, claim 54 of the '716 patent includes a system controller configured to communicate with the one or more wagering input devices, said system

16

controller configured to initiate and cause display of at least one of a buy-out offer and a partial buy-out offer via the one or more wagering input devices to any number of the one or more players eligible to win before the one or more wagering events have been completed.

53.     The claims of the '716 patent are neither directed to the use of a general-purpose computer nor generalized steps to be performed on a computer using conventional activity.  *See id*. at 1:52-3:21 and Figs.1-3.  For example, claim 54 of the '716 patent includes a system controller configured to communicate with the one or more wagering input devices, said system controller configured to initiate and cause display of at least one of a buy-out offer and a partial buy-out offer via the one or more wagering input devices to any number of the one or more players eligible to win before the one or more wagering events have been completed.

54.     The claims of the '716 patent do not preempt the field of their inventions or preclude the use of other methods and systems because the claims recite specific elements that include more than the performance of well-understood, routine, and conventional activities previously known to the art.  *See id*. at 1:52-3:21.  For example, claim 54 of the '716 patent includes a system controller configured to communicate with the one or more wagering input devices, said system controller configured to initiate and cause display of at least one of a buy-out offer and a partial buy-out offer via the one or more wagering input devices to any number of the one or more players eligible to win before the one or more wagering events have been completed.

### US Patent No. 9,704,338

55.     On July 11, 2017, the USPTO duly and legally issued the '338 patent entitled "Wagering Apparatus, Methods and Systems" to Bernard J. Marantelli.  The '338 patent has 34 claims.  A true and correct copy of the '338 patent is attached to this Complaint as **Exhibit 5** (hereinafter referred to as the "338 patent").

56.     The inventions of the '338 patent resolve technical problems related to how to enable a user of a remote wagering input device in communication with a sever via a communications interface to submit a wagering on a wagering event via a user interface and dispose of that wager prior to a conclusion of the wagering event.  *See* '338 patent, 1:52-3:21.  For example, claim 21 of the '338 patent includes one or more wagering devices in communication with a system controller through which one or more players may participate in one or more wagering events and with the one or more wagering devices configured to display at least one proposal to fully or partially buyout or cash-in to any number of the one or more players prior to completion of the one or more wagering events and issue a credit, tokens, currency, coupon, voucher or an award to any of the one or more players accepting the at least one proposal, wherein the amount of proposal is variable and based on at least one of a calculated probability, an originator of the proposal, a negotiation, the one or more players or a third party.

57.     The technological improvements described and claimed in the '338 patent were neither conventional nor generic at the time of their invention, but rather required novel and non-obvious solutions to problems and shortcomings in the art at the time.  *See id.*at 1:6-48.  For example, claim 21 of the '338 patent includes one or more wagering devices in communication with a system controller through which one or more players may participate in one or more wagering events and with the one or more wagering devices configured to display at least one proposal to fully or partially buyout or cash-in to any number of the one or more players prior to completion of the one or more wagering events and issue a credit, tokens, currency, coupon, voucher or an award to any of the one or more players accepting the at least one proposal, wherein the amount of proposal is variable and based on at least one of a calculated probability, an originator of the proposal, a negotiation, the one or more players or a third party.

58.     The inventions claimed in the '338 patent cover more than just the performance of well-understood, routine or conventional activities known in the art.  *See id.* at 1:52-3:21.  For example, claim 21 of the '338 patent includes one or more wagering devices in communication with a system controller through which one or more players may participate in one or more wagering events and with the one or more wagering devices configured to display at least one proposal to fully or partially buyout or cash-in to any number of the one or more players prior to completion of the one or more wagering events and issue a credit, tokens, currency, coupon, voucher or an award to any of the one or more players accepting the at least one proposal, wherein the amount of proposal is variable and based on at least one of a calculated probability, an originator of the proposal, a negotiation, the one or more players or a third party.

59.     The '338 patent claims provide technological solutions to technological problems. The written description of the '338 patent describes in technical detail each of the elements of the claims.  *See id.* at 1:52-3:21 and Figs.1-3.  For example, claim 21 of the '338 patent includes one or more wagering devices in communication with a system controller through which one or more players may participate in one or more wagering events and with the one or more wagering devices configured to display at least one proposal to fully or partially buyout or cash-in to any number of the one or more players prior to completion of the one or more wagering events and issue a credit, tokens, currency, coupon, voucher or an award to any of the one or more players accepting the at least one proposal, wherein the amount of proposal is variable and based on at least one of a calculated probability, an originator of the proposal, a negotiation, the one or more players or a third party.

60.     Each of the claims of the '338 patent capture the improvements described and illustrated in the specification.  *See id.* at 1:52-3:21.  For example, claim 21 of the '338 patent

19

includes one or more wagering devices in communication with a system controller through which one or more players may participate in one or more wagering events and with the one or more wagering devices configured to display at least one proposal to fully or partially buyout or cash-in to any number of the one or more players prior to completion of the one or more wagering events and issue a credit, tokens, currency, coupon, voucher or an award to any of the one or more players accepting the at least one proposal, wherein the amount of proposal is variable and based on at least one of a calculated probability, an originator of the proposal, a negotiation, the one or more players or a third party.

61.     The written description describes each of the elements such that persons of ordinary skill in the art understand what the claims and their elements cover and how the non-conventional and non-generic combination of claim elements differ markedly from, and improved upon, the art. *See id.* at 1:52-3:21.  For example, claim 21 of the '338 patent includes one or more wagering devices in communication with a system controller through which one or more players may participate in one or more wagering events and with the one or more wagering devices configured to display at least one proposal to fully or partially buyout or cash-in to any number of the one or more players prior to completion of the one or more wagering events and issue a credit, tokens, currency, coupon, voucher or an award to any of the one or more players accepting the at least one proposal, wherein the amount of proposal is variable and based on at least one of a calculated probability, an originator of the proposal, a negotiation, the one or more players or a third party.

62.     Viewed in light of the specification of the '338 patent, the claims are neither directed to any mathematical concepts, certain methods of organizing human activity, nor mental processes.  *See id.* at 1:52-3:21.  For example, claim 21 of the '338 patent includes one or more wagering devices in communication with a system controller through which one or more players

20

may participate in one or more wagering events and with the one or more wagering devices configured to display at least one proposal to fully or partially buyout or cash-in to any number of the one or more players prior to completion of the one or more wagering events and issue a credit, tokens, currency, coupon, voucher or an award to any of the one or more players accepting the at least one proposal, wherein the amount of proposal is variable and based on at least one of a calculated probability, an originator of the proposal, a negotiation, the one or more players or a third party.

63.     The claims of the '338 patent are neither directed to the use of a general-purpose computer nor generalized steps to be performed on a computer using conventional activity.  *See id*. at 1:52-3:21 and Figs.1-3.  For example, claim 21 of the '338 patent includes one or more wagering devices in communication with a system controller through which one or more players may participate in one or more wagering events and with the one or more wagering devices configured to display at least one proposal to fully or partially buyout or cash-in to any number of the one or more players prior to completion of the one or more wagering events and issue a credit, tokens, currency, coupon, voucher or an award to any of the one or more players accepting the at least one proposal, wherein the amount of proposal is variable and based on at least one of a calculated probability, an originator of the proposal, a negotiation, the one or more players or a third party.

