**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| DIOGENES LIMITED, | ) | |
| COLOSSUS (IOM) LIMITED, | ) | |
| | ) | |
| Plaintiffs, | ) | C.A. No. 21-01695-MN-CJB |
| | ) | |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| DRAFTKINGS, INC., | ) | |
| a Delaware corporation, | ) | |
| | ) | |
| Defendant. | ) | |

**FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiffs Diogenes Limited and Colossus (IOM) Limited (collectively, "Plaintiffs" or "Colossus") hereby brings this First Amended Complaint for patent infringement against DraftKings Inc., a Delaware corporation ("Defendant" or "DraftKings"), and alleges as follows:

**NATURE OF THE ACTION**

1.      This is a civil action for patent infringement arising under the patent laws of the United States, 35 U.S.C. § 271 *et seq.*, by Colossus against Defendant for infringement of U.S. Patent Nos. 8,721,439 (the "'439 patent"); 9,117,341 (the "'341 patent"); 9,275,516 (the "'516 patent"); 9,424,716 (the "'716 patent"); 9,704,338 (the "'338 patent"); 10,970,969 (the "'969 patent"); 10,997,822 (the "'822 patent"); and 11,200,779 (the "'779 patent"); (collectively, the "Asserted Patents").

**PARTIES**

2.      Diogenes Limited is a company incorporated pursuant to the laws of the Isle of Man with its principal address at PO Box 227, Clinch's House, Lord Street, Douglas, IM99 1RZ, Isle

1

of Man.  Diogenes Limited is the owner by assignment of all right, title, and interest to the Asserted Patents.

3.      Colossus (IOM) Limited is a company incorporated pursuant to the laws of the Isle of Man with its principal address at PO Box 227, Clinch's House, Lord Street, Douglas, IM99 1RZ, Isle of Man.  Colossus (IOM) Limited is the exclusive licensee of the Asserted Patents in connection with various rights including use and sublicensing for business purposes.  Sublicensees are required to mark in accordance with 35 U.S.C. § 287.

4.      On information and belief, DraftKings is a corporation duly organized and existing under the laws of the State of Delaware, having executive offices at 222 Berkeley Street, Boston, Massachusetts 02116, and having regular and established places of business at 221 River Street, Hoboken, New Jersey 07030; 111 River Street, Hoboken, New Jersey 07030; and 1133 Boardwalk, Atlantic City, New Jersey 08401.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this patent infringement action under 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the patent laws of the United States, Title 35 United States Code, including 35 U.S.C. § 1, *et seq*. This complaint includes claims for patent infringement arising under the patent laws of the United States, including 35 U.S.C. § 271, *et seq*.

6.      Defendant is subject to personal jurisdiction in this District because, based on information and belief, it is deemed to reside in this judicial district by virtue of being incorporated in the State of Delaware.  Accordingly, this Court may properly exercise personal jurisdiction over Defendant.

7.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c), and/or 1400(b), at least because Defendant is deemed to reside in this judicial district by virtue of being incorporated in the State of Delaware.

## COLOSSUS'S BUSINESS

8.     Colossus provides technology and intellectual property for use in betting and gaming. An overview of relevant services is described on the website located at https://corporate.colossusbets.com.

9.     Colossus's related company, ColossusBets Limited ("CBUK"), operates a platform for pool betting transactions, which includes the website located at www.colossusbets.com and a smartphone application, which allows users to create an account and place bets on the outcome of events selected by the operator. *See* About You, Colossus Terms of play & Policies, www.colossusbets.com/help/1-about-you/.

10.    For example, users may bet on the outcome of multiple related events that are pre-selected by CBUK ("legs") and decided over a set period of time ("Game Period"). At any point during the Game Period, CBUK may offer users the opportunity to sell to CBUK the whole or a portion of a bet which may still be eligible for a winning dividend.  *See* Cashing Out, Colossus Terms of play & Policies, www.colossusbets.com/help/5-cash-out/.

## BACKGROUND OF THE INVENTIONS

11.    While in-person gambling dates back at least to biblical times, online wagering began in or about 1996 and progressed with the further development of internet and computing capabilities.  While participation in in-person gaming is necessarily constrained by physical parameters (such as travel to a casino, casino floorspace for physical slot machines and tables) as well as human limitations (sportsbook agent capacity, dealer capacity for a maximum number of

players, dealer speed, wait times), online betting platforms may be accessed and utilized by a multitude of users in a multitude of locations simultaneously.  As a consequence, and as discussed further below, online wagering presents unique technical problems for gaming operators and developers.  For example, online wagering developers must implement gambling remotely using different devices in real-time communication with one another, while also ensuring that accuracy is maintained, and that all features are offered consistently across a plurality of users.

12.     The Asserted Patents describe novel systems, methods, and devices that improve upon prior art in online sports wagering.  While the Asserted Patents each contain distinct claims, discussed further *infra*, the specific inventive feature claimed in each of the Asserted Patents is the ability to present multiple players with a "buy-out" option before the completion of the final wagered-upon event.

13.     For example, a buy-out (or "cash out") option can strike a balance between the interests of bettors and the sportsbook operator (or the "house") during the life of a wager.  A multi-leg wager (for example, an accumulator or "parlay" wager) allows a bettor to make one wager requiring the successful outcome of multiple events, such as the result of three football games.  All of the wagered outcomes are required to win; the winnings from one event are staked on the next event in a series until either the bettor loses or the series completes successfully.  In multi-leg wagering, prior to the start of all of the sporting events wagered upon, a bettor purchases one ticket having each of the games or "legs" of the event contained thereon.  A successful bet or ticket is worth a predetermined value based on the application of each game's (or leg's) winnings to each of the successive events. A successful bet is more difficult because it is contingent on multiple successful outcomes, and can also be very profitable to the bettor given the progressive increase in stake between successful legs.

4

14.     For example, a bettor having a four-fold parlay, or a bet involving four sporting events, having won two of the four relevant bets on their ticket, stands a better chance to win the overall wager than what existed prior to the completion of those first two events.  Conversely, the house stands a more significant risk of losing the bet.  A buy-out allows a bettor to sell their rights in their parlay back to the house for a profit that is less than the maximum amount of the possible winnings, to the benefit of both parties.

15.     The complexity of the required method, system, or device required to generate buy out offers in real time with, for example, real time odds changes, and for multi-outcome wagering events with multiple legs that depend on the outcome of each other, is greatly increased vis-à-vis a single-outcome bet, and increases further with additional legs, or complexity of in-play betting or bet types like single-game parlays parimutuel pools.

16.     The Asserted Patents do not claim the concept of a "buy out" or the feature in a vacuum.  They are directed to specific wagering methods, systems and devices (e.g., gaming kiosks) that successfully implement the functionality within a novel and particular ordered combination of steps to accurately generate buy out offers across a multitude of users, and that are consistent for users, regardless of what type of wagering input device they use and where they are located.

17.     The buy out functionality is technical in nature.  A large volume of information from various sources must be collected and analyzed for a real-time valuation.  For any particular wager, this information includes the maximum payout for the bettor's bet and the probability of a successful outcome.  The probability calculation can take into account many types of real-time information from the sportsbook operator, such as odds changes, the maximum payout for the multi-leg event bet, the probability of a successful outcome on the remaining leg or legs, and in

5

parimutuel betting how many tickets have been sold holding the same ticketed outcome,  as well as the value and composition of the pool, including for example whether any consolation prizes are offered for near miss tickets.  The probability of success calculation for an in-progress multi-leg wagering event may also take into account external data from a multitude of sources.

18.     The collection and processing of this volume of information from a multitude of sources, accurately and in real time, is not possible outside of the technological environment of an online sports wagering system.  For example, in the context of multi-leg wagers, the probability of success must be continuously re-calculated between legs of a multi-leg wager, or before or while any particular leg event is in progress, based upon on a variety of mid-game statistical fluctuations.

19.     Further, the system identifies all similarly situated bettors to whom a particular buy-out offer will be made, regardless of geography, and facilitates real-time communications to and from that plurality of bettors.

20.     A partial buy-out offer may also be generated, in which a bettor retains some but not all of the rights in the ticket, and is eligible for a corresponding portion of the potential payout.

21.     A human operator cannot simultaneously receive and process data from a multitude of users, calculate and continuously re-calculate odds based on complex formulas for a multitude of ticketed players, and output that information to users (who might accept or not accept, or partially accept, necessitating further communication and/or payout) in real-time.  The required calculations alone cannot be completed mentally to the required level of speed or accuracy; even the most exceptional mathematicians are subject to the same, approximate 60-bits per second processing speed of the human brain.[1]  Increasing the number of human operators only necessitates

---

[1]   *See,   gen.   https://www.technologyreview.com/2009/08/25/210267/new-measure-of-human-brain-processing-speed/.*

additional communication and coordination processes, further slowing the naturally-capped pace of processing.  It is not possible to sync multiple minds in real-time.  The mathematical calculation of some bets and bet types cannot be calculated manually (even with calculator tools) in real-time, let alone with constant recalculations necessitated by fluctuating inputs of data or odds.  Moreover, in-person sportsbooks lack the physical capacity to service a multitude of players, except for on a rotating basis, and cannot service bettors in multiple geographical areas.

22.     Relatedly, it is not possible for a human operator to conduct the complex calculations and communications discussed above accurately in real time.  Given instantaneous and evolving odds, time constraints on a human's ability to perform the necessary calculations necessarily results in different users being presented with different values at different times.  The Asserted Patents allow for an abundance of data derived from thousands (or more) users to be simultaneously analyzed, resulting in an accurate and uniform buy out offer to be transmitted to users holding the same combinations of selections.

23.     Further specialized options are also possible for providing individualized offers based on additional factors, as one example, a bettor's preferred status.

24.     While the Asserted Patents disclose math (probabilities) involved in the calculation of the buy-out offer, the claims are not directed to that math.  Rather, the claims are directed to entire methods, systems, or devices rooted in computer networking and specifically online gaming technology that can process data from multiple sources in real time to continuously generate an accurate value for a cash out offer that best represents the effect of instantaneous  odds on the real-time value of a bettor's ticket.

25.     While the Asserted Patents disclose methods, systems, and devices that allow a bettor to sell their rights in their bet back to the house for a profit that is less than the maximum

amount of the possible winnings, the claims are not directed to the concept of hedging.  Rather, the claims are directed to entire methods, systems, or devices rooted in computer networking and specifically online gaming technology that can process data from multiple sources in real time to continuously generate an accurate value for a cash out offer that best represents the effect of instantaneous odds on the real-time value of a bettor's ticket

26.    Not surprisingly, methods, systems and apparatuses capable of processing data from multiple sources in real time to continuously generate an accurate value for a buy out offer at any desired time after the initiation of a multi-leg wager were not known or utilized in the pre-internet world.  The Asserted Patents thus do not recite a known sports gaming practice to the particular technological environment of the internet.

27.    The Asserted Patents are rooted in technology.  The claims of the Asserted Patents include wagering input devices that are connected to a server via a communications interface.  The wagering input devices include a display and a user input that allows users to enter a wager on a wagering event and transmit it over the communications interface to a server.  The server is configured to receive information about the wager and wagering event from a multitude of sources in real time, continuously recalculating the bettor's probability of success on the wager based on real-time data received regarding the wagering event and thousands (or more) of individual wagers, and continuously generating buy-out offers based on this determination.  This may be accomplished by specific mid-tier server architecture, as depicted in Figure 3 of the asserted patents, including a Cash-In program and related subroutines.  The server thus calculates a buy-out or partial buy-out offer prior to the completion of all of the legs of the multi-leg wager.  The server is further configured to transmit the buy-out offer to the wagering input device.  The bettor can view the full or partial buy-out offer on the display and select the offer via the user input.  The

8

acceptance of the buy-out offer is then transmitted to the server, which issues an award to the user in several different formats.  The confirmation of the buy-out and an indication of the award is displayed to the user via the display of the wagering input device.  The buy out offer is updated as necessary.

28.     The Asserted Patents do not claim an online gaming network operating in its routine manner.  They provide a unique, ordered combination of elements that, taken together, improve prior art in online wagering systems.  The ordered combination of the claims is further evidenced by the requirements of synchronicity of information, analysis and communication (real time), and communication of the buy out offer prior to the conclusion of a wagering event.  Such methods, systems and devices were neither typical nor accomplished previously in the prior art.

29.     Through this ordered combination of claim steps, the Asserted Patents solve the problem of generating an offer to fully or partially cash out a wager prior to the conclusion of a wagering event that accurately reflects real-time variability of the wagering event and is consistent across a plurality of online wagering input devices regardless of location—a problem arising in the realm of computer networks.

30.     The Asserted Patents also enhance online sports wagering in non-technical ways. The in-game benefit of a buy out feature attracts bettors to online sportsbooks (over in-person gaming sportsbooks), a platform which bettors can participate from any location at any time.  The flexibility of cash out, and the options this novel feature provides, also increases a bettor's likelihood to make more investments on the platform.

