

DLA Piper LLP (US)
1201 North Market Street
Suite 2100
Wilmington, Delaware 19801-1147
www.dlapiper.com

Brian Biggs
Brian.Biggs@dlapiper.com
T  302.468.5661
F  302.778.7813

July 1, 2022
*VIA CM/ECF*

Honorable Christopher J. Burke
United States District Court
District of Delaware
J. Caleb Boggs Federal Building
844 N. King Street
Unit 28, Room 2325
Wilmington, DE 19801-3555

Re:   *Diogenes Limited, Colossus (IOM) Limited v. DraftKings, Inc.*, C.A. No. 21-1695-MN-CJB

Dear Judge Burke,

Pursuant to the Court's June 24, 2022 Oral Order (D.I. 40), Plaintiffs Diogenes Limited and Colossus (IOM) Limited respectfully submit the following responses to the Court's Section 101 inquiries, as follows.

> **(1)  Which Supreme Court or Federal Circuit case is most similar to the challenged claim(s)? That is, each party is to identify which case provides the best analogy if this Court is to compare the claim(s) at issue in the relevant Section 101 Motion to claims previously found to be patent (in)eligible by a higher court[.]**

The claims of Colossus' Asserted Patents mimic most closely those at issue in *DDR Holdings, LLC v. Hotels.com LP*, 773 F.3d 1245 (Fed. Cir. 2014).  Each claim set "addresses a business challenge (retaining website visitors) [that] is a challenge particular to the internet," and even further, each challenge involved retaining users.  *Id.* at 1258.  *DDR's* "stickability" problem was that conventional hyperlinks would lead consumers away from a host's website—*i.e.*, presented the "challenge of retaining control over the attention of the customer." *Id.*  Exemplary claim 19 of Pat. No. 7,818,399 in *DDR* provided a system for displaying unique web pages; its key limitations required that once a user clicked on an active link associated with a buying opportunity, the system would (i) receive a signal corresponding to that link activation; (ii) automatically identify the source page; (iii) retrieve corresponding source data and then, critically, (iv) "automatically generate and transmit to the web browser a second web page" that displayed "elements visually corresponding to the source page."  The *DDR* system was patent-eligible because it changed the function of an old feature (a hyperlink) to automatically create a new display (a unique webpage with the look and feel of the source) thereby "address[ing] a

business challenge (retaining website visitors) . . . particular to the Internet." *Id.* at 1257.  The "stickability" problem addressed by the Colossus patents was that typical gamblers, especially those familiar with in-person betting, were not retaining interest with the computerized betting platform.  FAC ¶¶ 30, 34-37; Ans. Br. at 13-16; *see also, e.g.*, '439 Patent at 1:47-62, 2:32-63.  Colossus' claims address a business challenge specifically arising in the realm of computer networks (disparities between in-person and computerized betting), providing a technical solution that improved computerized betting. *See, e.g.*, '439 Patent 1:64-46, 2:32-63.  Just as *DDR's* system providing for an altered web page display was rooted in technology, so too are the systems here, which generate and display *accurate, constantly-updating* buy-out and partial buy-out offers on a wagerer's cell phone or laptop or on a parimutuel slot machine.  Further, both the *DDR* and Colossus systems and apparatuses cause a unique display to be provided; Colossus' systems also include claims that culminate in a buy-out or partial buy-out offer that *changes and updates on the user interface* (*e.g.* a cell phone or computer) *in real time*.  FAC ¶¶ 27-29; Ans. Br. at 17-19; *see also, e.g.*, '439 Patent Fig. 3 (Cash-In program and subroutines), '779 Patent Claim 16, and '516 Patent Claim 68.

      The claims at issue in *DDR* "specify how interactions with the Internet are manipulated to yield a desired result—a result that overrides the routine and conventional sequence of events ordinarily triggered by the click of a hyperlink." *Id.* at 1258-59.  The Colossus claims analogously override the routine and conventional sequences of events found in conventional wagering systems, where the success and payout value for a bet were determined at one interval (the termination of the applicable event(s)) based on static (end-of-event) information. For instance, claim 16 of the '779 Patent provides a wagering system that *continuously* "retrieve[s] data," "recalculate[s] the wager information," "evaluate[s] the recalculated wager information," and "determine[s]" eligibility to win an award; thereafter, it "generate[s] one or more [cash out] options *in real time* prior to the conclusion of the wagering event for at least a portion of the award" and "cause[s] the one or more options to be presented to one or more participants" via multiple user interfaces.  Colossus's technology changed the function of existing internet-based systems (accept bet, await results, display result), adding specific mid-tier architecture to accomplish a new process and display incorporated into an existing interface to address problems specific to computerized gaming.  *See*, *e.g.*, '439 Patent Fig. 3 (Cash-In program and subroutines); FAC ¶¶ 27-29; Ans. Br. at 17-19.  Finally, as in *DDR*, Colossus' technical solution to the computer-centric problem of online bettor stickability is claimed as an ordered combination of limitations, and thus does not pre-empt all permutations of that solution (buy out offers or computerized gaming).  *See* 773 F.3d at 1259; Opp. Br. (D.I. 20) at 12-13.