64.     The claims of the '338 patent do not preempt the field of their inventions or preclude the use of other methods and systems because the claims recite specific elements that include more than the performance of well-understood, routine, and conventional activities previously known to the art. *See id*. at 1:52-3:21.  For example, claim 21 of the '338 patent includes one or more wagering devices in communication with a system controller through which one or

more players may participate in one or more wagering events and with the one or more wagering devices configured to display at least one proposal to fully or partially buyout or cash-in to any number of the one or more players prior to completion of the one or more wagering events and issue a credit, tokens, currency, coupon, voucher or an award to any of the one or more players accepting the at least one proposal, wherein the amount of proposal is variable and based on at least one of a calculated probability, an originator of the proposal, a negotiation, the one or more players or a third party.

### US Patent No. 10,970,969

65.     On April 6, 2021, the USPTO duly and legally issued the '969 patent entitled "Wagering Apparatus, Methods and Systems" to Bernard J. Marantelli.  The '969 patent has 30 claims.  A true and correct copy of the '969 patent is attached to this Complaint as **Exhibit 6** (hereinafter referred to as the "969 patent").

66.     The inventions of the '969 patent resolve technical problems related to how to enable a user of a remote wagering input device in communication with a sever via a communications interface to submit a wagering on a wagering event via a user interface and dispose of that wager prior to a conclusion of the wagering event.  *See* '969 patent, 2:6-4:31.  For example, claim 1 of the '969 patent includes causing a central server system to generate a cash out offer for a player based on a wager and progress of a sporting event, by 1) monitoring progress of the sporting event, wherein the progress of the sporting event may comprise at least a current status; 2) identifying that the player's wager is active; and determining an amount of the cash out offer; and 3) causing the central server system to transmit the cash out offer to the wagering input device, prompting the player to accept or reject the cash out offer.

22

67.    The technological improvements described and claimed in the '969 patent were neither conventional nor generic at the time of their invention, but rather required novel and non-obvious solutions to problems and shortcomings in the art at the time.  *See id*.at 1:6-48.  For example, claim 1 of the '969 patent includes causing a central server system to generate a cash out offer for a player based on a wager and progress of a sporting event, by 1) monitoring progress of the sporting event, wherein the progress of the sporting event may comprise at least a current status; 2) identifying that the player's wager is active; and determining an amount of the cash out offer; and 3) causing the central server system to transmit the cash out offer to the wagering input device, prompting the player to accept or reject the cash out offer.

68.    The inventions claimed in the '969 patent cover more than just the performance of well-understood, routine or conventional activities known in the art.  *See id*. at 1:52-3:21.  For example, claim 1 of the '969 patent includes causing a central server system to generate a cash out offer for a player based on a wager and progress of a sporting event, by 1) monitoring progress of the sporting event, wherein the progress of the sporting event may comprise at least a current status; 2) identifying that the player's wager is active; and determining an amount of the cash out offer; and 3) causing the central server system to transmit the cash out offer to the wagering input device, prompting the player to accept or reject the cash out offer.

69.    The '969 patent claims provide technological solutions to technological problems. The written description of the '969 patent describes in technical detail each of the elements of the claims. *See id*. at 1:52-3:21 and Figs.1-3.  For example, claim 1 of the '969 patent includes causing a central server system to generate a cash out offer for a player based on a wager and progress of a sporting event, by 1) monitoring progress of the sporting event, wherein the progress of the sporting event may comprise at least a current status; 2) identifying that the player's wager is

23

active; and determining an amount of the cash out offer; and 3) causing the central server system to transmit the cash out offer to the wagering input device, prompting the player to accept or reject the cash out offer.

70.     Each of the claims of the '969 patent capture the improvements described and illustrated in the specification.  *See id.* at 1:52-3:21.  For example, claim 1 of the '969 patent includes causing a central server system to generate a cash out offer for a player based on a wager and progress of a sporting event, by 1) monitoring progress of the sporting event, wherein the progress of the sporting event may comprise at least a current status; 2) identifying that the player's wager is active; and determining an amount of the cash out offer; and 3) causing the central server system to transmit the cash out offer to the wagering input device, prompting the player to accept or reject the cash out offer.

71.     The written description describes each of the elements such that persons of ordinary skill in the art understand what the claims and their elements cover and how the non-conventional and non-generic combination of claim elements differ markedly from, and improved upon, the art. *See id.* at 1:52-3:21.  For example, claim 1 of the '969 patent includes causing a central server system to generate a cash out offer for a player based on a wager and progress of a sporting event, by 1) monitoring progress of the sporting event, wherein the progress of the sporting event may comprise at least a current status; 2) identifying that the player's wager is active; and determining an amount of the cash out offer; and 3) causing the central server system to transmit the cash out offer to the wagering input device, prompting the player to accept or reject the cash out offer.

72.     Viewed in light of the specification of the '969 patent, the claims are neither directed to any mathematical concepts, certain methods of organizing human activity, nor mental processes. *See id.* at 1:52-3:21.  For example, claim 1 of the '969 patent includes causing a central

server system to generate a cash out offer for a player based on a wager and progress of a sporting event, by 1) monitoring progress of the sporting event, wherein the progress of the sporting event may comprise at least a current status; 2) identifying that the player's wager is active; and determining an amount of the cash out offer; and 3) causing the central server system to transmit the cash out offer to the wagering input device, prompting the player to accept or reject the cash out offer.

73.     The claims of the '969 patent are neither directed to the use of a general-purpose computer nor generalized steps to be performed on a computer using conventional activity.  *See id*. at 1:52-3:21 and Figs.1-3.  For example, claim 1 of the '969 patent includes causing a central server system to generate a cash out offer for a player based on a wager and progress of a sporting event, by 1) monitoring progress of the sporting event, wherein the progress of the sporting event may comprise at least a current status; 2) identifying that the player's wager is active; and determining an amount of the cash out offer; and 3) causing the central server system to transmit the cash out offer to the wagering input device, prompting the player to accept or reject the cash out offer.

74.     The claims of the '969 patent do not preempt the field of their inventions or preclude the use of other methods and systems because the claims recite specific elements that include more than the performance of well-understood, routine, and conventional activities previously known to the art.  *See id*. at 1:52-3:21.  For example, claim 1 of the '969 patent includes causing a central server system to generate a cash out offer for a player based on a wager and progress of a sporting event, by 1) monitoring progress of the sporting event, wherein the progress of the sporting event may comprise at least a current status; 2) identifying that the player's wager is active; and determining an amount of the cash out offer; and 3) causing the central server system

to transmit the cash out offer to the wagering input device, prompting the player to accept or reject the cash out offer.

### US Patent No. 10,997,822

75.     On May 4, 2021, the USPTO duly and legally issued the '822 patent entitled "Wagering Apparatus, Methods and Systems" to Bernard J. Marantelli.  The '822 patent has 29 claims.  A true and correct copy of the '822 patent is attached to this Complaint as **Exhibit 7** (hereinafter referred to as the "822 patent").