31.     For example, the Asserted Patents' specification states:

> A prominent United Kingdom based betting and gaming company
> recently reported that 84% of its retail (i.e. in betting shops) soccer
> bets were coupon based accumulators. Almost 90% of those are on
> four-fold and above. A four-fold is four selections, so 90% of the

bets are on four selections and more. By comparison, in online betting, twice as many bets are singles as is the case in betting shops, and only 55% are four-fold and above.

*E.g.*, '439 patent at 1:39-46.

32.    Accordingly, the problem of generating more interest in online betting platforms was unique to this technology space, not a concern of in-person betting establishments.   The Asserted Patents overcame this problem.

33.    For example, the Asserted Patents further state:

A unique differentiator of the product of the present disclosure may be that at any desired time after initiation of an event (such as at any time after a "ticket" is purchased until completion of an event, after each leg has been completed, between legs, including potentially as a leg is "in-play", and/or during a designated span of time before, during and/or after any of the legs), any desired number of players who remain eligible for a prize (and potentially those still eligible for bonus and/or consolation prizes) or to win or have correct (win) predictions for each of the events or legs that are completed, may be offered a "buy-out" or an opportunity to sell their tickets (in whole or alternatively may be in part (i.e., a fractional amount) to the game operator or through the game operator (or alternatively directly) to a third party (e.g., one or more system operator(s), business entity or entities such as a merchant(s), one or more other persons, other player(s), etc.). Thus, for example, the game operator (or any other entity) may offer the player a fractional amount of the potential Jackpot Pool to buy the ticket for the still pending game(s) and thereby provide the player the opportunity to cash in and avoid the risk of being eliminated on a later leg or the final event. In other examples, a ticket held by players may be comprised of one or more divisions, and the buy-out offer or sale may involve just certain divisions of the ticket, so that those divisions are sold but the player retains ownership of the remaining divisions of the ticket. In yet another example, a ticket held by a player may include an accumulator or parlay wager, in which case the player may receive (or initiate) a buy-out offer or sale for a fractional amount of a prize (e.g., a jackpot), and which may occur at any time, such as before, during and/or after any of the legs specified by the wager have been completed.

*E.g.*, '439 patent at 2:32-63.

34.    The success of offering buy-out offers in online betting platforms is shown by the industry adopting and promoting the feature.  For example, DraftKings has a webpage promoting the "new feature" of cash out:



35.    Moreover, accurate and consistent buy-out offers improve bettor confidence.  It is desirable for an online wagering system to operate accurately and with stability across a plurality of players.  The novel method of the Asserted Patents provides the capability to provide a buy-out offer to a plurality of players based on the many criteria described above, and to do so consistently across similarly situated tickets, independent of bettors' geography.  Thus according to the patented methods, a bettor receives a buy-out offer reflecting a value derived from real-time information from a multitude of sources, with the confidence that other bettors have not received offers based on different underlying determinations.

36.    These technological advancements   foster additional bettor engagement and platform profits.  Combined with buy-out offers' improved real-time accuracy, these accessibility improvements drive bettor engagement by increasing popularity of placed bets and placement of new bets, which in turn increases revenue.

37.    Upon accepting a buy-out offer prior to the conclusion of a final leg of a wagering event, many bettors re-wager all or some of these earnings in future bets.  Bettors and sportsbooks

11

alike view the possibility of continued play as a benefit:  bettors continue their entertainment experience and invest in new chances to win, and the re-investment of the buy out increases the sportsbook's turnover.  Increased better enjoyment and length of time of play further result in keeping customers at an online betting site, i.e., better site "stickability," than an online wagering system lacking the method of the Asserted Patents.

## THE ASSERTED PATENTS

### *US Patent No. 8,721,439*

38.     On May 13, 2014, the United States Patent and Trademark Office ("USPTO") duly and legally issued the '439 patent entitled "Wagering Apparatus, Methods and Systems" to Bernard J. Marantelli.  The '439 patent has 30 claims.  A true and correct copy of the '439 patent is attached to this Complaint as **Exhibit 1** (hereinafter referred to as the "'439 patent").

39.     The claims of the '439 patent provide concrete technical solutions to a problem specifically arising in the realm of computer networks (i.e., distributed electronic gaming systems), namely, how to generate an offer to dispose of a wager prior to the conclusion of a wagering event that not only accurately reflects real-time variability of the wagering event but is also consistent across a plurality of online wagering input devices, regardless of their location. *See, e.g.,* '439 patent, 1:52-3:22.

40.     More specifically, the claimed system includes components that work together to receive, in real-time, complex data related to the progress and variability of one or more wagering events from multiple sources and wager information received from thousands (or more) of online wagering input devices over a communications interface. The system continuously processes this information to determine a value for an offer to dispose of a wager prior to a conclusion of the

wagering event that most accurately reflects the number of pending wagers on the wagering event, their values, and the current variability of the wagering event. *See, e.g.,* '439 patent, 1:52-3:21.

41.     For example, claim 1 of the '439 patent is directed to a method of providing one or more wagering input devices in communication with a system controller through which the one or more players may participate in a multi-outcome wagering event comprising a defined number of legs, said system controller being adapted for: initiating the multi-outcome wagering event; initiating at least one of a buy-out offer and partial buy-out offer to any number of the one or more players that are eligible to win at least one jackpot at any time before the multi-outcome wagering event has been completed; receiving an acceptance of the buy-out offer from at least one of the players, wherein each of the players accepting the buy-out offer will no longer be eligible to exclusively win the at least one jackpot; completing the remainder of the defined number of legs to finish the multi-outcome wagering event; and determining if any of the players have won the at least one jackpot or portion thereof.

42.     In addition, claims 20 and 21 of the '439 patent require that the one or more wagering input devices include computer devices with specialized hardware components (e.g., a physical cash out button) for performing one or more steps of the method described in claim 1. Specifically, claim 20 states that the wager further comprises a list that is at least one of printed on a ticket, printed on a voucher, and displayed via the one or more wagering input devices. Claim 21 states that the one or more wagering input devices comprise at least one of a wagering terminal, a wagering workstation, a personal computer, a smart phone, a tablet computing device, a gaming machine, a slot machine, and a lottery machine.

43.     Further, claim 22 of the '439 patent adds the requirement that the multi-outcome wagering event comprises a pool or is progressive, wherein said pool is at least one of fixed, variable and guaranteed.

44.     The technological improvements described and claimed in, for example, claims 1, 20, 21, and 22 of the '439 patent were neither conventional nor generic at the time of their invention, but rather required novel and non-obvious solutions to problems and shortcomings specific to the technical field of online gaming systems, operating on computer networks.  *See id*. at 1:6-48.  No existing electronic sportsbook was systematically offering the ability to dispose of a wager prior to conclusion of a wagering event for a determined value to all of its users.  As described above, the claimed system is capable of processing data from multiple sources in real time to continuously generate an accurate value for a cash out offer that best represents instantaneous odds and is consistent across multiple wagering input devices.  Accordingly, the claims improve a pre-existing technological process.

45.     The inventions of, for example, claims 1, 20, 21, and 22 of the '439 patent are more than just the performance of well-understood, routine or conventional activities known in the art; they do not claim an online gaming network operating in its routine manner.  The prior art did not disclose the claimed, ordered combination of events discussed above, nor a device capable of performing such a method.

46.     The written description describes each of the elements of claims 1, 20, 21, and 22 of the '439 patent such that persons of ordinary skill in the art understand what the claims and their elements cover and how the non-conventional and non-generic combination of claim elements differ markedly from, and improved upon, prior online gaming methods and devices.  *See* '439 patent, 1:52-3:21.

47.    Claims 1, 20, 21, and 22 of the '439 patent, viewed in light of the specification, are not directed to a mathematical concept, or the concept of hedging.  As described herein, claims are directed to a specific arrangement of components that are configured to generate accurate buy-out offers that are consistent for users regardless of what type of wagering input device they use and where they are located.

48.    Claims 1, 20, 21, and 22 of the '439 patent, viewed in light of the specification, are not directed to any methods of organizing human activity or mental processes. The complexity of the claimed process increases for multi-outcome wagering events with multiple legs that depend on the outcome of each other as required by claim 1. Likewise, in the case where the multi-outcome wagering event comprises a pool as in claim 22, the value of a wager depends on the number and value of other wagers in the pool.  The human mind is not capable of calculating every permutation that these wagering events present, especially in a period of time to provide accurate values for a buy-out to users before the completion of the wagering event.

49.    Claims 1, 20, 21, and 22 of the '439 patent are not directed to the use of a general-purpose computer utilized in a typical fashion.  As an example, the patent discloses specific mid-tier server architecture, as depicted in Figure 3 of the '439 patent, including a Cash-In program and related subroutines.  The claimed method is directed to a specific combination and ordering of steps, resulting in a novel method, system, and device which are not simply a general-purpose computer performing generalized steps. Further, the wagering input devices of claim 21 include machines (e.g., wagering terminals) that include specialized components (e.g., a physical cash out button) for performing the process of claim 1.

15

*US Patent No. 9,117,341*

50.     On August 25, 2015, the USPTO duly and legally issued the '341 patent entitled "Wagering Apparatus, Methods and Systems" to Bernard J. Marantelli.  The '341 patent has 40 claims.  A true and correct copy of the '341 patent is attached to this Complaint as **Exhibit 2** (hereinafter referred to as the "'341 patent").

51.     The claims of the '341 patent provide concrete technical solutions to a problem specifically arising in the realm of computer networks (i.e., distributed electronic gaming systems), namely, how to generate an offer to dispose of a wager prior to the conclusion of a wagering event that not only accurately reflects real-time variability of the wagering event but is also consistent across a plurality of online wagering input devices, regardless of their location.

52.     More specifically, the claimed system includes components that work together to receive, in real-time, complex data related to the progress and variability of one or more wagering events from multiple sources and wager information received from thousands (or more) of online wagering input devices over a communications interface. The system continuously processes this information to determine a value for an offer to dispose of a wager prior to a conclusion of the wagering event that most accurately reflects the number of pending wagers on the wagering event, their values, and the current variability of the wagering event. *See, e.g.,* '341 patent, 1:52-3:21.

53.     For example, claim 1 of the '341 patent is directed to a method of conducting a wagering event for one or more players, wherein a player is presented with at least one of a buy-out offer and a partial buy-out offer prior to completion of the wagering event. The method includes providing one or more wagering input devices in communication with a system controller through which one or more players may participate in a wagering event, said system controller being adapted for: initiating the wagering event for one or more players; receiving a wager via the

one or more wagering input devices in response to a player desiring to participate in the wagering event; identifying one or more players eligible to win from among players participating in the wagering event; initiating at least one of a buy-out offer and partial buy-out offer to any number of the one or more players that are eligible to win, said buy-out offer or partial buy-out offer being initiated at any time before the wagering event has been completed; identifying any acceptances of said at least one of a buy-out offer and partial buy-out offer that have been initiated; completing the wagering event; and determining if any of the players have won.

54.    In addition, claim 21 of the '341 patent further states that the one or more wagering input devices include computer devices with specialized hardware components (e.g., a physical cash out button) for performing one or more steps of the method described in claim 1. Specifically, claim 21 states that the one or more wagering input devices comprise at least one of a wagering terminal, a wagering workstation, a personal computer, a smart phone, a tablet computing device, a gaming machine, a slot machine, and a lottery machine.

55.    Further, claim 22 of the '341 patent adds the requirement that the wagering event comprises a pool or is progressive, wherein said pool is at least one of fixed, variable and guaranteed.

56.    The technological improvements described and claimed in, for example, claims 1, 21, and 22 of the '341 patent were neither conventional nor generic at the time of their invention, but rather required novel and non-obvious solutions to problems and shortcomings specific to the technical field of online gaming systems, operating on computer networks. *See id.* at 1:6-48.  No existing electronic sportsbook was systematically offering the ability to dispose of a wager prior to conclusion of a wagering event for a determined value to all of its users.  As described above, the claimed system is capable of processing data from multiple sources in real time to continuously

generate an accurate value for a cash out offer that best represents instantaneous odds and is consistent across multiple wagering input devices. Accordingly, the claims improve a pre-existing technological process.

57.     The inventions of, for example, claims 1, 21, and 23 of the '341 patent are more than just the performance of well-understood, routine or conventional activities known in the art; they do not claim an online gaming network operating in its routine manner.  The prior art did not disclose the claimed, ordered combination of events discussed above, nor a device capable of performing such a method.

58.     The written description describes each of the elements of claims 1,  21, and 22 of the '341 patent such that persons of ordinary skill in the art understand what the claims and their elements cover and how the non-conventional and non-generic combination of claim elements differ markedly from, and improved upon, prior online gaming methods and devices.  *See* '341 patent, 1:52-3:21.

59.     Claims 1, 21, and 22 of the '439 patent, viewed in light of the specification, are not directed to a mathematical concept, or the concept of hedging.  As described herein, the claims are directed to a specific arrangement of components that are configured to generate accurate buy-out offers that are consistent for users regardless of what type of wagering input device they use and where they are located.