      **(2)  How do you reconcile the fact that to avoid being an abstract idea, a claim must not be to a "disembodied concept" and instead must be to a concept tethered to "real-world application[,]" see CLS Bank Int'l v. Alice Corp. Pty. Ltd., 717 F.3d 1269, 1286 (Fed. Cir. 2013) (Lourie, J., concurring) (internal quotation marks and citations omitted), but on the other hand, just because a claim might include a large number of concrete, tangible components, that does not necessarily mean that the claim is not abstract, see Yu v. Apple, Inc., 1 F.4th 1040, 1042-45 & n.2 (Fed. Cir. 2021); see also In re TLI Commc'ns LLC Pat. Litig., 823 F.3d 607, 611 (Fed. Cir. 2016)? In other words, what is your view about what it means for a claim to have a sufficient "real-world application" in the Section 101 context?**

A "real-world application" does not necessarily require a tangible apparatus. "The key to this inquiry is whether the claims tie the otherwise abstract idea to a specific way of doing something with a computer, or a specific computer for doing something; if so, they likely will be patent eligible[.]" 717 F.3d 1269, 1302 (Lourie, J., concurring). To wit, an apparatus may be a meaningful limitation and, where it is, that apparatus must either be improved itself (e.g., a special purpose computer), or be "part of the solution" or "integral to the performance" of a patent-eligible process. *Id.* However, process claims are patent eligible where they are directed to a solution to a "technical problem", an improvement on a technical process, or to "a challenge particular to the Internet" (*e.g.* a computer network)—*whether limited by a tangible apparatus or not*. *In re TLI Communications LLC Pat. Litig.,* 823 F.3d 607, 613 (Fed. Cir. 2016), citing *DDR Holdings, LLC v. Hotels.com LP*, 773 F.3d 1245, 1256-7 (Fed. Cir. 2014) and *Diamond v. Diehr*, 101 S. Ct. 1048 (1981); *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 223 (2014)

The ineligible claims in *In re TLI Communications LLC Patent Litigation* neither captured an improved machine nor an apparatus that was integral to the performance of a patent-eligible process. They fell "squarely within [the Federal Circuit's] precedent finding generic computer components insufficient to add an inventive concept" to the abstract "method for recording and administering digital images" because: (1) the telephone and server were described as performing their generic functions, and (2) there was no technical explanation as to the "image analysis unit" or "control unit" in the dependent claims. 823 F.3d at 611, 614-15. There was neither an improved machine, nor a patent-eligible process (or solution to a "technological problem") residing in the generic apparatus disclosed. *Id.* at 613. Similarly, in *Yu v. Apple*, the driver for the majority invalidity decision was that the underlying "enhancement" – using one image to enhance another – was admittedly known in the art for centuries. 1 F.4th at 1043, 1046. The Court held that while the specification disclosed a specific structure, that structure was not captured by the claim, and "[w]hat is claimed is simply a generic environment in which to carry out the abstract idea." *Id.* Absent claiming any new functionality, the claims' lack of any non-conventional camera components to effectuate the claimed enhanced digital image led the Court to determine that no "improved machine" (digital camera) was present. *Id.* at 1043-44. Both cases confirm that apparatus claims may be patent-eligible where they are not directed to a new machine. A device that carries out a non-abstract system or method (*e.g.*, one that is directed to a solution to "a challenge particular to the Internet", as described above) is patent-eligible. If the apparatus is not "integral" to the method's performance (consider, *e.g.*, cross-platform software) nor is itself transformed into a "special purpose computer" by its programming to perform the patent-eligible function, *see* 717 F.3d at 1302 (Lourie, concurring) (citing *In re Alappat*, 33 F.3d 1526, 1544-45 (Fed. Cir. 1994)), such apparatus claims ultimately may provide no additional reach over stand-alone method claims, but such issues are outside the inquiry on a § 101 motion to dismiss. Conversely, the inclusion of non-conventional components (device improvements) might evidence a new machine, resulting in patent-ineligible method claims but patent-eligible apparatus claims.