76.     The inventions of the '822 patent resolve technical problems related to how to enable a user of a remote wagering input device in communication with a sever via a communications interface to submit a wagering on a wagering event via a user interface and dispose of that wager prior to a conclusion of the wagering event.  *See* '822 patent, 2:6-4:31.  For example, claim 1 of the '822 patent includes  a communications interface; a processor operatively coupled to the communications interface; and a memory having programming instructions stored thereon, which, when executed by the processor, performs one or more operations, comprising identifying an acceptance of the cash out offer from the first input device prior to the end of the wagering event, processing the cash out offer, and transmitting, over the communications interface, a value of the cash out offer to the first input device.

77.     The technological improvements described and claimed in the '822 patent were neither conventional nor generic at the time of their invention, but rather required novel and non-obvious solutions to problems and shortcomings in the art at the time.  *See id.*at 1:6-48.  For example, claim 1 of the '822 patent includes  a communications interface; a processor operatively coupled to the communications interface; and a memory having programming instructions stored thereon, which, when executed by the processor, performs one or more operations, comprising

identifying an acceptance of the cash out offer from the first input device prior to the end of the wagering event, processing the cash out offer, and transmitting, over the communications interface, a value of the cash out offer to the first input device.

78.     The inventions claimed in the '822 patent cover more than just the performance of well-understood, routine or conventional activities known in the art.  *See id.* at 1:52-3:21.  For example, claim 1 of the '822 patent includes  a communications interface; a processor operatively coupled to the communications interface; and a memory having programming instructions stored thereon, which, when executed by the processor, performs one or more operations, comprising identifying an acceptance of the cash out offer from the first input device prior to the end of the wagering event, processing the cash out offer, and transmitting, over the communications interface, a value of the cash out offer to the first input device.

79.     The '822 patent claims provide technological solutions to technological problems. The written description of the '822 patent describes in technical detail each of the elements of the claims.  *See id.* at 1:52-3:21 and Figs.1-3.  For example, claim 1 of the '822 patent includes  a communications interface; a processor operatively coupled to the communications interface; and a memory having programming instructions stored thereon, which, when executed by the processor, performs one or more operations, comprising identifying an acceptance of the cash out offer from the first input device prior to the end of the wagering event, processing the cash out offer, and transmitting, over the communications interface, a value of the cash out offer to the first input device.

80.     Each of the claims of the '822 patent capture the improvements described and illustrated in the specification.  *See id.* at 1:52-3:21.  For example, claim 1 of the '822 patent includes a communications interface; a processor operatively coupled to the communications

27

interface; and a memory having programming instructions stored thereon, which, when executed by the processor, performs one or more operations, comprising identifying an acceptance of the cash out offer from the first input device prior to the end of the wagering event, processing the cash out offer, and transmitting, over the communications interface, a value of the cash out offer to the first input device.

81.     The written description describes each of the elements such that persons of ordinary skill in the art understand what the claims and their elements cover and how the non-conventional and non-generic combination of claim elements differ markedly from, and improved upon, the art. *See id*. at 1:52-3:21.  For example, claim 1 of the '822 patent includes  a communications interface; a processor operatively coupled to the communications interface; and a memory having programming instructions stored thereon, which, when executed by the processor, performs one or more operations, comprising identifying an acceptance of the cash out offer from the first input device prior to the end of the wagering event, processing the cash out offer, and transmitting, over the communications interface, a value of the cash out offer to the first input device.

82.     Viewed in light of the specification of the '822 patent, the claims are neither directed to any mathematical concepts, certain methods of organizing human activity, nor mental processes.  *See id*. at 1:52-3:21.  For example, claim 1 of the '822 patent includes  a communications interface; a processor operatively coupled to the communications interface; and a memory having programming instructions stored thereon, which, when executed by the processor, performs one or more operations, comprising identifying an acceptance of the cash out offer from the first input device prior to the end of the wagering event, processing the cash out offer, and transmitting, over the communications interface, a value of the cash out offer to the first input device.

83.     The claims of the '822 patent are neither directed to the use of a general-purpose computer nor generalized steps to be performed on a computer using conventional activity.  *See id*. at 1:52-3:21 and Figs.1-3.  For example, claim 1 of the '822 patent includes  a communications interface; a processor operatively coupled to the communications interface; and a memory having programming instructions stored thereon, which, when executed by the processor, performs one or more operations, comprising identifying an acceptance of the cash out offer from the first input device prior to the end of the wagering event, processing the cash out offer, and transmitting, over the communications interface, a value of the cash out offer to the first input device.

84.     The claims of the '822 patent do not preempt the field of their inventions or preclude the use of other methods and systems because the claims recite specific elements that include more than the performance of well-understood, routine, and conventional activities previously known to the art.  *See id*. at 1:52-3:21.  For example, claim 1 of the '822 patent includes a communications interface; a processor operatively coupled to the communications interface; and a memory having programming instructions stored thereon, which, when executed by the processor, performs one or more operations, comprising identifying an acceptance of the cash out offer from the first input device prior to the end of the wagering event, processing the cash out offer, and transmitting, over the communications interface, a value of the cash out offer to the first input device.

## **GENERAL ALLEGATIONS**

85.     On information and belief, DraftKings operates and does business under at least the names "DraftKings" and "DraftKings Sportsbook at Resorts Casino." On information and belief, DraftKings provides sportsbook services solely for DraftKings offerings.

86.     On information and belief, DraftKings operates sports and other betting games through electronic, interactive, and technological means (including the internet).

### *Accused Products*

87.     DraftKings' infringing products include its sports betting platform (i.e., DraftKings Sportsbook).  The DraftKings Sportsbook is accessible to end users through 1) DraftKings Sportsbook kiosks and/or over the counter betting at partnered casinos; 2) DraftKings Sportsbook mobile applications; and 3) DraftKings Sportsbook web applications; (collectively, the "Accused Products"). *Ways to Bet*, DRAFTKINGS https://www.draftkings.com/about/sportsbook/.

88.     DraftKings accesses and provides access to the DraftKings Sportsbook through its web-based interface, mobile applications running on computing devices, such as laptops, tablets, or mobile phones, and/or kiosks located at retail locations.  The mobile applications are available on any iOS or Android device, including any iPhone, iPad, iPod touch, Android phone or Android tablet. *DraftKings Mobile Apps*, DRAFTKINGS, https://www.draftkings.com/mobileapps.  The web-based interface is available through a web browser running on a personal computer, laptop, or other computing device. *Sign Me Up*, DRAFTKINGS, https://www.draftkings.com/; *Log In*, DRAFTKINGS SPORTSBOOK, https://sportsbook.draftkings.com. The kiosks are available at, at least, a retail location called the DraftKings Sportsbook at Resorts Casino, located at 1133 Boardwalk, Atlantic City, New Jersey 08401.