60.     Claims 1, 21, and 22 of the '341 patent, viewed in light of the specification, are not directed to any methods of organizing human activity or mental processes. The complexity of the claimed process increases when the wagering event comprises a pool as in claim 22, as the value of a wager depends on the number and value of other wagers in the pool.  The human mind is not capable of calculating every permutation that these wagering events present, especially in a period

18

of time to provide accurate values for a buy-out to users before the completion of the wagering event.

61.     Claims 1, 21, and 22 of the '341 patent are not directed to the use of a general-purpose computer utilized in a typical fashion.  As an example, the patent discloses specific mid-tier server architecture, as depicted in Figure 3 of the '341 patent, including a Cash-In program and related subroutines.  The claimed method is directed to a specific combination and ordering of steps, resulting in a novel method, system, and device which are not simply a general-purpose computer performing generalized steps. Further, the wagering input devices of claim 21 include machines (e.g., wagering terminals) that include specialized components (e.g., a physical cash out button) for performing the process of claim 1.

### US Patent No. 9,275,516

62.     On March 1, 2016, the USPTO duly and legally issued the '516 patent entitled "Wagering Apparatus, Methods and Systems" to Bernard J. Marantelli.  The '516 patent has 75 claims.  A true and correct copy of the '516 patent is attached to this Complaint as **Exhibit 3** (hereinafter referred to as the "'516 patent").

63.     The claims of the '516 patent provide concrete technical solutions to a problem specifically arising in the realm of computer networks (i.e., distributed electronic gaming systems), namely, how to generate an offer to dispose of a wager prior to the conclusion of a wagering event that not only accurately reflects real-time variability of the wagering event but is also consistent across a plurality of online wagering input devices, regardless of their location.  *See, e.g.,* '516 patent, 1:52-3:22.

64.     More specifically, the claimed system includes components that work together to receive, in real-time, complex data related to the progress and variability of one or more wagering

events from multiple sources and wager information received from thousands (or more) of online wagering input devices over a communications interface. The system continuously processes this information to determine a value for an offer to dispose of a wager prior to a conclusion of the wagering event that most accurately reflects the number of pending wagers on the wagering event, their values, and the current variability of the wagering event. *See, e.g.,* '516 patent, 1:52-3:21.

65.     For example, claim 68 of the '516 patent is directed to a wagering apparatus that comprises a server system controller configured to communicate with one or more wagering devices. The server system controller is programmed to: display one or more wagering events; select, in response to input from one or more players, one or more wagering events upon which at least one wager is accepted, wherein the at least one wager associated with the selection, of the one or more wagering events, has an associated jackpot; generate a ticket and associated record within a database reflecting the wagering event selections from the one or more players; receive input of an outcome of the wagering events; determine whether one or more tickets have the potential to correctly select the outcome of at least one wagering event, thereby qualifying any of the one or more players to win the jackpot or a portion thereof; generate and cause display of a cash out option to fully or partially end the wager to any of the one or more players that are qualified to win the jackpot or a portion thereof; receive a selection of the cash out option from any of the one or more players that desire to fully or partially end the wager; and issue one or more of a credit, tokens, currency, coupon, voucher, credit slip, or prize, or funding of a player's electronically recordable identification card or online account to any of the one or more players selecting the cash out option.

66.     In addition, claim 73 of the '516 patent further states that the one or more wagering input devices include computer devices with specialized hardware components, such as a physical

cash out button and a payment output device capable of issuing a credit, tokens, currency coupon, voucher or prize to the one or more players that have won a jackpot or portion thereof.

67.     Further, claim 74 of the '516 patent adds the requirement that at least one of the event and wager comprises one or more of fixed odds single wagers, multiple wagers, full cover wagers, full cover wagers with singles, Any to Come ("ATC") or "if cash" wagers, specialty wagers, forecasts, fixed, variable, guaranteed, parimutuel wagering, fixed-odds wagering, accumulator or parlay wagering, fixed odds, a pool, progressive, fixed pool, variable pool or guaranteed pool.

68.     The technological improvements described and claimed in, for example, claims 68, 73, and 74 of the '516 patent were neither conventional nor generic at the time of their invention, but rather required novel and non-obvious solutions to problems and shortcomings specific to the technical field of online gaming systems, operating on computer networks. *See id.* at 1:6-48.  No existing electronic sportsbook was systematically offering the ability to dispose of a wager prior to conclusion of a wagering event for a determined value to all of its users. As described above, the claimed system is capable of processing data from multiple sources in real time to continuously generate an accurate value for a cash out offer that best represents instantaneous odds and is consistent across multiple wagering input devices. Accordingly, the claims improve a pre-existing technological process.

69.     The inventions of, for example, claims 68, 73, and 74 of the '516 patent are more than just the performance of well-understood, routine or conventional activities known in the art; they do not claim an online gaming network operating in its routine manner.  The prior art did not disclose the claimed, ordered combination of events discussed above, nor a device capable of performing such a method.

70.     The written description describes each of the elements of claims 68, 73, and 74 of the '516 patent such that persons of ordinary skill in the art understand what the claims and their elements cover and how the non-conventional and non-generic combination of claim elements differ markedly from, and improved upon, prior online gaming methods and devices. *See* '516 patent, 1:52-3:21.

71.     Claims 1, 21, and 22 of the '439 patent, viewed in light of the specification, are not directed to a mathematical concept, or the concept of hedging. As described herein, the claims are directed to a specific arrangement of components that are configured to generate accurate buy-out offers that are consistent for users regardless of what type of wagering input device they use and where they are located.

72.     Claims 68, 73, and 74 of the '516 patent, viewed in light of the specification, are not directed to any methods of organizing human activity or mental processes. The complexity of the claimed process increases when at least one of the event and wager comprises one or more of fixed odds single wagers, multiple wagers, full cover wagers, full cover wagers with singles, Any to Come ("ATC") or "if cash" wagers, specialty wagers, forecasts, fixed, variable, guaranteed, parimutuel wagering, fixed-odds wagering, accumulator or parlay wagering, fixed odds, a pool, progressive, fixed pool, variable pool or guaranteed pool, as in claim 74. The value of a wager depends on the number and value of other wagers in the pool. The human mind is not capable of calculating every permutation that these wagering events present, especially in a period of time to provide accurate values for a buy-out to users before the completion of the wagering event.

73.     Claims 68, 73, and 74 of the '516 patent are not directed to the use of a general-purpose computer utilized in a typical fashion. As an example, the patent discloses specific mid-tier server architecture, as depicted in Figure 3 of the '516 patent, including a Cash-In program

22

and related subroutines. The claimed method is directed to a specific combination and ordering of steps, resulting in a novel method, system, and device which are not are simply a general-purpose computer performing generalized steps. Further, the wagering input devices of claim 73 include machines (e.g., wagering terminals) that include specialized components (e.g., a physical cash out button) for performing the process of claim 68.

### US Patent No. 9,424,716

74.     On August 23, 2016, the USPTO duly and legally issued the '716 patent entitled "Wagering Apparatus, Methods and Systems" to Bernard J. Marantelli. The '716 patent has 108 claims. A true and correct copy of the '716 patent is attached to this Complaint as **Exhibit 4** (hereinafter referred to as the "'716 patent").

75.     The inventions of the '716 patent claims provide concrete technical solutions to a problem specifically arising in the realm of computer networks (i.e., distributed electronic gaming systems), namely, how to generate an offer to dispose of a wager prior to the conclusion of a wagering event that not only accurately reflects real-time variability of the wagering event but is also consistent across a plurality of online wagering input devices, regardless of their location.

76.     More specifically, the claimed system includes components that work together to receive, in real-time, complex data related to the progress and variability of one or more wagering events from multiple sources and wager information received from thousands (or more) of online wagering input devices over a communications interface. The system continuously processes this information to determine a value for an offer to dispose of a wager prior to a conclusion of the wagering event that most accurately reflects the number of pending wagers on the wagering event, their values, and the current variability of the wagering event. *See, e.g.,* '716 patent, 1:52-3:22.

77.     For example, claim 54 of the '716 patent is directed to a wagering system including one or more wagering input devices for allowing the placement of a wager on one or more wagering events and a system controller that is configured to communicate with the one or more wagering input devices. The system controller is further configured to:  initiate the one or more wagering events for one or more players; receive a wager via the one or more wagering input devices in response to input from a player desiring to participate in the one or more wagering events; monitor an outcome of the one or more wagering events; identify one or more players eligible to win the one or more wagering events based on the wager from among players participating in the one or more wagering events compared against the outcome of the one or more wagering events; initiate and cause display of at least one of a buy-out offer and a partial buy-out offer via the one or more wagering input devices to any number of the one or more players eligible to win before the one or more wagering events have been completed, wherein one or more additional buy-out offers or partial buy-out offers may be initiated and displayed via the one or more wagering input devices to any number of the one or more players that have not accepted a buy-out offer or a partial buy-out offer; receive any acceptances of the at least one of the buy-out offer and partial buy-out offer via the one or more wagering input devices in response to input from a particular number of the one or more players that have accepted the buy-out offer or partial buy-out offer; and issue a credit, tokens, currency or an award to the one or more players accepting the buy-out offer or partial buy-out offer; wherein the buy-out offer and partial buy-out offer comprises one or more of a full cash out on a single, a partial cash out on a single, a full cash out on a multiple, accumulator, parlay or pool, or a partial cash out on a multiple, accumulator, parlay or pool.

78.     In addition, claim 60 of the '716 patent further states that the one or more wagering input devices include computer devices with specialized hardware components (e.g., a physical cash out button). Specifically, claim 60 states that the wagering system of claim 54 further comprises a cash out option and that the system controller is further configured to: receive a selection of the cash out option from any of the one or more players that desire to fully or partially end the wager, wherein the selection of the cash out option from any of the one or more players is provided via one or more of the one or more wagering input devices, a hand held device, a mobile device, a wireless device, a computing system, a smart phone, a telephone, a tablet computer, text messaging, a PDA, an interactive television, email, Internet browser or a cashier; wherein any of the one or more players selecting the cash out option to fully end the wager no longer participates in the one or more wagering events, and any of the one or more players selecting the cash out option to partially end the wager continues to participate in the one or more wagering events; and issue to the one or more players that selected the cash out option one or more of cash, tickets or credit slips redeemable by the player, funding of a player's electronically recordable identification card or online account, or an award.

79.     These technological improvements described and claimed in claims 54 and 60 of the '716 patent were neither conventional nor generic at the time of their invention, but rather required novel and non-obvious solutions to problems and shortcomings specific to the technical field of online gaming systems, operating on computer networks.  *See id*. at 1:6-48.   No existing electronic sportsbook was systematically offering the ability to dispose of a wager prior to conclusion of a wagering event for a determined value to all of its users.  As described above, the claimed system is capable of processing data from multiple sources in real time to continuously generate an accurate value for a cash out offer that best represents instantaneous odds and is

consistent across multiple wagering input devices. Accordingly, the claims improve a pre-existing technological process.

80.     The inventions of claims 54 and 60 of the '716 patent are more than just the performance of well-understood, routine or conventional activities known in the art; they do not claim an online gaming network operating in its routine manner.  The prior art did not disclose the claimed, ordered combination of events discussed above, nor a device capable of performing such a method.

81.      The written description describes each of the elements of claims 54 and 60 of the '716 patent such that persons of ordinary skill in the art understand what the claims and their elements cover and how the non-conventional and non-generic combination of claim elements differ markedly from, and improved upon, prior online gaming methods and devices.  *See* '716 patent, 1:52-3:21.

82.     Claims 54 and 60 of the '716 patent, viewed in light of the specification, are not directed to a mathematical concept, or the concept of hedging.  As described herein, the claims are directed to a specific arrangement of components that are configured to generate accurate buy-out offers that are consistent for users regardless of what type of wagering input device they use and where they are located.

83.     Claims 54 and 60 of the '716 patent, viewed in light of the specification, are not directed to any methods of organizing human activity or mental processes. The complexity of the claimed process increases when the buy-out offer and partial buy-out offer comprises one or more of a full cash out on a single, a partial cash out on a single, a full cash out on a multiple, accumulator, parlay or pool, or a partial cash out on a multiple, accumulator, parlay or pool as in claim 54. The value of a wager depends on the number and value of other wagers in the pool.  The

human mind is not capable of calculating every permutation that these wagering events present, especially in a period of time to provide accurate values for a buy-out to users before the completion of the wagering event.

84.     Claims 54 and 60 of the '716 patent are not directed to the use of a general-purpose computer utilized in a typical fashion.  As an example, the patent discloses specific mid-tier server architecture, as depicted in Figure 3 of the '716 patent, including a Cash-In program and related subroutines.  The claimed method is directed to a specific combination and ordering of steps, resulting in a novel method, system, and device which are not simply a general-purpose computer performing generalized steps. Further, the wagering input devices of claim 60 include machines (e.g., wagering terminals) that include specialized components (e.g., a physical cash out button) for performing the process of claim 54.