**(3)  When a court is figuring out what a claim is "directed to," what are the permissible tools that the court can use as part of that analysis?**

The Court should consider several categories of intrinsic evidence when figuring out what a claim is "directed to": "the plain claim language, statements in the written description, and the prosecution history, if relevant." *CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1374 (Fed. Cir. 2020), *cert. denied sub nom. InfoBionic, Inc. v. Cardionet, LLC*, 141 S. Ct. 1266 (2021).  With respect to the claim language, the Court must look "at the 'focus' of the claims" to determine whether it involves an abstract idea. *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 765-66 (Fed. Cir. 2019) (citing *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016)).  However, "in determining the patentability of a method, a court must look to the claims as an ordered combination, without ignoring the requirements of the individual steps." *McRO, Inc. v. Bandai Namco Games America, et. al.*, 837 F.3d 1299, 1313 (Fed. Cir. 2016).  The written description/specification may be useful in illuminating whether the claims are "directed to" the identified abstract idea, and in this context. Courts have discussed the problem the inventors sought to resolve.  *See In re TLI Comm's*, 823 F.3d at 611-12 (discussing that "the focus of the patentee and the claims" was not on an improved machine).  Also in this regard, the Court can consider issues that were "important during prosecution." *See TecSec Inc. v. Adobe Inc.*, 978 F.3d 1278, 1295 (Fed. Cir. 2020) (considering prosecution history and finding claims eligible when the specification "expressly identifie[d] a deficiency [in the prior art] of using only multilevel security through encryption" and explained the claimed advance).

Where the Court resolves the "directed to" inquiry later in a case, *i.e.*, not on a threshold Rule 12 motion, it has the benefit of utilizing relevant extrinsic evidence, including expert and inventor testimony.  *See American Axle & Mfg., Inc. v. Neapco Holdings LLC*, 967 F.3d 1285, 1295-96 (2020).  Additionally, it "is within the trial court's discretion whether to take judicial notice of a longstanding practice where there is no evidence of such practice in the intrinsic record." *CardioNet*, 955 F.3d at 1373.  That is, if "the extrinsic evidence is overwhelming to the point of being indisputable, then a court could take notice of that and find the claims directed to the abstract idea." *Id.* at 1374.  In sum, while the "directed to" inquiry centers around the claim language, the Court has flexibility in consulting multiple sources as appropriate depending on the circumstances of the case, and the timing of its decision.

**(4)  How is the "conventionality" analysis in Section 101 law different from that in a Section 102/103 analysis?**

The Step 2 inquiry as to whether a claim element is "well-understood, routine and conventional to a skilled artisan in the relevant field"—a question of fact—examines whether a (presumably known) claimed element "ha[d] become *so prevalent* as to be routine or conventional." *Exergen Corp. v. Kaz USA, Inc.*, 725 F. App'x. 959, 966 n.4 (Fed. Cir. 2018) (citing record below) (emphasis added).  Conventionality is thus not coextensive with whether the element was "disclosed in a prior art reference," such as a single copy of a thesis available in a university library that would qualify as invalidating prior art under § 102. *Exergen*, 725 F. App'x. at 965-66; *accord Berkheimer v. HP Inc.,* 881 F.3d 1360, 1369 (Fed. Cir. 2018) ("Whether a particular technology is well-understood, routine, and conventional goes beyond what was simply known in the prior art. The mere fact that something is disclosed in a piece of

4

prior art, for example, does not mean it was well-understood, routine, and conventional."). Well-pled allegations and expert opinions, as well as other extrinsic evidence, can be consulted with respect to what was unconventional and/or an inventive concept at the time of an invention. *See, e.g.*, *Sapphire Crossing LLC v. Quotient Tech. Inc.*, C.A. No. 18-1717-MN-CJB, 2020 WL 1550786 (D. Del. Apr. 1, 2020).

Another critical distinction is evidenced by the fact that claim elements may define a non-conventional (and patent-eligible) arrangement of limitations, even if the individual claim elements themselves are well-understood, routine, and conventional. *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016). A non-conventional arrangement of elements will satisfy Step 2 "even though all the constituents of the combination were well known and in common use before the combination was made," *Diamond v. Diehr*, 450 U.S. 175, 188 (1981), and this conclusion of patent-eligibility will not foreclose the possibility that the fact-finder may consider that combination of known elements to have been obvious under § 103. The converse is also true, as even an expert's admission that something was in the prior art for §§ 102/103 would not speak to whether an inventive concept might lie in the claimed ordered combination of steps. *See C.R. Bard Inc. v. AngioDynamics, Inc.*, 979 F.3d 1372, 1384 (Fed. Cir. 2020) ("Even if the prior art asserted by AngioDynamics demonstrated that it would have been obvious to combine radiographic marking with the other claim elements, that evidence does not establish that radiographic marking was routine and conventional under Alice step two.").

Respectfully submitted,

*/s/ Brian A. Biggs*
Brian A. Biggs (DE Bar No. 5591)

cc: Counsel of record