89.     DraftKings markets, advertises, sells, and offers to sell the DraftKings Sportsbook products, services and mobile applications through its root website domain draftkings.com, which includes the subdomains www.draftkings.com and https://www.draftkings.com/sportsbook.  The website and mobile applications prominently use the names "DraftKings," and "DraftKings Sportsbook" throughout.  On information and belief, the DraftKings Sportsbook website, mobile

application, and kiosks at the DraftKings Sportsbook at Resorts Casino are effectuated at least in part through, and attributable to DraftKings.

90.     The DraftKings website includes copyright notices identifying "DraftKings" as the owner and are thus attributed to Defendant. In providing information regarding the website and DraftKings, the website identifies "DraftKings Inc. Boston, MA." On information and belief, the DraftKings website is administered and operated by Defendant.

91.     DraftKings offers various types of sports betting wagers to its users, including straight bets, parlay bets, and round robins on its sports betting platform. *Bet Types, Frequently Asked Questions*, DRAFTKINGS SPORTSBOOK, https://sportsbook.draftkings.com.

92.     On information and belief, DraftKings uses and tests its products on various computing devices, including portable and mobile devices such as mobile phones, tablets, and laptops.  For example, DraftKings uses and tests its products on portable and mobile devices to develop training and video tutorials showing how to use DraftKings products and other promotional materials. *See, e.g., DK My Contests Walkthrough*, YOUTUBE, https://youtu.be/ykiiUuvkufU; *CFB Announcement*, YOUTUBE, https://youtu.be/G5A3zSWFTVg; *How To Play*, DRAFTKINGS, https://www.draftkings.com/how-to-play; *DraftKings - The App!*, YOUTUBE, https://youtu.be/xAQPboDT4mQ; *NBA Quick Hits - February 3rd*, YOUTUBE, https://www.youtube.com/watch?v=vtsvD9TbmaQ; *DraftKings Fantasy Football TV Commercial, 'Welcome to the Big Time'*, YOUTUBE, https://youtu.be/AIGap9cvu34; *DraftKings Commercial*, YOUTUBE, https://youtu.be/xo8N-fcH08g; *DraftKings Sportsbook TV Commercial, 'Golf's Biggest Weekend'*, ISPOT.TV, https://www.ispot.tv/ad/IhHV/draftkings-sportsbook-golfs-biggest-weekend; *DraftKings $750,000 Fantasy NASCAR Contest TV*

31

Commercial, 'NASCAR Returns', ISPOT.TV, https://www.ispot.tv/ad/IlA7/draftkings-750000-fantasy-nascar-contest-nascar-returns.  As  another example, DraftKings uses and tests its products in conjunction with making those products available through and/or on Apple and Android devices.  *See, e.g., Run your app on a device*, XCODE, https://help.apple.com/xcode/mac/current/#/dev60b6fbbc7; *Run Apps on a Hardware Device*, ANDROID    STUDIO    USER GUIDE, https://developer.android.com/studio/run/device.html ("[w]hen building an Android app, it's important that you always test your application on a real device before releasing it to users."). Additionally, DraftKings employs personnel for developing their games, which includes using and testing the DraftKings products on physical devices, including software engineers, mobile designers, and game analysts.

93.     The DraftKings Sportsbook uses innovative technology from the Asserted Patents. For example, the DraftKings Sportsbook provides a "Cash Out" feature that gives users the opportunity to close out their active bet before the outcome of a wagering event is decided.  *See* https://sportsbook.draftkings.com/help/quick-start-guide/5.

94.     The "Cash Out" feature allows users to secure part of their winnings or cut their losses as the odds change in or against their favor.  *See id*.

95.     The "Cash Out" feature is available for pre-game, live, future and parlay bets and can be for more or less than a user's original wagered amount, depending on how events unfold following your placement.  *See id*.  Users can determine if their bet is eligible for "Cash Out" after placing wager.  *See id*.

96.     After placing a bet, users can "Cash Out" of their wager early (i.e., before a conclusion of the wagering event) by visiting 'My Bets' within their account and selecting a yellow

32

Cash Out button. *See id*. The DraftKings Sportsbook then confirms the user wants to cash out of their wager. Payouts in are made upon confirming "Cash Out" and the money is deposited in the user's account immediately. *See id*.

97.     The "Cash Out" feature is available on each of the Asserted Products. *See id*.

98.     DraftKings directs users to use the "Cash Out" feature and provides detailed instructions on how to cash out of a wager. *See id*.

## *Notices of Infringement*

99.     On August 9, 2018, Colossus sent a letter via certified mail and e-mail to Defendant informing Defendant of Colossus's patent portfolio covering their proprietary cash out feature and identifying specific features/products offered by Defendant that infringe Colossus's patents. Copies of Colossus's issued patents, including the '439 patent, the '341 patent, the '516 patent, the '716 patent, and the '338 patent, were attached. A copy of this letter is attached to this Complaint as **Exhibit 8**.

100.    On August 20, 2018, Colossus sent a letter to Defendant via certified mail and e-mail requesting a response regarding Defendant's infringement of Colossus's patents. A copy of this letter is attached to this Complaint as **Exhibit 9**.

101.    On August 21, 2018, Colossus sent a letter via UPS to Defendant's legal department with copies of the previous letters dates August 9, 2018 and August 20, 2018. A copy of this letter is attached to this Complaint as **Exhibit 10**.

102.    On the same day, Colossus received an e-mail from Defendant's counsel confirming receipt of Colossus's previous letters. A copy of this e-mail is attached to this Complaint as **Exhibit 11**.

33

103.    On July 20, 2021, Colossus sent a notice letter via certified mail and e-mail to Defendant's counsel informing Defendant of the issuance of additional patents to Colossus covering their propriety cash out feature, including the '969 patent and the '822 patent, and identifying specific features/products offered by Defendant that infringe Colossus' patents.  Copies of the '969 patent and the '822 patent were provided.  A copy of this letter is attached to this Complaint as **Exhibit 12**.

104.    On July 29, 2021, Colossus received a letter from Defendant's counsel indicating they would respond on behalf of Defendant and other partner entities.  A copy of this letter is attached to this Complaint as **Exhibit 13**.

## CLAIMS FOR RELIEF

### COUNT I - INFRINGEMENT OF US PATENT NO. 8,721,439

105.    **Exhibit 14** includes a chart comparing an exemplary claim of the '439 patent  (the "Exemplary '439 patent Claim") to one or more of the Accused Products (the "'439 Accused Products").  As set forth in this chart, the '439 Accused Products practice the technology claimed by the '439 patent.  Accordingly, the Exemplary '439 Accused Products incorporated in these charts satisfy all elements of the Exemplary '439 patent Claim. Colossus therefore incorporates by reference in their allegations herein the claim chart of **Exhibit 14**.

106.    Defendant has been on actual notice of the '439 patent at least as early as about August 9, 2018, when Defendant received a notice letter from Plaintiffs.

107.    Defendant has infringed and continues to infringe, literally or under the doctrine of equivalents, one or more claims of the '439 patent by having made, used, offered to sell, sold and/or imported, without limitation, the '439 Accused Products.