### US Patent No. 9,704,338

85.     On July 11, 2017, the USPTO duly and legally issued the '338 patent entitled "Wagering Apparatus, Methods and Systems" to Bernard J. Marantelli.  The '338 patent has 34 claims.  A true and correct copy of the '338 patent is attached to this Complaint as **Exhibit 5** (hereinafter referred to as the "338 patent").

86.     The inventions of the '338 patent claims provide concrete technical solutions to a problem specifically arising in the realm of computer networks (i.e., distributed electronic gaming systems), namely, how to generate an offer to dispose of a wager prior to the conclusion of a wagering event that not only accurately reflects real-time variability of the wagering event but is also consistent across a plurality of online wagering input devices, regardless of their location.

87.     More specifically, the claimed system includes components that work together to receive, in real-time, complex data related to the progress and variability of one or more wagering

27

events from multiple sources and wager information received from thousands (or more) of online wagering input devices over a communications interface. The system continuously processes this information to determine a value for an offer to dispose of a wager prior to a conclusion of the wagering event that most accurately reflects the number of pending wagers on the wagering event, their values, and the current variability of the wagering event. *See, e.g.,* '338 patent, 1:54-3:29.

88.     For example, claim 1 of the '338 patent is directed to a method of conducting a multi-outcome wagering event for one or more players, wherein the wagering event comprises a defined number of legs, and wherein a player is presented with at least one of a buy-out offer and a partial buy-out offer prior to completion of all of the defined number of legs. The method includes providing one or more wagering input devices in communication with a system controller through which one or more players may participate in the multi-outcome wagering event. The system controller comprises a trading exchange module. The one or more wagering input devices comprise specialized hardware, such as one or more of a physical cash out button, a user input, a payment acceptor, or a link to a customer account for receiving a wager from a player, one or more displays for displaying the at least one of the buy-out offer and the partial buy-out offer after the multi-outcome wagering event begins, an input for receiving an acceptance of at least one of the buy-out offer and the partial buy-out offer, and a user output for issuing a credit, tokens, currency or an award to a player.

89.     The system controller is adapted for: initiating the multi-outcome wagering event for one or more players, said multi-outcome wagering event comprised of a defined number of legs, wherein one or more jackpots, or a portion thereof, is awarded at least where a particular number of the defined number of legs are completed; receiving a wager via one or more of the user input, the payment acceptor or the link of the one or more wagering input devices in response to

28

input from a player desiring to participate in the multi-outcome wagering event, wherein the wager coincides with each of the defined number of legs; generating a record reflecting the wager associated with the player at the system controller; receiving input of an outcome of each of the defined number of legs corresponding to the multi-outcome wager event; generating and causing display via the one or more wagering input devices the outcome of each of the defined number of legs to a player; identifying one or more players eligible to win each of the defined number of legs based on the wager from among players participating in the multi-outcome wagering event, determining any players eligible to win at least one jackpot or a portion thereof based on the potential outcome of each of the defined number of legs in comparison against the record reflecting the wager from among players participating in the multi-outcome wagering event, wherein players eligible to win at least one leg are eligible to win at least one jackpot or a portion thereof; initiating via the trading exchange module and causing display of at least one of a buy-out offer and partial buy-out offer via the respective one or more displays of the one or more wagering input devices to any number of the one or more players that are eligible to win at least one jackpot for at least a portion of said at least one jackpot, said buy-out offer or partial buy-out offer being initiated by the trading exchange module at any time before the multi-outcome wagering event has been completed; receiving an acceptance of the buy-out offer or partial buy-out offer via the input for receiving acceptance of the one or more wagering input devices in response to input from a particular number of the players eligible to win at least one jackpot that have accepted the buy-out offer or partial buy-out offer, each of the players accepting the buy-out offer will no longer be eligible to exclusively win the at least one jackpot, wherein each of the players not accepting the buy-out offer will remain eligible to win the at least one jackpot, and wherein each of the players accepting a partial buy-out offer remains eligible to win at least a portion of the at least one jackpot;

29

issuing a credit, tokens, currency or an award via the user output of the one or more wagering input devices to the one or more players accepting the buy-out offer or partial buy-out offer; completing the remainder of the defined number of legs to finish the multi-outcome wagering event; determining if any of the players have won the at least one jackpot or portion thereof; notifying the players that have won the jackpot or portion thereof via the one or more wagering input devices; and issuing a credit, tokens, currency or an award to the players that have won the jackpot or portion thereof via the user output of the one or more wagering input devices.

90.    In addition, claim 7 of the '338 patent further states that the one or more wagering input devices include computer devices with specialized hardware components (e.g., a physical cash out button) for performing one or more steps of the method described in claim 1. Specifically, claim 7 states that the one or more wagering input devices comprise at least one of a wagering terminal, a wagering workstation, a personal computer, a smart phone, a tablet computing device, a gaming machine, a slot machine, and a lottery machine.

91.    Further, claim 9 of the '338 patent adds the requirement that the wager comprises one or more of fixed odds single wagers, multiple wagers, full cover wagers, full cover wagers with singles, Any to Come ("ATC") or "if cash" wagers, specialty wagers, forecasts, fixed, variable, guaranteed, parimutuel wagering, fixed-odds wagering, accumulator or parlay wagering, fixed odds, a pool, progressive, fixed pool, variable pool or guaranteed pool.

92.    These technological improvements described and claimed in claims 1, 7 and 9 of the '338 patent were neither conventional nor generic at the time of their invention, but rather required novel and non-obvious solutions to problems and shortcomings specific to the technical field of online gaming systems, operating on computer networks. *See id*. at 1:6-50.   No existing electronic sportsbook was systematically offering the ability to dispose of a wager prior to

conclusion of a wagering event for a determined value to all of its users.  As described above, the claimed system is capable of processing data from multiple sources in real time to continuously generate an accurate value for a cash out offer that best represents instantaneous odds and is consistent across multiple wagering input devices. Accordingly, the claims improve a pre-existing technological process.

93.     The inventions of claims 1, 7 and 9 of the '338 patent are more than just the performance of well-understood, routine or conventional activities known in the art; they do not claim an online gaming network operating in its routine manner.  The prior art did not disclose the claimed, ordered combination of events discussed above, nor a device capable of performing such a method.

94.      The written description describes each of the elements of claims 1, 7 and 9 of the '338 patent such that persons of ordinary skill in the art understand what the claims and their elements cover and how the non-conventional and non-generic combination of claim elements differ markedly from, and improved upon, prior online gaming methods and devices.  *See* '338 patent, 1:54-3:29.

95.     Claims 1, 21, and 22 of the '439 patent, viewed in light of the specification, are not directed to a mathematical concept, or the concept of hedging.  As described herein, the claims are directed to a specific arrangement of components that are configured to generate accurate buy-out offers that are consistent for users regardless of what type of wagering input device they use and where they are located.

96.     Claims 1, 7, and 9 of the '338 patent, viewed in light of the specification, are not directed to any methods of organizing human activity or mental processes. The complexity of the claimed process increases for multi-outcome wagering events with multiple legs that depend on

the outcome of each other as required by claim 1. Likewise, in the case where at least one of the event and wager comprises one or more of fixed odds single wagers, multiple wagers, full cover wagers, full cover wagers with singles, Any to Come ("ATC") or "if cash" wagers, specialty wagers, forecasts, fixed, variable, guaranteed, parimutuel wagering, fixed-odds wagering, accumulator or parlay wagering, fixed odds, a pool, progressive, fixed pool, variable pool or guaranteed pool as in claim 9, the value of a wager depends on the number and value of other wagers in the pool.  The human mind is not capable of calculating every permutation that these wagering events present, especially in a period of time to provide accurate values for a buy-out to users before the completion of the wagering event.

97.     Claims 1, 7, and 9 of the '338 patent are not directed to the use of a general-purpose computer utilized in a typical fashion.  As an example, the patent discloses specific mid-tier server architecture, as depicted in Figure 3 of the '338 patent, including a Cash-In program and related subroutines.  The claimed method is directed to a specific combination and ordering of steps, resulting in a novel method, system, and device which are not simply a general-purpose computer performing generalized steps. Further, the wagering input devices of claim 7 include machines (e.g., wagering terminals) that include specialized components (e.g., a physical cash out button) for performing the process of claim 1.

### US Patent No. 10,970,969

98.     On April 6, 2021, the USPTO duly and legally issued the '969 patent entitled "Wagering Apparatus, Methods and Systems" to Bernard J. Marantelli.  The '969 patent has 30 claims.  A true and correct copy of the '969 patent is attached to this Complaint as **Exhibit 6** (hereinafter referred to as the "969 patent").

99.     The inventions of the '969 patent claims provide concrete technical solutions to a problem specifically arising in the realm of computer networks (i.e., distributed electronic gaming systems), namely, how to generate an offer to dispose of a wager prior to the conclusion of a wagering event that not only accurately reflects real-time variability of the wagering event but is also consistent across a plurality of online wagering input devices, regardless of their location.

100.     More specifically, the claimed invention includes computer software and hardware components that work together to receive, in real-time, complex data related to the progress and variability of one or more wagering events from multiple sources and wager information received from thousands (or more) of online wagering input devices over a communications interface. The system continuously processes this information to determine a value for an offer to dispose of a wager prior to a conclusion of the wagering event that most accurately reflects the number of pending wagers on the wagering event, their values, and the current variability of the wagering event.  See '969 patent, 2:6-4:31.

101.     For example, claim 21 of the '969 patent is directed to a non-transitory computer readable medium having stored thereon a computer program adapted for use with at least one wagering input device and at least one central server system for conducting a wagering event. The computer program comprises a routine of set instructions, which causes the processor to perform one or more operations, including: causing the at least one central server system to initiate the wagering event for one or more players, wherein the wagering event corresponds to a sporting event; causing the at least one wagering input device to accept a wager corresponding to a player of the one or more players that desires to participate in the wagering event; causing the wager that has been accepted by the at least one wagering input device to be communicated to the at least one central server system; causing the at least one central server system to generate a cash out offer for

33

the player by: evaluating a status of the sporting event; determining if the player is eligible to receive the cash out offer; and determining an amount of the cash out offer; causing the at least one central server system to communicate the cash out offer to the at least one wagering input device, causing the at least one wagering input device to display the cash out offer; causing the at least one wagering input device to identify if the cash out offer has been accepted or rejected by the player; and causing the at least one wagering input device to communicate the acceptance of the cash out offer to the at least one central server system.

102.    In addition, claims 22 and 23 of the '969 patent require that the one or more wagering input devices include computer devices with specialized hardware components (e.g., a physical cash out button). Specifically, claim 22 states that the at least one wagering input device is configured to issue a credit, tokens, coupon, voucher, award or funding of an account of the player based on the amount of the accepted cash out offer. Claim 23 states that the at least one wagering input device comprises a wagering terminal, a hand held device, a mobile device, a wireless device, a computer, a smart phone, a telephone, a tablet computer, a PDA or an interactive television.

103.    These technological improvements described and claimed in claims 21, 22, and 23 of the '969 patent were neither conventional nor generic at the time of their invention, but rather required novel and non-obvious solutions to problems and shortcomings specific to the technical field of online gaming systems, operating on computer networks. *See id*. at 1:6-2:2.  No existing electronic sportsbook was systematically offering the ability to dispose of a wager prior to conclusion of a wagering event for a determined value to all of its users.  As described above, the claimed system is capable of processing data from multiple sources in real time to continuously generate an accurate value for a cash out offer that best represents instantaneous odds and is

34

consistent across multiple wagering input devices. Accordingly, the claims improve a pre-existing technological process.

104.    The inventions of claims 21, 22, and 23 of the '969 patent are more than just the performance of well-understood, routine or conventional activities known in the art; they do not claim an online gaming network operating in its routine manner.  The prior art did not disclose the claimed, ordered combination of events discussed above, nor a device capable of performing such a method.

105.    The written description describes each of the elements of claims 21, 22, and 23 of the '969 patent such that persons of ordinary skill in the art understand what the claims and their elements cover and how the non-conventional and non-generic combination of claim elements differ markedly from, and improved upon, prior online gaming methods and devices.  *See* '969 patent, 2:6-4:31.

106.    Claims 21, 22, and 23 of the '969 patent, viewed in light of the specification, are not directed to a mathematical concept, or the concept of hedging.  As described herein, the claims are directed to a specific arrangement of components that are configured to generate accurate buy-out offers that are consistent for users regardless of what type of wagering input device they use and where they are located.

107.    Claims 21, 22, and 23 of the '969 patent, viewed in light of the specification are not directed to any methods of organizing human activity or mental processes. The human mind is not capable of calculating every permutation that these wagering events present, especially in a period of time to provide accurate values for a buy-out to users before the completion of the wagering event.