108.    Defendant owns and controls the operation of the '439 Accused Products and generates substantial financial revenues therefrom. Defendant directly makes the infringing '439

34

Accused Products at least because it is solely responsible for putting the infringing system into service by directing and/or controlling the system as a whole and by obtaining the benefits therefrom, including through the Defendant's websites, mobile applications, and kiosks. Defendant further directly uses the '439 Accused Products at least because it assembled the combined infringing elements and makes them collectively available in the United States.

109.    Defendant also has and continues to infringe, literally or under the doctrine of equivalents, the Exemplary '439 patent Claim, by having its employees internally test and use these '439 Accused Products. More specifically, in order to maintain legal compliance in the United States, Defendant is required to periodically monitor and ensure that the '439 Accused Products are performing as designed and intended. Defendant is also a direct infringer by virtue of its branding and marketing activities which collectively comprise the sale and offering for sale of the Exemplary Defendant Products.

110.    Defendant has and continues to infringe, literally or under the doctrine of equivalents, the '439 patent by taking active steps to induce, encourage, facilitate, aid or otherwise cause direct infringement, either directly or under the doctrine of equivalents, by others, including but not limited to users of DraftKings Sportsbook through DraftKings' mobile application, website, and retail kiosks.

111.    Since at least after receiving actual notice of the '439 patent, Defendant has knowingly induced infringement of, and continues to knowingly induce infringement of, either directly or under the doctrine of equivalents, one or more claims of the '439 patent with specific intent that the '439 Accused Products be used by its customers, partners, and third parties to directly infringe the '439 patent, which products constitute a material part of the invention and are not staple articles or commodities of commerce suitable for substantial non-infringing use.

112.    Defendant has and continues to instruct and encourage its customers, partners, and third parties to use the '439 Accused Products in a manner that infringes at least the Exemplary '439 patent Claim. *See* https://sportsbook.draftkings.com/help/quick-start-guide/5; **Exhibit 14**.

113.    Plaintiffs are informed and believe, and on this basis allege, that the Court should award increased damages under 35 U.S.C. § 284 for willful and deliberate infringement, and find this to be an exceptional case which warrants an award of attorney's fees to Plaintiffs pursuant to 35 U.S.C. § 285.

114.    Plaintiffs have suffered and continue to suffer irreparable injury as a direct and proximate result of Defendant's infringement for which there is no adequate remedy at law. Unless Defendant is enjoined, Plaintiffs will continue to suffer such irreparable injury.

115.    The foregoing infringement on the part of Defendant has caused past and ongoing injury to Plaintiffs. Colossus is entitled to recover damages adequate to compensate for Defendant's infringement.

116.    To the extent Defendant continues, and has continued, its infringing activities noted above in an infringing manner post-notice of the '439 patent, such infringement is and will be necessarily willful and deliberate.

117.    Each of Defendant's aforesaid activities have been without authority and/or license from Plaintiffs.

### COUNT II - INFRINGEMENT OF US PATENT NO. 9,117,341

118.    **Exhibit 15** includes a chart comparing an exemplary claim of the '341 patent (the "Exemplary '341 patent Claim") to one or more of the Accused Products (the "'341 Accused Products").  As set forth in this chart, the '341 Accused Products practice the technology claimed by the '341 patent.  Accordingly, the Exemplary '341 Accused Products incorporated in these

36

charts satisfy all elements of the Exemplary '341 patent Claim. Colossus therefore incorporates by reference in their allegations herein the claim chart of **Exhibit 15**.

119.     Defendant has been on actual notice of the '341 patent at least as early as about August 9, 2018, when Defendant received a notice letter from Plaintiffs.

120.     Defendant has infringed and continues to infringe, literally or under the doctrine of equivalents, one or more claims of the '341 patent by having made, used, offered to sell, sold and/or imported, without limitation, the '341 Accused Products.

121.     Defendant owns and controls the operation of the '341 Accused Products and generates substantial financial revenues therefrom. Defendant directly makes the infringing '341 Accused Products at least because it is solely responsible for putting the infringing system into service by directing and/or controlling the system as a whole and by obtaining the benefits therefrom, including through the Defendant's websites, mobile applications, and kiosks. Defendant further directly uses the '341 Accused Products at least because it assembled the combined infringing elements and makes them collectively available in the United States.

122.     Defendant also has and continues to infringe, literally or under the doctrine of equivalents, the Exemplary '341 patent Claim, by having its employees internally test and use these '341 Accused Products. More specifically, in order to maintain legal compliance in the United States, Defendant is required to periodically monitor and ensure that the '341 Accused Products are performing as designed and intended. Defendant is also a direct infringer by virtue of its branding and marketing activities which collectively comprise the sale and offering for sale of the Exemplary Defendant Products.

123.     Defendant has and continues to infringe, literally or under the doctrine of equivalents, the '341 patent by taking active steps to induce, encourage, facilitate, aid or otherwise

37

cause direct infringement, either directly or under the doctrine of equivalents, by others, including but not limited to users of DraftKings Sportsbook through DraftKings' mobile application, website, and retail kiosks.

124.   Since at least after receiving actual notice of the '341 patent, Defendant has knowingly induced infringement of, and continues to knowingly induce infringement of, either directly or under the doctrine of equivalents, one or more claims of the '341 patent with specific intent that the '341 Accused Products be used by its customers, partners, and third parties to directly infringe the '341 patent, which products constitute a material part of the invention and are not staple articles or commodities of commerce suitable for substantial non-infringing use.

125.   Defendant has and continues to instruct and encourage its customers, partners, and third parties to use the '341 Accused Products in a manner that infringes at least the Exemplary '341 patent Claim. *See* https://sportsbook.draftkings.com/help/quick-start-guide/5; **Exhibit 15**.

126.   Plaintiffs are informed and believe, and on this basis allege, that the Court should award increased damages under 35 U.S.C. § 284 for willful and deliberate infringement, and find this to be an exceptional case which warrants an award of attorney's fees to Plaintiffs pursuant to 35 U.S.C. § 285.

127.   Plaintiffs have suffered and continue to suffer irreparable injury as a direct and proximate result of Defendant's infringement for which there is no adequate remedy at law. Unless Defendant is enjoined, Plaintiffs will continue to suffer such irreparable injury.

128.   The foregoing infringement on the part of Defendant has caused past and ongoing injury to Plaintiffs. Colossus is entitled to recover damages adequate to compensate for Defendant's infringement.

EAST/186510661

129.    To the extent Defendant continues, and has continued, its infringing activities noted above in an infringing manner post-notice of the '341 patent, such infringement is and will be necessarily willful and deliberate.

130.    Each of Defendant's aforesaid activities have been without authority and/or license from Plaintiffs.

## COUNT III - INFRINGEMENT OF US PATENT NO. 9,275,516

131.    **Exhibit 16** includes a chart comparing an exemplary claim of the '516 patent (the "Exemplary '516 patent Claim") to one or more of the Accused Products (the "'516 Accused Products"). As set forth in this chart, the '516 Accused Products practice the technology claimed by the '516 patent. Accordingly, the Exemplary '516 Accused Products incorporated in these charts satisfy all elements of the Exemplary '516 patent Claim. Colossus therefore incorporates by reference in their allegations herein the claim chart of **Exhibit 16**.