108.    Claims 21, 22, and 23 of the '969 patent are not directed to the use of a general-purpose computer utilized in a typical fashion.  As an example, the patent discloses specific mid-tier server architecture, as depicted in Figure 3 of the '969 patent, including a Cash-In program and related subroutines.  The claimed method is directed to a specific combination and ordering of steps, resulting in a novel method, system, and device which are not simply a general-purpose computer performing generalized steps. Further, the wagering input devices of claim 9 include machines that include specialized components (e.g., a physical cash out button and an electronic ticket generator) for performing the process of claim 8.

### US Patent No. 10,997,822

109.    On May 4, 2021, the USPTO duly and legally issued the '822 patent entitled "Wagering Apparatus, Methods and Systems" to Bernard J. Marantelli.  The '822 patent has 29 claims.  A true and correct copy of the '822 patent is attached to this Complaint as **Exhibit 7** (hereinafter referred to as the "822 patent").

110.    The inventions of the '822 patent claims provide concrete technical solutions to a problem specifically arising in the realm of computer networks (i.e., distributed electronic gaming systems), namely, how to generate an offer to dispose of a wager prior to the conclusion of a wagering event that not only accurately reflects real-time variability of the wagering event but is also consistent across a plurality of online wagering input devices, regardless of their location.

111.    More specifically, the claimed system includes components that work together to receive, in real-time, complex data related to the progress and variability of one or more wagering events from multiple sources and wager information received from thousands (or more) of online wagering input devices over a communications interface. The system continuously processes this information to determine a value for an offer to dispose of a wager prior to a conclusion of the

wagering event that most accurately reflects the number of pending wagers on the wagering event, their values, and the current variability of the wagering event. *See* '822 patent, 2:6-4:31.

112.    For example, claim 1 of the '822 patent is directed to a system for processing a payment for a wager in connection with a wagering event. The system comprises a communications interface, a processor operatively coupled to the communications interface, and a memory having programming instructions stored thereon, which, when executed by the processor, cause the processor to perform one or more operations, including: receiving, over the communications interface, a designated amount for a value of the wager on the wagering event from a first input device, receiving, over the communications interface, a cash out offer from a second input device, identifying an acceptance of the cash out offer from the first input device prior to the end of the wagering event, processing the cash out offer, and transmitting, over the communications interface, a value of the cash out offer to the first input device.

113.    In addition, claim 2 of the '822 patent further states that the one or more wagering input devices include computer devices with specialized hardware components (e.g., a physical cash out button). Specifically, claim 2 states that the one or more of the first input device and the second input device comprise one or more of wagering stations, wagering terminals, internet connected computing systems, smart phones, tablet computers, and televisions.

114.    Further, claim 4 of the '822 patent adds the requirement that the wager comprises one or more of fixed odds single wagers, multiple wagers, full cover wagers, full cover wagers with singles, Any to Come ("ATC") or "if cash" wagers, specialty wagers, forecasts, fixed, variable, guaranteed, parimutuel wagering, fixed-odds wagering, accumulator or parlay wagering, fixed odds, a pool, progressive, fixed pool, variable pool, and guaranteed pool.

115.    These technological improvements described and claimed in claims 1, 2, and 4 of the '822 patent were neither conventional nor generic at the time of their invention, but rather required novel and non-obvious solutions to problems and shortcomings specific to the technical field of online gaming systems, operating on computer networks.  *See id*. at 1:6-2:2.  No existing electronic sportsbook was systematically offering the ability to dispose of a wager prior to conclusion of a wagering event for a determined value to all of its users. As described above, the claimed system is capable of processing data from multiple sources in real time to continuously generate an accurate value for a cash out offer that best represents instantaneous odds and is consistent across multiple wagering input devices. Accordingly, the claims improve a pre-existing technological process.

116.    The inventions of claims 1, 2, and 4 of the '822 patent cover more than just the performance of well-understood, routine or conventional activities known in the art; they do not claim an online gaming network operating in its routine manner.  The prior art did not disclose the claimed, ordered combination of events discussed above, nor a device capable of performing such a method.

117.     The written description describes each of the elements of claims 1, 2, and 4 of the '822 patent such that persons of ordinary skill in the art understand what the claims and their elements cover and how the non-conventional and non-generic combination of claim elements differ markedly from, and improved upon, prior online gaming methods and devices.  *See* '822 patent, 2:6-4:31.

118.    Claims 1, 21, and 22 of the '439 patent, viewed in light of the specification, are not directed to a mathematical concept, or the concept of hedging.  As described herein, the claims are directed to a specific arrangement of components that are configured to generate accurate buy-out

offers that are consistent for users regardless of what type of wagering input device they use and where they are located.

119.    Claims 1, 2, and 4 of the '822 patent, viewed in light of the specification, are not directed to any methods of organizing human activity or mental processes. The complexity of the claimed process increases when the wager comprises one or more of fixed odds single wagers, multiple wagers, full cover wagers, full cover wagers with singles, Any to Come ("ATC") or "if cash" wagers, specialty wagers, forecasts, fixed, variable, guaranteed, parimutuel wagering, fixed-odds wagering, accumulator or parlay wagering, fixed odds, a pool, progressive, fixed pool, variable pool, and guaranteed pool as in claim 4. The value of a wager depends on the number and value of other wagers in the pool.  The human mind is not capable of calculating every permutation that these wagering events present, especially in a period of time to provide accurate values for a buy-out to users before the completion of the wagering event.

120.    Claims 1, 2, and 4 of the '822 patent are not directed to the use of a general-purpose computer utilized in a typical fashion.  As an example, the patent discloses specific mid-tier server architecture, as depicted in Figure 3 of the '822 patent, including a Cash-In program and related subroutines.  The claimed method is directed to a specific combination and ordering of steps, resulting in a novel method, system, and device which are not simply a general-purpose computer performing generalized steps. Further, the wagering input devices of claim 2 include machines (e.g., wagering stations) that include specialized components (e.g., a physical cash out button) for performing the process of claim 1.

### US Patent No. 11,200,779

121.    On December 14, 2021, the USPTO duly and legally issued the '779 patent entitled "Wagering Apparatus, Methods and Systems" to Bernard J. Marantelli.  The '779 patent has 30

claims.  A true and correct copy of the '779 patent is attached to this Complaint as **Exhibit 8** (hereinafter referred to as the "779 patent").

122.    The inventions of the '779 patent claims provide concrete technical solutions to a problem specifically arising in the realm of computer networks (i.e., distributed electronic gaming systems), namely, how to generate an offer to dispose of a wager prior to the conclusion of a wagering event that not only accurately reflects real-time variability of the wagering event but is also consistent across a plurality of online wagering input devices, regardless of their location.

123.    More specifically, the claimed system includes components that work together to receive, in real-time, complex data related to the progress and variability of one or more wagering events from multiple sources and wager information received from thousands (or more) of online wagering input devices over a communications interface. The system continuously processes this information to determine a value for an offer to dispose of a wager prior to a conclusion of the wagering event that most accurately reflects the number of pending wagers on the wagering event, their values, and the current variability of the wagering event.  *See* '779 patent, 1:54-3:3.

124.    For example, claim 16 of the '779 patent is directed to a system for conducting a wagering event among one or more participants in real time. The system includes a system controller comprising a trading engine module, a database, a plurality of input devices each having a user interface, and a communications interface for facilitating communications between the system controller and the plurality of input devices. The system controller is configured to: receive, by the trading engine module, a plurality of wagers on the wagering event from the plurality of input devices via the communications interface, the plurality of wagers input by a plurality of participants via the user interfaces of respective input devices from the plurality of input devices, store the plurality of wagers in a record within the database, the record comprising wager

information for the plurality of wagers associated with the plurality of participants, continuously retrieve data in real time related to a progress of the wagering event, recalculate the wager information in real time based on the continuously retrieved data, continuously evaluate the recalculated wager information, determine that one or more participants of the plurality of participants is eligible to win an award based on their respective one or more wagers and a potential outcome of the wagering event, generate one or more options in real time for the one or more participants to cash out prior to a conclusion of the wagering event for at least a portion of the award, cause the one or more options to be presented to the one or more participants via the user interfaces of the respective one or more input devices, receive a selection of an option from the one or more options for a participant from at least one input device from the one or more input devices prior to conclusion of the wagering event, and cause the at least the portion of the award to be presented to the a least one participant, such that the user interface displays one or more of a confirmation that the option has been selected and a value of the at least the portion of the award.

125.     In addition, claim 23 of the '779 adds the requirement that the plurality of wagers comprise one or more of fixed odds single wagers, multiple wagers, full cover wagers, full cover wagers with singles, Any to Come ("ATC") or "if cash" wagers, specialty wagers, forecasts, fixed, variable, guaranteed, parimutuel wagering, tote wagering, fixed-odds wagering, accumulator or parlay wagering, fixed odds, a pool, progressive, fixed pool, variable pool or guaranteed pool.

126.     Further, claim 25 of the '779 patent further states that the plurality of input devices include computer devices with specialized hardware components (e.g., a physical cash out button). Specifically, claim 25 states that the plurality of input devices comprise one or more of: a wagering station, a wagering terminal, a hand held device, a mobile device, a wireless device, a computing

system, a smart phone, a telephone, a tablet or desktop computer, a PDA, an interactive television, an internet connected device, and a cashier system.

127.    These technological improvements described and claimed in, for example, claims 16, 23, and 25 of the '779 patent were neither conventional nor generic at the time of their invention, but rather required novel and non-obvious solutions to problems and shortcomings specific to the technical field of online gaming systems, operating on computer networks.  *See id.* at 1:6-50.   No existing electronic sportsbook was systematically offering the ability to dispose of a wager prior to conclusion of a wagering event for a determined value to all of its users.   As described above, the claimed system is capable of processing data from multiple sources in real time to continuously generate an accurate value for a cash out offer that best represents instantaneous odds and is consistent across multiple wagering input devices. Accordingly, the claims improve a pre-existing technological process.

128.    The inventions of claims 16, 23, and 25 of the '779 patent are more than just the performance of well-understood, routine or conventional activities known in the art; they do not claim an online gaming network operating in its routine manner.  The prior art did not disclose the claimed, ordered combination of events discussed above, nor a device capable of performing such a method.

129.    The written description describes each of the elements of claims 16, 23, and 25 of the '779 patent such that persons of ordinary skill in the art understand what the claims and their elements cover and how the non-conventional and non-generic combination of claim elements differ markedly from, and improved upon, prior online gaming methods and devices.  *See* '779 patent, 1:54-3:3.

42

130.    Claims 1, 21, and 22 of the '439 patent, viewed in light of the specification, are not directed to a mathematical concept, or the concept of hedging.  As described herein, the claims are directed to a specific arrangement of components that are configured to generate accurate buy-out offers that are consistent for users regardless of what type of wagering input device they use and where they are located.

131.    Claims 16, 23, and 25 of the '779 patent, viewed in light of the specification, are not directed to any methods of organizing human activity or mental processes. The complexity of the claimed process increases when the plurality of wagers comprise one or more of fixed odds single wagers, multiple wagers, full cover wagers, full cover wagers with singles, `Any to Come` ("ATC") or "if cash" wagers, specialty wagers, forecasts, fixed, variable, guaranteed, parimutuel wagering, tote wagering, fixed-odds wagering, accumulator or parlay wagering, fixed odds, a pool, progressive, fixed pool, variable pool or guaranteed pool as in claim 23. The value of a wager depends on the number and value of other wagers in the pool.  The human mind is not capable of calculating every permutation that these wagering events present, especially in a period of time to provide accurate values for a buy-out to users before the completion of the wagering event.

132.    Claims 16, 23, and 25 of the '779 patent are not directed to the use of a general-purpose computer utilized in a typical fashion.  As an example, the patent discloses specific mid-tier server architecture, as depicted in Figure 3 of the '779 patent, including a Cash-In program and related subroutines.  The claimed method is directed to a specific combination and ordering of steps, resulting in a novel method, system, and device which are not simply a general-purpose computer performing generalized steps. Further, the wagering input devices of claim 25 include machines (e.g., wagering stations) that include specialized components (e.g., a physical cash out button) for performing the process of claim 16.

43

## GENERAL ALLEGATIONS

133.    On information and belief, DraftKings operates and does business under at least the names "DraftKings" and "DraftKings Sportsbook at Resorts Casino." On information and belief, DraftKings provides sportsbook services solely for DraftKings offerings.

134.    On information and belief, DraftKings operates sports and other betting games through electronic, interactive, and technological means (including the internet).

### *Accused Products*

135.    DraftKings' infringing products include its sports betting platform (i.e., DraftKings Sportsbook).  The DraftKings Sportsbook is accessible to end users through 1) DraftKings Sportsbook kiosks and/or over the counter betting at partnered casinos; 2) DraftKings Sportsbook mobile applications; and 3) DraftKings Sportsbook web applications; (collectively, the "Accused Products"). *Ways to Bet*, DRAFTKINGS https://www.draftkings.com/about/sportsbook/.