132.    Defendant has been on actual notice of the '516 patent at least as early as about August 9, 2018, when Defendant received a notice letter from Plaintiffs.

133.    Defendant has infringed and continues to infringe, literally or under the doctrine of equivalents, one or more claims of the '516 patent by having made, used, offered to sell, sold and/or imported, without limitation, the '516 Accused Products.

134.    Defendant owns and controls the operation of the '516 Accused Products and generates substantial financial revenues therefrom. Defendant directly makes the infringing '516 Accused Products at least because it is solely responsible for putting the infringing system into service by directing and/or controlling the system as a whole and by obtaining the benefits therefrom, including through the Defendant's websites, mobile applications, and kiosks.

39

Defendant further directly uses the '516 Accused Products at least because it assembled the combined infringing elements and makes them collectively available in the United States.

135.    Defendant also has and continues to infringe, literally or under the doctrine of equivalents, the Exemplary '516 patent Claim, by having its employees internally test and use these '516 Accused Products. More specifically, in order to maintain legal compliance in the United States, Defendant is required to periodically monitor and ensure that the '516 Accused Products are performing as designed and intended. Defendant is also a direct infringer by virtue of its branding and marketing activities which collectively comprise the sale and offering for sale of the Exemplary Defendant Products.

136.    Defendant has and continues to infringe, literally or under the doctrine of equivalents, the '516 patent by taking active steps to induce, encourage, facilitate, aid or otherwise cause direct infringement, either directly or under the doctrine of equivalents, by others, including but not limited to users of DraftKings Sportsbook through DraftKings' mobile application, website, and retail kiosks.

137.    Since at least after receiving actual notice of the '516 patent, Defendant has knowingly induced infringement of, and continues to knowingly induce infringement of, either directly or under the doctrine of equivalents, one or more claims of the '516 patent with specific intent that the '516 Accused Products be used by its customers, partners, and third parties to directly infringe the '516 patent, which products constitute a material part of the invention and are not staple articles or commodities of commerce suitable for substantial non-infringing use.

138.    Defendant has and continues to instruct and encourage its customers, partners, and third parties to use the '516 Accused Products in a manner that infringes at least the Exemplary '516 patent Claim. *See* https://sportsbook.draftkings.com/help/quick-start-guide/5; **Exhibit 16**.

40

139.    Plaintiffs are informed and believe, and on this basis allege, that the Court should award increased damages under 35 U.S.C. § 284 for willful and deliberate infringement, and find this to be an exceptional case which warrants an award of attorney's fees to Plaintiffs pursuant to 35 U.S.C. § 285.

140.    Plaintiffs have suffered and continue to suffer irreparable injury as a direct and proximate result of Defendant's infringement for which there is no adequate remedy at law. Unless Defendant is enjoined, Plaintiffs will continue to suffer such irreparable injury.

141.    The foregoing infringement on the part of Defendant has caused past and ongoing injury to Plaintiffs. Colossus is entitled to recover damages adequate to compensate for Defendant's infringement.

142.    To the extent Defendant continues, and has continued, its infringing activities noted above in an infringing manner post-notice of the '516 patent, such infringement is and will be necessarily willful and deliberate.

143.    Each of Defendant's aforesaid activities have been without authority and/or license from Plaintiffs.

**COUNT IV - INFRINGEMENT OF US PATENT NO. 9,424,716**

144.    **Exhibit 17** includes a chart comparing an exemplary claim of the '716 patent (the "Exemplary '716 patent Claim") to one or more of the Accused Products (the "'716 Accused Products"). As set forth in this chart, the '716 Accused Products practice the technology claimed by the '716 patent. Accordingly, the Exemplary '716 Accused Products incorporated in these charts satisfy all elements of the Exemplary '716 patent Claim. Colossus therefore incorporates by reference in their allegations herein the claim chart of **Exhibit 17**.

41

145.    Defendant has been on actual notice of the '716 patent at least as early as about August 9, 2018, when Defendant received a notice letter from Plaintiffs.

146.    Defendant has infringed and continues to infringe, literally or under the doctrine of equivalents, one or more claims of the '716 patent by having made, used, offered to sell, sold and/or imported, without limitation, the '716 Accused Products.

147.    Defendant owns and controls the operation of the '716 Accused Products and generates substantial financial revenues therefrom. Defendant directly makes the infringing '716 Accused Products at least because it is solely responsible for putting the infringing system into service by directing and/or controlling the system as a whole and by obtaining the benefits therefrom, including through the Defendant's websites, mobile applications, and kiosks. Defendant further directly uses the '716 Accused Products at least because it assembled the combined infringing elements and makes them collectively available in the United States.

148.    Defendant also has and continues to infringe, literally or under the doctrine of equivalents, the Exemplary '716 patent Claim, by having its employees internally test and use these '716 Accused Products. More specifically, in order to maintain legal compliance in the United States, Defendant is required to periodically monitor and ensure that the '716 Accused Products are performing as designed and intended. Defendant is also a direct infringer by virtue of its branding and marketing activities which collectively comprise the sale and offering for sale of the Exemplary Defendant Products.

149.    Defendant has and continues to infringe, literally or under the doctrine of equivalents, the '716 patent by taking active steps to induce, encourage, facilitate, aid or otherwise cause direct infringement, either directly or under the doctrine of equivalents, by others, including

42

but not limited to users of DraftKings Sportsbook through DraftKings' mobile application, website, and retail kiosks.

150.    Since at least after receiving actual notice of the '716 patent, Defendant has knowingly induced infringement of, and continues to knowingly induce infringement of, either directly or under the doctrine of equivalents, one or more claims of the '716 patent with specific intent that the '716 Accused Products be used by its customers, partners, and third parties to directly infringe the '716 patent, which products constitute a material part of the invention and are not staple articles or commodities of commerce suitable for substantial non-infringing use.

151.    Defendant  has and continues to instruct and encourage its customers, partners, and third parties to use the '716 Accused Products in a manner that infringes at least the Exemplary '716 patent Claim. *See* https://sportsbook.draftkings.com/help/quick-start-guide/5; **Exhibit 17**.

152.    Plaintiffs are informed and believe, and on this basis allege, that the Court should award increased damages under 35 U.S.C. § 284 for willful and deliberate infringement, and find this to be an exceptional case which warrants an award of attorney's fees to Plaintiffs pursuant to 35 U.S.C. § 285.

153.    Plaintiffs have suffered and continue to suffer irreparable injury as a direct and proximate result of Defendant's infringement for which there is no adequate remedy at law. Unless Defendant is enjoined, Plaintiffs will continue to suffer such irreparable injury.

154.    The foregoing infringement on the part of Defendant has caused past and ongoing injury to Plaintiffs. Colossus is entitled to recover damages adequate to compensate for Defendant's infringement.

155.    To the extent Defendant continues, and has continued, its infringing activities noted above in an infringing manner post-notice of the '716 patent, such infringement is and will be necessarily willful and deliberate.