136.    DraftKings accesses and provides access to the DraftKings Sportsbook through its web-based interface, mobile applications running on computing devices, such as laptops, tablets, or mobile phones, and/or kiosks located at retail locations.  The mobile applications are available on any iOS or Android device, including any iPhone, iPad, iPod touch, Android phone or Android tablet. *DraftKings Mobile Apps*, DRAFTKINGS, https://www.draftkings.com/mobileapps.  The web-based interface is available through a web browser running on a personal computer, laptop, or other computing device. *Sign Me Up*, DRAFTKINGS, https://www.draftkings.com/; *Log In*, DRAFTKINGS SPORTSBOOK, https://sportsbook.draftkings.com. The kiosks are available at, at least, a retail location called the DraftKings Sportsbook at Resorts Casino, located at 1133 Boardwalk, Atlantic City, New Jersey 08401.

137.   DraftKings markets, advertises, sells, and offers to sell the DraftKings Sportsbook products, services and mobile applications through its root website domain draftkings.com, which includes the subdomains www.draftkings.com and https://www.draftkings.com/sportsbook.   The website and mobile applications prominently use the names "DraftKings," and "DraftKings Sportsbook" throughout.   On information and belief, the DraftKings Sportsbook website, mobile application, and kiosks at the DraftKings Sportsbook at Resorts Casino are effectuated at least in part through, and attributable to DraftKings.

138.   The DraftKings website includes copyright notices identifying "DraftKings" as the owner and are thus attributed to Defendant. In providing information regarding the website and DraftKings, the website identifies "DraftKings Inc. Boston, MA." On information and belief, the DraftKings website is administered and operated by Defendant.

139.   DraftKings offers various types of sports betting wagers to its users, including straight bets, parlay bets, and round robins on its sports betting platform.  *Bet Types, Frequently Asked Questions*, DRAFTKINGS SPORTSBOOK, https://sportsbook.draftkings.com.

140.   On information and belief, DraftKings uses and tests its products on various computing devices, including portable and mobile devices such as mobile phones, tablets, and laptops.  For example, DraftKings uses and tests its products on portable and mobile devices to develop training and video tutorials showing how to use DraftKings products and other promotional materials.  *See, e.g., DK My Contests Walkthrough*, YOUTUBE, https://youtu.be/ykiiUuvkufU; *CFB Announcement*, YOUTUBE, https://youtu.be/G5A3zSWFTVg; *How To Play*, DRAFTKINGS, https://www.draftkings.com/how-to-play; *DraftKings - The App!*, YOUTUBE, https://youtu.be/xAQPboDT4mQ; *NBA Quick Hits - February 3rd*, YOUTUBE,

https://www.youtube.com/watch?v=vtsvD9TbmaQ; *DraftKings Fantasy Football TV Commercial, 'Welcome to the Big Time'*, YOUTUBE, https://youtu.be/AIGap9cvu34; *DraftKings Commercial*, YOUTUBE, https://youtu.be/xo8N-fcH08g; *DraftKings Sportsbook TV Commercial, 'Golf's Biggest Weekend'*, ISPOT.TV, https://www.ispot.tv/ad/IhHV/draftkings-sportsbook-golfs-biggest-weekend; *DraftKings $750,000 Fantasy NASCAR Contest TV* Commercial, 'NASCAR Returns', ISPOT.TV, https://www.ispot.tv/ad/IlA7/draftkings-750000-fantasy-nascar-contest-nascar-returns. As another example, DraftKings uses and tests its products in conjunction with making those products available through and/or on Apple and Android devices. *See, e.g., Run your app on a device*, XCODE, https://help.apple.com/xcode/mac/current/#/dev60b6fbbc7; *Run Apps on a Hardware Device*, ANDROID STUDIO USER GUIDE, https://developer.android.com/studio/run/device.html ("[w]hen building an Android app, it's important that you always test your application on a real device before releasing it to users."). Additionally, DraftKings employs personnel for developing their games, which includes using and testing the DraftKings products on physical devices, including software engineers, mobile designers, and game analysts.

141.    The DraftKings Sportsbook uses innovative technology from the Asserted Patents. For example, the DraftKings Sportsbook provides a "Cash Out" feature that gives users the opportunity to close out their active bet before the outcome of a wagering event is decided. *See* https://sportsbook.draftkings.com/help/quick-start-guide/5.

142.    The "Cash Out" feature allows users to secure part of their winnings or cut their losses as the odds change in or against their favor. *See id*.

143.     The "Cash Out" feature is available for pre-game, live, future and parlay bets and can be for more or less than a user's original wagered amount, depending on how events unfold following your placement.  *See id*.  Users can determine if their bet is eligible for "Cash Out" after placing wager.  *See id*.

144.     After placing a bet, users can "Cash Out" of their wager early (i.e., before a conclusion of the wagering event) by visiting 'My Bets' within their account and selecting a yellow Cash Out button.  *See id*.  The DraftKings Sportsbook then confirms the user wants to cash out of their wager.  Payouts in are made upon confirming "Cash Out" and the money is deposited in the user's account immediately.  *See id*.

145.     The "Cash Out" feature is available on each of the Asserted Products. *See id*.

146.     DraftKings directs users to use the "Cash Out" feature and provides detailed instructions on how to cash out of a wager. *See id*.

### *Notices of Infringement*

147.     On August 9, 2018, Colossus sent a letter via certified mail and e-mail to Defendant informing Defendant of Colossus's patent portfolio covering their proprietary cash out feature and identifying specific features/products offered by Defendant that infringe Colossus's patents. Copies of Colossus's issued patents, including the '439 patent, the '341 patent, the '516 patent, the '716 patent, and the '338 patent, were attached.  A copy of this letter is attached to this Complaint as **Exhibit 9**.

148.     On August 20, 2018, Colossus sent a letter to Defendant via certified mail and e-mail requesting a response regarding Defendant's infringement of Colossus's patents.  A copy of this letter is attached to this Complaint as **Exhibit 10**.

47

149.    On August 21, 2018, Colossus sent a letter via UPS to Defendant's legal department with copies of the previous letters dates August 9, 2018 and August 20, 2018.  A copy of this letter is attached to this Complaint as **Exhibit 11**.

150.    On the same day, Colossus received an e-mail from Defendant's counsel confirming receipt of Colossus's previous letters.   A copy of this e-mail is attached to this Complaint as **Exhibit 12**.

151.    On July 20, 2021, Colossus sent a notice letter via certified mail and e-mail to Defendant's counsel informing Defendant of the issuance of additional patents to Colossus covering their propriety cash out feature, including the '969 patent and the '822 patent, and identifying specific features/products offered by Defendant that infringe Colossus' patents.  Copies of the '969 patent and the '822 patent were provided.  A copy of this letter is attached to this Complaint as **Exhibit 13**.

152.    On July 29, 2021, Colossus received a letter from Defendant's counsel indicating they would respond on behalf of Defendant and other partner entities.  A copy of this letter is attached to this Complaint as **Exhibit 14**.

## CLAIMS FOR RELIEF

## COUNT I - INFRINGEMENT OF US PATENT NO. 8,721,439

153.    The Accused Products practice the methods and systems of the '439 patent, including but not limited to, those in claims 1, 20, 21, 22, and 26. **Exhibit 15** includes a chart comparing a claim of the '439 patent (the "'439 patent Claim") to one or more of the Accused Products (the "'439 Accused Products").   As set forth in this chart, the '439 Accused Products incorporated in these charts satisfy all elements of, at least, the '439 patent Claim. Colossus therefore incorporates by reference in their allegations herein the claim chart of **Exhibit 15**.

154.    Defendant has been on actual notice of the '439 patent at least as early as about August 9, 2018, when Defendant received a notice letter from Plaintiffs.

155.    Defendant has infringed and continues to infringe, literally or under the doctrine of equivalents, one or more claims of the '439 patent by having made, used, offered to sell, sold and/or imported, without limitation, the '439 Accused Products.

156.    Defendant owns and controls the operation of the '439 Accused Products and generates substantial financial revenues therefrom. Defendant directly makes the infringing '439 Accused Products at least because it is solely responsible for putting the infringing system into service by directing and/or controlling the system as a whole and by obtaining the benefits therefrom, including through the Defendant's websites, mobile applications, and kiosks. Defendant further directly uses the '439 Accused Products at least because it assembled the combined infringing elements and makes them collectively available in the United States.

157.    Defendant also has and continues to infringe, literally or under the doctrine of equivalents, the '439 patent Claim, by having its employees internally test and use these '439 Accused Products. More specifically, in order to maintain legal compliance in the United States, Defendant is required to periodically monitor and ensure that the '439 Accused Products are performing as designed and intended. Defendant is also a direct infringer by virtue of its branding and marketing activities which collectively comprise the sale and offering for sale of the '439 Accused Products.

158.    Defendant has and continues to infringe, literally or under the doctrine of equivalents, the '439 patent by taking active steps to induce, encourage, facilitate, aid or otherwise cause direct infringement, either directly or under the doctrine of equivalents,  by others, including

but not limited to users of DraftKings Sportsbook through DraftKings' mobile application, website, and retail kiosks.

159.    Since at least after receiving actual notice of the '439 patent, Defendant has knowingly induced infringement of, and continues to knowingly induce infringement of, either directly or under the doctrine of equivalents, one or more claims of the '439 patent with specific intent that the '439 Accused Products be used by its customers, partners, and third parties to directly infringe the '439 patent, which products constitute a material part of the invention and are not staple articles or commodities of commerce suitable for substantial non-infringing use.

160.    Defendant has and continues to instruct and encourage its customers, partners, and third parties to use the '439 Accused Products in a manner that infringes at least the '439 patent Claim. *See* https://sportsbook.draftkings.com/help/quick-start-guide/5; **Exhibit 15**.

161.    Plaintiffs are informed and believe, and on this basis allege, that the Court should award increased damages under 35 U.S.C. § 284 for willful and deliberate infringement, and find this to be an exceptional case which warrants an award of attorney's fees to Plaintiffs pursuant to 35 U.S.C. § 285.

162.    Plaintiffs have suffered and continue to suffer irreparable injury as a direct and proximate result of Defendant's infringement for which there is no adequate remedy at law. Unless Defendant is enjoined, Plaintiffs will continue to suffer such irreparable injury.

163.    The foregoing infringement on the part of Defendant has caused past and ongoing injury to Plaintiffs. Colossus is entitled to recover damages adequate to compensate for Defendant's infringement.

164.    To the extent Defendant continues, and has continued, its infringing activities noted above in an infringing manner post-notice of the '439 patent, such infringement is and will be necessarily willful and deliberate.

165.    Each of Defendant's aforesaid activities have been without authority and/or license from Plaintiffs.

## COUNT II - INFRINGEMENT OF US PATENT NO. 9,117,341

166.    The Accused Products practice the methods and systems of the '341 patent, including but not limited to, those in claims 1, 21, 22, and 31.  **Exhibit 16** includes a chart comparing a claim of the '341 patent (the "'341 patent Claim") to one or more of the Accused Products (the "'341 Accused Products").  As set forth in this chart, the '341 Accused Products incorporated in these charts satisfy all elements of, at least, the '341 patent Claim. Colossus therefore incorporates by reference in their allegations herein the claim chart of **Exhibit 16**.

167.    Defendant has been on actual notice of the '341 patent at least as early as about August 9, 2018, when Defendant received a notice letter from Plaintiffs.

168.    Defendant has infringed and continues to infringe, literally or under the doctrine of equivalents, one or more claims of the '341 patent by having made, used, offered to sell, sold and/or imported, without limitation, the '341 Accused Products.

169.    Defendant owns and controls the operation of the '341 Accused Products and generates substantial financial revenues therefrom. Defendant directly makes the infringing '341 Accused Products at least because it is solely responsible for putting the infringing system into service by directing and/or controlling the system as a whole and by obtaining the benefits therefrom, including through the Defendant's websites, mobile applications, and kiosks.

Defendant further directly uses the '341 Accused Products at least because it assembled the combined infringing elements and makes them collectively available in the United States.

170.    Defendant also has and continues to infringe, literally or under the doctrine of equivalents, the '341 patent Claim, by having its employees internally test and use these '341 Accused Products. More specifically, in order to maintain legal compliance in the United States, Defendant is required to periodically monitor and ensure that the '341 Accused Products are performing as designed and intended. Defendant is also a direct infringer by virtue of its branding and marketing activities which collectively comprise the sale and offering for sale of the '341 Accused Products.

171.    Defendant has and continues to infringe, literally or under the doctrine of equivalents, the '341 patent by taking active steps to induce, encourage, facilitate, aid or otherwise cause direct infringement, either directly or under the doctrine of equivalents,  by others, including but not limited to users of DraftKings Sportsbook through DraftKings' mobile application, website, and retail kiosks.