156.     Each of Defendant's aforesaid activities have been without authority and/or license from Plaintiffs.

## COUNT V - INFRINGEMENT OF US PATENT NO. 9,704,338

157.    **Exhibit 18** includes a chart comparing an exemplary claim of the '516 patent (the "Exemplary '338 patent Claim") to one or more of the Accused Products (the "'338 Accused Products").  As set forth in this chart, the '338 Accused Products practice the technology claimed by the '338 patent.  Accordingly, the Exemplary '338 Accused Products incorporated in these charts satisfy all elements of the Exemplary '338 patent Claim. Colossus therefore incorporates by reference in their allegations herein the claim chart of **Exhibit 18**.

158.    Defendant has been on actual notice of the '338 patent at least as early as about August 9, 2018, when Defendant received a notice letter from Plaintiffs.

159.    Defendant has infringed and continues to infringe, literally or under the doctrine of equivalents, one or more claims of the '338 patent by having made, used, offered to sell, sold and/or imported, without limitation, the '338 Accused Products.

160.    Defendant owns and controls the operation of the '338 Accused Products and generates substantial financial revenues therefrom. Defendant directly makes the infringing '338 Accused Products at least because it is solely responsible for putting the infringing system into service by directing and/or controlling the system as a whole and by obtaining the benefits therefrom, including through the Defendant's websites, mobile applications, and kiosks.

44

Defendant further directly uses the '338 Accused Products at least because it assembled the combined infringing elements and makes them collectively available in the United States.

161.    Defendant also has and continues to infringe, literally or under the doctrine of equivalents, the Exemplary '338 patent Claim, by having its employees internally test and use these '338 Accused Products. More specifically, in order to maintain legal compliance in the United States, Defendant is required to periodically monitor and ensure that the '338 Accused Products are performing as designed and intended. Defendant is also a direct infringer by virtue of its branding and marketing activities which collectively comprise the sale and offering for sale of the Exemplary Defendant Products.

162.    Defendant has and continues to infringe, literally or under the doctrine of equivalents, the '338 patent by taking active steps to induce, encourage, facilitate, aid or otherwise cause direct infringement, either directly or under the doctrine of equivalents, by others, including but not limited to users of DraftKings Sportsbook through DraftKings' mobile application, website, and retail kiosks.

163.    Since at least after receiving actual notice of the '338 patent, Defendant has knowingly induced infringement of, and continues to knowingly induce infringement of, either directly or under the doctrine of equivalents, one or more claims of the '338 patent with specific intent that the '338 Accused Products be used by its customers, partners, and third parties to directly infringe the '338 patent, which products constitute a material part of the invention and are not staple articles or commodities of commerce suitable for substantial non-infringing use.

164.    Defendant has and continues to instruct and encourage its customers, partners, and third parties to use the '338 Accused Products in a manner that infringes at least the Exemplary '338 patent Claim. *See* https://sportsbook.draftkings.com/help/quick-start-guide/5; **Exhibit 18**.

45

165.    Plaintiffs are informed and believe, and on this basis allege, that the Court should award increased damages under 35 U.S.C. § 284 for willful and deliberate infringement, and find this to be an exceptional case which warrants an award of attorney's fees to Plaintiffs pursuant to 35 U.S.C. § 285.

166.    Plaintiffs have suffered and continue to suffer irreparable injury as a direct and proximate result of Defendant's infringement for which there is no adequate remedy at law. Unless Defendant is enjoined, Plaintiffs will continue to suffer such irreparable injury.

167.    The foregoing infringement on the part of Defendant has caused past and ongoing injury to Plaintiffs. Colossus is entitled to recover damages adequate to compensate for Defendant's infringement.

168.    To the extent Defendant continues, and has continued, its infringing activities noted above in an infringing manner post-notice of the '338 patent, such infringement is and will be necessarily willful and deliberate.

169.    Each of Defendant's aforesaid activities have been without authority and/or license from Plaintiffs.

**COUNT VI - INFRINGEMENT OF US PATENT NO. 10,970,969**

170.    **Exhibit 19** includes a chart comparing an exemplary claim of the '516 patent (the "Exemplary '969 patent Claim") to one or more of the Accused Products (the "'969 Accused Products"). As set forth in this chart, the '969 Accused Products practice the technology claimed by the '969 patent. Accordingly, the Exemplary '969 Accused Products incorporated in these charts satisfy all elements of the Exemplary '969 patent Claim. Colossus therefore incorporates by reference in their allegations herein the claim chart of **Exhibit 19**.

171.    Defendant has been on actual notice of the '969 patent at least as early as about August 9, 2018, when Defendant received a notice letter from Plaintiffs.

172.    Defendant has infringed and continues to infringe, literally or under the doctrine of equivalents, one or more claims of the '969 patent by having made, used, offered to sell, sold and/or imported, without limitation, the '969 Accused Products.

173.    Defendant owns and controls the operation of the '969 Accused Products and generates substantial financial revenues therefrom. Defendant directly makes the infringing '969 Accused Products at least because it is solely responsible for putting the infringing system into service by directing and/or controlling the system as a whole and by obtaining the benefits therefrom, including through the Defendant's websites, mobile applications, and kiosks. Defendant further directly uses the '969 Accused Products at least because it assembled the combined infringing elements and makes them collectively available in the United States.

174.    Defendant also has and continues to infringe, literally or under the doctrine of equivalents, the Exemplary '969 patent Claim, by having its employees internally test and use these '969 Accused Products. More specifically, in order to maintain legal compliance in the United States, Defendant is required to periodically monitor and ensure that the '969 Accused Products are performing as designed and intended. Defendant is also a direct infringer by virtue of its branding and marketing activities which collectively comprise the sale and offering for sale of the Exemplary Defendant Products.

175.    Defendant has and continues to infringe, literally or under the doctrine of equivalents, the '969 patent by taking active steps to induce, encourage, facilitate, aid or otherwise cause direct infringement, either directly or under the doctrine of equivalents, by others, including

47

but not limited to users of DraftKings Sportsbook through DraftKings' mobile application, website, and retail kiosks.

176.    Since at least after receiving actual notice of the '969 patent, Defendant has knowingly induced infringement of, and continues to knowingly induce infringement of, either directly or under the doctrine of equivalents, one or more claims of the '969 patent with specific intent that the '969 Accused Products be used by its customers, partners, and third parties to directly infringe the '969 patent, which products constitute a material part of the invention and are not staple articles or commodities of commerce suitable for substantial non-infringing use.

177.    Defendant  has and continues to instruct and encourage its customers, partners, and third parties to use the '969 Accused Products  in a manner that infringes at least the Exemplary '969 patent Claim. *See* https://sportsbook.draftkings.com/help/quick-start-guide/5; **Exhibit 19**.

178.    Plaintiffs are informed and believe, and on this basis allege, that the Court should award increased damages under 35 U.S.C. § 284 for willful and deliberate infringement, and find this to be an exceptional case which warrants an award of attorney's fees to Plaintiffs pursuant to 35 U.S.C. § 285.