172.    Since at least after receiving actual notice of the '341 patent, Defendant has knowingly induced infringement of, and continues to knowingly induce infringement of, either directly or under the doctrine of equivalents, one or more claims of the '341 patent with specific intent that the '341 Accused Products be used by its customers, partners, and third parties to directly infringe the '341 patent, which products constitute a material part of the invention and are not staple articles or commodities of commerce suitable for substantial non-infringing use.

173.    Defendant has and continues to instruct and encourage its customers, partners, and third parties to use the '341 Accused Products in a manner that infringes at least the '341 patent Claim. *See* https://sportsbook.draftkings.com/help/quick-start-guide/5; **Exhibit 16**.

52

174.    Plaintiffs are informed and believe, and on this basis allege, that the Court should award increased damages under 35 U.S.C. § 284 for willful and deliberate infringement, and find this to be an exceptional case which warrants an award of attorney's fees to Plaintiffs pursuant to 35 U.S.C. § 285.

175.    Plaintiffs have suffered and continue to suffer irreparable injury as a direct and proximate result of Defendant's infringement for which there is no adequate remedy at law. Unless Defendant is enjoined, Plaintiffs will continue to suffer such irreparable injury.

176.    The foregoing infringement on the part of Defendant has caused past and ongoing injury to Plaintiffs. Colossus is entitled to recover damages adequate to compensate for Defendant's infringement.

177.    To the extent Defendant continues, and has continued, its infringing activities noted above in an infringing manner post-notice of the '341 patent, such infringement is and will be necessarily willful and deliberate.

178.     Each of Defendant's aforesaid activities have been without authority and/or license from Plaintiffs.

**COUNT III - INFRINGEMENT OF US PATENT NO. 9,275,516**

179.    The Accused Products practice the systems and apparatuses of '516 patent, including but not limited to, those in claims 54, 68, 73, and 74.  **Exhibit 17** includes a chart comparing a claim of the '516 patent (the "'516 patent Claim") to one or more of the Accused Products (the "'516 Accused Products").  As set forth in this chart, the '516 Accused Products incorporated in these charts satisfy all elements of, at least, the '516 patent Claim. Colossus therefore incorporates by reference in their allegations herein the claim chart of **Exhibit 17**.

180.    Defendant has been on actual notice of the '516 patent at least as early as about August 9, 2018, when Defendant received a notice letter from Plaintiffs.

181.    Defendant has infringed and continues to infringe, literally or under the doctrine of equivalents, one or more claims of the '516 patent by having made, used, offered to sell, sold and/or imported, without limitation, the '516 Accused Products.

182.    Defendant owns and controls the operation of the '516 Accused Products and generates substantial financial revenues therefrom. Defendant directly makes the infringing '516 Accused Products at least because it is solely responsible for putting the infringing system into service by directing and/or controlling the system as a whole and by obtaining the benefits therefrom, including through the Defendant's websites, mobile applications, and kiosks. Defendant further directly uses the '516 Accused Products at least because it assembled the combined infringing elements and makes them collectively available in the United States.

183.    Defendant also has and continues to infringe, literally or under the doctrine of equivalents, the '516 patent Claim, by having its employees internally test and use these '516 Accused Products. More specifically, in order to maintain legal compliance in the United States, Defendant is required to periodically monitor and ensure that the '516 Accused Products are performing as designed and intended. Defendant is also a direct infringer by virtue of its branding and marketing activities which collectively comprise the sale and offering for sale of the '516 Accused Products.

184.    Defendant has and continues to infringe, literally or under the doctrine of equivalents, the '516 patent by taking active steps to induce, encourage, facilitate, aid or otherwise cause direct infringement, either directly or under the doctrine of equivalents, by others, including

but not limited to users of DraftKings Sportsbook through DraftKings' mobile application, website, and retail kiosks.

185.    Since at least after receiving actual notice of the '516 patent, Defendant has knowingly induced infringement of, and continues to knowingly induce infringement of, either directly or under the doctrine of equivalents, one or more claims of the '516 patent with specific intent that the '516 Accused Products be used by its customers, partners, and third parties to directly infringe the '516 patent, which products constitute a material part of the invention and are not staple articles or commodities of commerce suitable for substantial non-infringing use.

186.    Defendant has and continues to instruct and encourage its customers, partners, and third parties to use the '516 Accused Products in a manner that infringes at least the '516 patent Claim. *See* https://sportsbook.draftkings.com/help/quick-start-guide/5; **Exhibit 17**.

187.    Plaintiffs are informed and believe, and on this basis allege, that the Court should award increased damages under 35 U.S.C. § 284 for willful and deliberate infringement, and find this to be an exceptional case which warrants an award of attorney's fees to Plaintiffs pursuant to 35 U.S.C. § 285.

188.    Plaintiffs have suffered and continue to suffer irreparable injury as a direct and proximate result of Defendant's infringement for which there is no adequate remedy at law. Unless Defendant is enjoined, Plaintiffs will continue to suffer such irreparable injury.

189.    The foregoing infringement on the part of Defendant has caused past and ongoing injury to Plaintiffs. Colossus is entitled to recover damages adequate to compensate for Defendant's infringement.

190.    To the extent Defendant continues, and has continued, its infringing activities noted above in an infringing manner post-notice of the '516 patent, such infringement is and will be necessarily willful and deliberate.

191.     Each of Defendant's aforesaid activities have been without authority and/or license from Plaintiffs.

### COUNT IV - INFRINGEMENT OF US PATENT NO. 9,424,716

192.    The Accused Products practice the systems and apparatuses of the '716 patent, including but not limited to, those in claims 54, 60, and 65. **Exhibit 18** includes a chart comparing a claim of the '716 patent (the "'716 patent Claim") to one or more of the Accused Products (the "'716 Accused Products").  As set forth in this chart, the '716 Accused Products incorporated in these charts satisfy all elements of, at least, the '716 patent Claim. Colossus therefore incorporates by reference in their allegations herein the claim chart of **Exhibit 18**.

193.    Defendant has been on actual notice of the '716 patent at least as early as about August 9, 2018, when Defendant received a notice letter from Plaintiffs.

194.    Defendant has infringed and continues to infringe, literally or under the doctrine of equivalents, one or more claims of the '716 patent by having made, used, offered to sell, sold and/or imported, without limitation, the '716 Accused Products.

195.    Defendant owns and controls the operation of the '716 Accused Products and generates substantial financial revenues therefrom. Defendant directly makes the infringing '716 Accused Products at least because it is solely responsible for putting the infringing system into service by directing and/or controlling the system as a whole and by obtaining the benefits therefrom, including through the Defendant's websites, mobile applications, and kiosks.

Defendant further directly uses the '716 Accused Products at least because it assembled the combined infringing elements and makes them collectively available in the United States.

196.    Defendant also has and continues to infringe, literally or under the doctrine of equivalents, the '716 patent Claim, by having its employees internally test and use these '716 Accused Products. More specifically, in order to maintain legal compliance in the United States, Defendant is required to periodically monitor and ensure that the '716 Accused Products are performing as designed and intended. Defendant is also a direct infringer by virtue of its branding and marketing activities which collectively comprise the sale and offering for sale of the '716 Accused Products.

197.    Defendant has and continues to infringe, literally or under the doctrine of equivalents, the '716 patent by taking active steps to induce, encourage, facilitate, aid or otherwise cause direct infringement, either directly or under the doctrine of equivalents, by others, including but not limited to users of DraftKings Sportsbook through DraftKings' mobile application, website, and retail kiosks.

198.    Since at least after receiving actual notice of the '716 patent, Defendant has knowingly induced infringement of, and continues to knowingly induce infringement of, either directly or under the doctrine of equivalents, one or more claims of the '716 patent with specific intent that the '716 Accused Products be used by its customers, partners, and third parties to directly infringe the '716 patent, which products constitute a material part of the invention and are not staple articles or commodities of commerce suitable for substantial non-infringing use.

199.    Defendant has and continues to instruct and encourage its customers, partners, and third parties to use the '716 Accused Products in a manner that infringes at least the '716 patent Claim. *See* https://sportsbook.draftkings.com/help/quick-start-guide/5; **Exhibit 18**.

200.     Plaintiffs are informed and believe, and on this basis allege, that the Court should award increased damages under 35 U.S.C. § 284 for willful and deliberate infringement, and find this to be an exceptional case which warrants an award of attorney's fees to Plaintiffs pursuant to 35 U.S.C. § 285.

201.     Plaintiffs have suffered and continue to suffer irreparable injury as a direct and proximate result of Defendant's infringement for which there is no adequate remedy at law. Unless Defendant is enjoined, Plaintiffs will continue to suffer such irreparable injury.

202.     The foregoing infringement on the part of Defendant has caused past and ongoing injury to Plaintiffs. Colossus is entitled to recover damages adequate to compensate for Defendant's infringement.

203.     To the extent Defendant continues, and has continued, its infringing activities noted above in an infringing manner post-notice of the '716 patent, such infringement is and will be necessarily willful and deliberate.

204.      Each of Defendant's aforesaid activities have been without authority and/or license from Plaintiffs.

**COUNT V - INFRINGEMENT OF US PATENT NO. 9,704,338**

205.     The Accused Products practice the methods and systems of the '338 patent, including but not limited to, those in claims 1, 7, 9, and 21. **Exhibit 19** includes a chart comparing a claim of the '338 patent (the "'338 patent Claim") to one or more of the Accused Products (the "'338 Accused Products").  As set forth in this chart, the '338 Accused Products incorporated in these charts satisfy all elements of, at least, the '338 patent Claim. Colossus therefore incorporates by reference in their allegations herein the claim chart of **Exhibit 19**.

206.    Defendant has been on actual notice of the '338 patent at least as early as about August 9, 2018, when Defendant received a notice letter from Plaintiffs.

207.    Defendant has infringed and continues to infringe, literally or under the doctrine of equivalents, one or more claims of the '338 patent by having made, used, offered to sell, sold and/or imported, without limitation, the '338 Accused Products.

208.    Defendant owns and controls the operation of the '338 Accused Products and generates substantial financial revenues therefrom. Defendant directly makes the infringing '338 Accused Products at least because it is solely responsible for putting the infringing system into service by directing and/or controlling the system as a whole and by obtaining the benefits therefrom, including through the Defendant's websites, mobile applications, and kiosks. Defendant further directly uses the '338 Accused Products at least because it assembled the combined infringing elements and makes them collectively available in the United States.

209.    Defendant also has and continues to infringe, literally or under the doctrine of equivalents, the '338 patent Claim, by having its employees internally test and use these '338 Accused Products. More specifically, in order to maintain legal compliance in the United States, Defendant is required to periodically monitor and ensure that the '338 Accused Products are performing as designed and intended. Defendant is also a direct infringer by virtue of its branding and marketing activities which collectively comprise the sale and offering for sale of the '338 Accused Products.

210.    Defendant has and continues to infringe, literally or under the doctrine of equivalents, the '338 patent by taking active steps to induce, encourage, facilitate, aid or otherwise cause direct infringement, either directly or under the doctrine of equivalents, by others, including

but not limited to users of DraftKings Sportsbook through DraftKings' mobile application, website, and retail kiosks.

211.    Since at least after receiving actual notice of the '338 patent, Defendant has knowingly induced infringement of, and continues to knowingly induce infringement of, either directly or under the doctrine of equivalents, one or more claims of the '338 patent with specific intent that the '338 Accused Products be used by its customers, partners, and third parties to directly infringe the '338 patent, which products constitute a material part of the invention and are not staple articles or commodities of commerce suitable for substantial non-infringing use.

212.    Defendant has and continues to instruct and encourage its customers, partners, and third parties to use the '338 Accused Products in a manner that infringes at least the '338 patent Claim. *See* https://sportsbook.draftkings.com/help/quick-start-guide/5; **Exhibit 19**.

213.    Plaintiffs are informed and believe, and on this basis allege, that the Court should award increased damages under 35 U.S.C. § 284 for willful and deliberate infringement, and find this to be an exceptional case which warrants an award of attorney's fees to Plaintiffs pursuant to 35 U.S.C. § 285.

214.    Plaintiffs have suffered and continue to suffer irreparable injury as a direct and proximate result of Defendant's infringement for which there is no adequate remedy at law. Unless Defendant is enjoined, Plaintiffs will continue to suffer such irreparable injury.

215.    The foregoing infringement on the part of Defendant has caused past and ongoing injury to Plaintiffs. Colossus is entitled to recover damages adequate to compensate for Defendant's infringement.

216.     To the extent Defendant continues, and has continued, its infringing activities noted above in an infringing manner post-notice of the '338 patent, such infringement is and will be necessarily willful and deliberate.

217.     Each of Defendant's aforesaid activities have been without authority and/or license from Plaintiffs.

## COUNT VI - INFRINGEMENT OF US PATENT NO. 10,970,969

218.     The Accused Products practice the methods and non-transitory computer readable mediums of the '969 patent, including but not limited to, those in claims 1, 8, 21, and 22 . **Exhibit 20** includes a chart comparing a claim of the '969 patent (the "'969 patent Claim") to one or more of the Accused Products (the "'969 Accused Products").   As set forth in this chart, the '969 Accused Products incorporated in these charts satisfy all elements of, at least, the '969 patent Claim. Colossus therefore incorporates by reference in their allegations herein the claim chart of **Exhibit 20**.