179.    Plaintiffs have suffered and continue to suffer irreparable injury as a direct and proximate result of Defendant's infringement for which there is no adequate remedy at law. Unless Defendant is enjoined, Plaintiffs will continue to suffer such irreparable injury.

180.    The foregoing infringement on the part of Defendant has caused past and ongoing injury to Plaintiffs. Colossus is entitled to recover damages adequate to compensate for Defendant's infringement.

181.    To the extent Defendant continues, and has continued, its infringing activities noted above in an infringing manner post-notice of the '969 patent, such infringement is and will be necessarily willful and deliberate.

182.    Each of Defendant's aforesaid activities have been without authority and/or license from Plaintiffs.

### COUNT VII - INFRINGEMENT OF US PATENT NO. 10,997,822

183.    **Exhibit 20** includes a chart comparing an exemplary claim of the '516 patent (the "Exemplary '822 patent Claim") to one or more of the Accused Products (the "'822 Accused Products"). As set forth in this chart, the '822 Accused Products practice the technology claimed by the '822 patent. Accordingly, the Exemplary '822 Accused Products incorporated in these charts satisfy all elements of the Exemplary '822 patent Claim. Colossus therefore incorporates by reference in their allegations herein the claim chart of **Exhibit 20**.

184.    Defendant has been on actual notice of the '822 patent at least as early as about August 9, 2018, when Defendant received a notice letter from Plaintiffs.

185.    Defendant has infringed and continues to infringe, literally or under the doctrine of equivalents, one or more claims of the '822 patent by having made, used, offered to sell, sold and/or imported, without limitation, the '822 Accused Products.

186.    Defendant owns and controls the operation of the '822 Accused Products and generates substantial financial revenues therefrom. Defendant directly makes the infringing '822 Accused Products at least because it is solely responsible for putting the infringing system into service by directing and/or controlling the system as a whole and by obtaining the benefits therefrom, including through the Defendant's websites, mobile applications, and kiosks.

49

Defendant further directly uses the '822 Accused Products at least because it assembled the combined infringing elements and makes them collectively available in the United States.

187.    Defendant also has and continues to infringe, literally or under the doctrine of equivalents, the Exemplary '822 patent Claim, by having its employees internally test and use these '822 Accused Products. More specifically, in order to maintain legal compliance in the United States, Defendant is required to periodically monitor and ensure that the '822 Accused Products are performing as designed and intended. Defendant is also a direct infringer by virtue of its branding and marketing activities which collectively comprise the sale and offering for sale of the Exemplary Defendant Products.

188.    Defendant has and continues to infringe, literally or under the doctrine of equivalents, the '822 patent by taking active steps to induce, encourage, facilitate, aid or otherwise cause direct infringement, either directly or under the doctrine of equivalents, by others, including but not limited to users of DraftKings Sportsbook through DraftKings' mobile application, website, and retail kiosks.

189.    Since at least after receiving actual notice of the '822 patent, Defendant has knowingly  induced infringement of, and continues to knowingly induce infringement of, either directly or under the doctrine of equivalents, one or more claims of the '822 patent with specific intent that the '822 Accused Products be used by its customers, partners, and third parties to directly infringe the '822 patent, which products constitute a material part of the invention and are not staple articles or commodities of commerce suitable for substantial non-infringing use.

190.    Defendant has and continues to instruct and encourage its customers, partners, and third parties to use the '822 Accused Products  in a manner that infringes at least the Exemplary '822 patent Claim. *See* https://sportsbook.draftkings.com/help/quick-start-guide/5; **Exhibit 20**.

191.     Plaintiffs are informed and believe, and on this basis allege, that the Court should award increased damages under 35 U.S.C. § 284 for willful and deliberate infringement, and find this to be an exceptional case which warrants an award of attorney's fees to Plaintiffs pursuant to 35 U.S.C. § 285.

192.     Plaintiffs have suffered and continue to suffer irreparable injury as a direct and proximate result of Defendant's infringement for which there is no adequate remedy at law. Unless Defendant is enjoined, Plaintiffs will continue to suffer such irreparable injury.

193.     The foregoing infringement on the part of Defendant has caused past and ongoing injury to Plaintiffs. Colossus is entitled to recover damages adequate to compensate for Defendant's infringement.

194.     To the extent Defendant continues, and has continued, its infringing activities noted above in an infringing manner post-notice of the '822 patent, such infringement is and will be necessarily willful and deliberate.

195.     Each of Defendant's aforesaid activities have been without authority and/or license from Plaintiffs.

## JURY DEMAND

196.     Plaintiffs request a trial by jury all issues so triable by right.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully requests that the Court find in their favor and against Defendant aa follows:

1.  That DraftKings has infringed and is infringing the Asserted Patents under 35 U.S.C. § 271;

2.  That DraftKings has willfully infringed each of the Asserted Patents;

3. Equitable relief under 35 U.S.C. § 283, including but not limited to an injunction that enjoins DraftKings and any of its officers, agents, employees, assigns, representatives, privies, successors, and those acting in concert or participation with them from infringing the Asserted Patents;

4. An award of damages sufficient to compensate Colossus for infringement of the Asserted Patents by DraftKings, together with prejudgment and post-judgment interest under 35 U.S.C. § 284;

5. That Colossus be awarded damages increased up to three times under 35 U.S.C. § 284 as a result of DraftKings' willful infringement;

6. Entry of an order compelling DraftKings to compensate Colossus for any ongoing and/or future infringement of the Asserted Patents, in an amount and under terms appropriate under the circumstances;

7. That this Court declare this an exceptional case and award Colossus reasonable attorneys' fees, costs, and expenses in accordance with 35 U.S.C. § 285; and

8. That Colossus be granted such other and further relief as the Court may deem just and proper under the circumstances.

EAST/186510661

Dated: December 1, 2021

<table>
<tr><td><u>**OF COUNSEL:**</u></td><td>**DLA PIPER LLP (US)**</td></tr>
</table>

| | |
|---|---|
| Paul A. Taufer (*Pro Hac Vice* to be Submitted) | /s/ Brian A. Biggs |
| Michael L. Burns (*Pro Hac Vice* to be Submitted) | Brian A. Biggs (DE Bar No. 5591) |
| Steven M. Kellner (*Pro Hac Vice* to be Submitted) | 1201 North Market Street, Suite 2100 |
| Gregory Ferroni (*Pro Hac Vice* to be Submitted) | Wilmington, DE 19801 |
| **DLA Piper LLP (US)** | Telephone: (302) 468-5700 |
| One Liberty Place | Facsimile: (302) 394-2341 |
| 1650 Market Street, PA 19103 | brian.biggs@us.dlapiper.com |
| Telephone: (215) 656-3385 | |
| Facsimile: (215) 606-3385 | *Attorneys for Plaintiff Diogenes Limited and* |
| paul.taufer@us.dlapiper.com | *Colossus (IOM) Limited* |
| michael.burns@us.dlapiper.com | |
| steven.kellner@us.dlapiper.com | |
| gregory.ferroni@us.dlapiper.com | |

EAST/186510661