219.     Defendant has been on actual notice of the '969 patent at least as early as about August 9, 2018, when Defendant received a notice letter from Plaintiffs.

220.     Defendant has infringed and continues to infringe, literally or under the doctrine of equivalents, one or more claims of the '969 patent by having made, used, offered to sell, sold and/or imported, without limitation, the '969 Accused Products.

221.     Defendant owns and controls the operation of the '969 Accused Products and generates substantial financial revenues therefrom. Defendant directly makes the infringing '969 Accused Products at least because it is solely responsible for putting the infringing system into service by directing and/or controlling the system as a whole and by obtaining the benefits therefrom, including through the Defendant's websites, mobile applications, and kiosks.

Defendant further directly uses the '969 Accused Products at least because it assembled the combined infringing elements and makes them collectively available in the United States.

222.    Defendant also has and continues to infringe, literally or under the doctrine of equivalents, the '969 patent Claim, by having its employees internally test and use these '969 Accused Products. More specifically, in order to maintain legal compliance in the United States, Defendant is required to periodically monitor and ensure that the '969 Accused Products are performing as designed and intended. Defendant is also a direct infringer by virtue of its branding and marketing activities which collectively comprise the sale and offering for sale of the '969 Accused Products.

223.    Defendant has and continues to infringe, literally or under the doctrine of equivalents, the '969 patent by taking active steps to induce, encourage, facilitate, aid or otherwise cause direct infringement, either directly or under the doctrine of equivalents, by others, including but not limited to users of DraftKings Sportsbook through DraftKings' mobile application, website, and retail kiosks.

224.    Since at least after receiving actual notice of the '969 patent, Defendant has knowingly induced infringement of, and continues to knowingly induce infringement of, either directly or under the doctrine of equivalents, one or more claims of the '969 patent with specific intent that the '969 Accused Products be used by its customers, partners, and third parties to directly infringe the '969 patent, which products constitute a material part of the invention and are not staple articles or commodities of commerce suitable for substantial non-infringing use.

225.    Defendant has and continues to instruct and encourage its customers, partners, and third parties to use the '969 Accused Products in a manner that infringes at least the '969 patent Claim. *See* https://sportsbook.draftkings.com/help/quick-start-guide/5; **Exhibit 20**.

226.     Plaintiffs are informed and believe, and on this basis allege, that the Court should award increased damages under 35 U.S.C. § 284 for willful and deliberate infringement, and find this to be an exceptional case which warrants an award of attorney's fees to Plaintiffs pursuant to 35 U.S.C. § 285.

227.     Plaintiffs have suffered and continue to suffer irreparable injury as a direct and proximate result of Defendant's infringement for which there is no adequate remedy at law. Unless Defendant is enjoined, Plaintiffs will continue to suffer such irreparable injury.

228.     The foregoing infringement on the part of Defendant has caused past and ongoing injury to Plaintiffs. Colossus is entitled to recover damages adequate to compensate for Defendant's infringement.

229.     To the extent Defendant continues, and has continued, its infringing activities noted above in an infringing manner post-notice of the '969 patent, such infringement is and will be necessarily willful and deliberate.

230.      Each of Defendant's aforesaid activities have been without authority and/or license from Plaintiffs.

**COUNT VII - INFRINGEMENT OF US PATENT NO. 10,997,822**

231.     The Accused Products practice the systems and non-transitory computer readable mediums of the '822 patent, including but limited to, those in claims 1, 2, 4, and 15.  **Exhibit 21** includes a chart comparing a claim of the '822 patent (the "'822 patent Claim") to one or more of the Accused Products (the "'822 Accused Products").  As set forth in this chart, the '822 Accused Products incorporated in these charts satisfy all elements of, at least, the '822 patent Claim. Colossus therefore incorporates by reference in their allegations herein the claim chart of **Exhibit 21**.

232.    Defendant has been on actual notice of the '822 patent at least as early as about August 9, 2018, when Defendant received a notice letter from Plaintiffs.

233.    Defendant has infringed and continues to infringe, literally or under the doctrine of equivalents, one or more claims of the '822 patent by having made, used, offered to sell, sold and/or imported, without limitation, the '822 Accused Products.

234.    Defendant owns and controls the operation of the '822 Accused Products and generates substantial financial revenues therefrom. Defendant directly makes the infringing '822 Accused Products at least because it is solely responsible for putting the infringing system into service by directing and/or controlling the system as a whole and by obtaining the benefits therefrom, including through the Defendant's websites, mobile applications, and kiosks. Defendant further directly uses the '822 Accused Products at least because it assembled the combined infringing elements and makes them collectively available in the United States.

235.    Defendant also has and continues to infringe, literally or under the doctrine of equivalents, the '822 patent Claim, by having its employees internally test and use these '822 Accused Products. More specifically, in order to maintain legal compliance in the United States, Defendant is required to periodically monitor and ensure that the '822 Accused Products are performing as designed and intended. Defendant is also a direct infringer by virtue of its branding and marketing activities which collectively comprise the sale and offering for sale of the '822 Accused Products.

236.    Defendant has and continues to infringe, literally or under the doctrine of equivalents, the '822 patent by taking active steps to induce, encourage, facilitate, aid or otherwise cause direct infringement, either directly or under the doctrine of equivalents,  by others, including

but not limited to users of DraftKings Sportsbook through DraftKings' mobile application, website, and retail kiosks.

237.    Since at least after receiving actual notice of the '822 patent, Defendant has knowingly  induced infringement of, and continues to knowingly induce infringement of, either directly or under the doctrine of equivalents, one or more claims of the '822 patent with specific intent that the '822 Accused Products be used by its customers, partners, and third parties to directly infringe the '822 patent, which products constitute a material part of the invention and are not staple articles or commodities of commerce suitable for substantial non-infringing use.

238.    Defendant has and continues to instruct and encourage its customers, partners, and third parties to use the '822 Accused Products  in a manner that infringes at least the '822 patent Claim. *See* https://sportsbook.draftkings.com/help/quick-start-guide/5; **Exhibit 21**.

239.    Plaintiffs are informed and believe, and on this basis allege, that the Court should award increased damages under 35 U.S.C. § 284 for willful and deliberate infringement, and find this to be an exceptional case which warrants an award of attorney's fees to Plaintiffs pursuant to 35 U.S.C. § 285.

240.    Plaintiffs have suffered and continue to suffer irreparable injury as a direct and proximate result of Defendant's infringement for which there is no adequate remedy at law. Unless Defendant is enjoined, Plaintiffs will continue to suffer such irreparable injury.

241.    The foregoing infringement on the part of Defendant has caused past and ongoing injury to Plaintiffs. Colossus is entitled to recover damages adequate to compensate for Defendant's infringement.

242.    To the extent Defendant continues, and has continued, its infringing activities noted above in an infringing manner post-notice of the '822 patent, such infringement is and will be necessarily willful and deliberate.

243.    Each of Defendant's aforesaid activities have been without authority and/or license from Plaintiffs.

## COUNT VIII - INFRINGEMENT OF US PATENT NO. 11,200,779

244.    The Accused Products practice the systems of the '779 patent, including but not limited to, those in claims 16, 23, and 25. **Exhibit 22** includes a chart comparing a claim of the '779 patent (the "'779 patent Claim") to one or more of the Accused Products (the "'779 Accused Products").  As set forth in this chart,  the '779 Accused Products incorporated in these charts satisfy all elements of, at least, the '779 patent Claim. Colossus therefore incorporates by reference in their allegations herein the claim chart of **Exhibit 22**.

245.    Defendant has infringed and continues to infringe, literally or under the doctrine of equivalents, one or more claims of the '779 patent by having made, used, offered to sell, sold and/or imported, without limitation, the '779 Accused Products.

246.    Defendant owns and controls the operation of the '779 Accused Products and generates substantial financial revenues therefrom. Defendant directly makes the infringing '779 Accused Products at least because it is solely responsible for putting the infringing system into service by directing and/or controlling the system as a whole and by obtaining the benefits therefrom, including through the Defendant's websites, mobile applications, and kiosks. Defendant further directly uses the '779 Accused Products at least because it assembled the combined infringing elements and makes them collectively available in the United States.

247. Defendant also has and continues to infringe, literally or under the doctrine of equivalents, the '779 patent Claim, by having its employees internally test and use these '779 Accused Products. More specifically, in order to maintain legal compliance in the United States, Defendant is required to periodically monitor and ensure that the '779 Accused Products are performing as designed and intended. Defendant is also a direct infringer by virtue of its branding and marketing activities which collectively comprise the sale and offering for sale of the '779 Accused Products.

248. Defendant has and continues to infringe, literally or under the doctrine of equivalents, the '779 patent by taking active steps to induce, encourage, facilitate, aid or otherwise cause direct infringement, either directly or under the doctrine of equivalents, by others, including but not limited to users of DraftKings Sportsbook through DraftKings' mobile application, website, and retail kiosks.

249. Since at least after receiving actual notice of the '779 patent, Defendant has knowingly induced infringement of, and continues to knowingly induce infringement of, either directly or under the doctrine of equivalents, one or more claims of the '779 patent with specific intent that the '779 Accused Products be used by its customers, partners, and third parties to directly infringe the '779 patent, which products constitute a material part of the invention and are not staple articles or commodities of commerce suitable for substantial non-infringing use.

250. Defendant has and continues to instruct and encourage its customers, partners, and third parties to use the '779 Accused Products in a manner that infringes at least the '779 patent Claim. *See* https://sportsbook.draftkings.com/help/quick-start-guide/5; **Exhibit 22**.

251. Plaintiffs are informed and believe, and on this basis allege, that the Court should award increased damages under 35 U.S.C. § 284 for willful and deliberate infringement, and find

this to be an exceptional case which warrants an award of attorney's fees to Plaintiffs pursuant to 35 U.S.C. § 285.

252.    Plaintiffs have suffered and continue to suffer irreparable injury as a direct and proximate result of Defendant's infringement for which there is no adequate remedy at law. Unless Defendant is enjoined, Plaintiffs will continue to suffer such irreparable injury.

253.    The foregoing infringement on the part of Defendant has caused past and ongoing injury to Plaintiffs. Colossus is entitled to recover damages adequate to compensate for Defendant's infringement.

254.    To the extent Defendant continues, and has continued, its infringing activities noted above in an infringing manner post-notice of the '779 patent, such infringement is and will be necessarily willful and deliberate.

255.    Each of Defendant's aforesaid activities have been without authority and/or license from Plaintiffs.

## JURY DEMAND

256.    Plaintiffs request a trial by jury all issues so triable by right.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully requests that the Court find in their favor and against Defendant aa follows:

1.  That DraftKings has infringed and is infringing the Asserted Patents under 35 U.S.C. § 271;

2.  That DraftKings has willfully infringed each of the Asserted Patents;

3.  Equitable relief under 35 U.S.C. § 283, including but not limited to an injunction that enjoins DraftKings and any of its officers, agents, employees, assigns, representatives,

privies, successors, and those acting in concert or participation with them from infringing the Asserted Patents;

4. An award of damages sufficient to compensate Colossus for infringement of the Asserted Patents by DraftKings, together with prejudgment and post-judgment interest under 35 U.S.C. § 284;

5. That Colossus be awarded damages increased up to three times under 35 U.S.C. § 284 as a result of DraftKings' willful infringement;

6. Entry of an order compelling DraftKings to compensate Colossus for any ongoing and/or future infringement of the Asserted Patents, in an amount and under terms appropriate under the circumstances;

7. That this Court declare this an exceptional case and award Colossus reasonable attorneys' fees, costs, and expenses in accordance with 35 U.S.C. § 285; and

8. That Colossus be granted such other and further relief as the Court may deem just and proper under the circumstances.

Dated: February 7, 2022

**Of Counsel**:

Paul A. Taufer (admitted *Pro Hac Vice*)
Michael L. Burns (admitted *Pro Hac Vice*)
Steven M. Kellner (admitted *Pro Hac Vice*)
Gregory Ferroni (admitted *Pro Hac Vice*)
**DLA PIPER LLP (US)**
One Liberty Place
1650 Market Street, PA 19102
Telephone: 215-656-3385
Facsimile: 215-606-3385
paul.taufer@us.dlapiper.com
michael.burns@us.dlapiper.com
steven.kellner@us.dlapiper.com
gregory.ferroni@us.dlapiper.com

**DLA PIPER LLP (US)**

/s/ Brian A. Biggs
Brian A. Biggs (DE Bar No. 5591)
1201 North Market Street, Suite 2100
Wilmington, DE 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2341
brian.biggs@us.dlapiper.com

*Attorney for Plaintiff Diogenes Limited and Colossus (IOM) Limited*

70