IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DIOGENES LIMITED and COLOSSUS (IOM) LIMITED, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 21-1695-MN-CJB |
| DRAFTKINGS, INC., | ) ) ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

At Wilmington this **18th day of July, 2022**:

As announced at the hearing on July 8, 2022, the Court HEREBY RECOMMENDS that

Defendant DraftKings, Inc.'s ("Defendant") motion to dismiss (the "motion"), (D.I. 16), which

argues that Plaintiffs Diogenes Limited and Colossus (IOM) Limited's ("Plaintiffs") asserted

United States Patent Nos. 8,721,439 (the "'439 patent"), 9,117,341, 9,275,516, 9,424,716,

9,704,338, 10,970,969, 10,997,822, and 11,200,779 (the "'779 patent") are directed to non-

patent-eligible subject matter pursuant to 35 U.S.C. § 101 ("Section 101"), be GRANTED-IN-

PART and DENIED-IN-PART.

Defendant's motion was fully briefed as of March 29, 2022, (D.I. 27), and the Court

received further submissions regarding Section 101-related questions on July 1, 2022, (D.I. 41;

D.I. 42). The Court carefully reviewed all submissions in connection with Defendant's motion,

heard oral argument, and applied the relevant legal standards for review of this type of Section

101-related motion at the pleading stage, which it has previously set out in *Genedics, LLC v.*

*Meta Co.*, Civil Action No. 17-1062-CJB, 2018 WL 3991474, at *2-5 (D. Del. Aug. 21, 2018).

The Court's Report and Recommendation is consistent with the bench ruling announced

at the hearing on July 8, 2022,[1] pertinent excerpts of which follow:

> The final case today [is] *Diogenes Limited [&] Colossus Limited [vs.] DraftKings, Inc*. At issue there is Defendant's Rule 12(b)(6) motion, which seeks to dismiss the claims in the [A]mended [C]omplaint as to all eight asserted patents, pursuant to Section 101.
>
> In an effort to convince the Court to dismiss the [A]mended [C]omplaint as to all 31 asserted claims across all eight patents, Defendant asserts that asserted claim 1 of United States Patent Number 8,721,439, or the '439 patent, is representative of all of the other asserted claims in all of the other asserted patents. The '439 patent is entitled "Wagering Apparatus, Methods, and Systems." Claim 1 of the patent is lengthy. It is a claim [to a] method of conducting a multi-outcome wagering event for one or more players, where the wagering event comprises a defined number of what are called "legs," and where at least one player is presented with at least what the claim calls a "buy-out offer" or a "partial buy-out offer" prior to completion of all [of] the legs. The patent explains in column 4 that a leg can be any number of individual components of any type of event, such as an inning of a baseball game or a baseball [game] itself or a combination of baseball games, like the games in the World Series.
>
> In a bit, I[ will] discuss Defendant's effort to attempt to obtain dismissal of all of the asserted claims across all of the asserted patents in this case by simply focusing on this one purportedly representative claim. But to start, I[ will] go through the *Alice* analysis as to claim 1 of the '439 patent, which I[ will] simply refer to as claim 1. The Court will do so in order to determine, at least as to that one claim, if Defendant has made its case for dismissal.
>
> I now turn to the *Alice* analysis at step o[n]e. Here, Defendant argues that claim 1 is directed to the abstract idea of "hedging financial risk." There's no question that "hedging financial risk" is an abstract idea, and Plaintiffs do not assert otherwise. In *Bilski [vs.] Kappos*, for example, the Supreme Court explained that the concept of hedging financial risk is an "unpatentable abstract

---

[1]      (*See* D.I. 45)

idea" and to allow a patentee to "patent risk hedging [] would pre[-]empt use of this approach in all fields, and would effectively grant a monopoly over an abstract idea."[2]

Thus, the next step of the analysis is to ask whether it [is] correct that claim 1 really is directed to the abstract idea of "hedging financial risk." Here, in asserting that it is, Defendant starts by pointing to the claim itself. Although the claim has eight different steps to it, Defendant asserts[—]the Court believes rightly[—]that most of those steps are "generic steps." [Defendant] notes, for example, that the claim uses functional language to describe how it makes use of certain computer equipment to first initiate a wagering event, then to receive a wager, then to identify one or more winners, then to initiate at least one of a buy-out offer or partial buy-out offer, then to receive acceptance of that offer, then to complete the remainder of the wagering event, [and] then to determine if any of the players have won the event. And Defendant points to the preamble and to the fifth step of the claim, which note that at least one of the player[s] has to be presented with at least one of a buy-out offer or a part[i]al buy-out offer prior to the completion of the event. Defendant says those buy-out offers are a key part of the claim and it says that those are basically just a way of hedging financial risk. Lastly, Defendant asserts that all of these generic steps are basically just steps that can be and have been taken in a brick-and-mortar casino context. The claim, according to Defendant, simply amounts to computerizing those concepts. In the end, then, Defendant argues that the claim is directed to the well-known concept of hedging risk, which the claim happens to do by using a computer.

This brings up a few questions. For one, is initiating or receiving acceptance of a "buy-out" or "part[i]al buy-out" offer just another way of offering someone the ability to hedge risk on a bet? In the Court's view, the answer is yes. The patent specification says that a buy-out or "cash out"[—]the parties tend to use the terms interchangeably[—]are the same thing. And in column 2, the patent notes that "the game operator [(]or any other entity[)] may offer the player a fractional amount of the potential [J]ackpot [P]ool to buy the ticket for the still pending games and thereby provide the player the opportunity to *cash in* and *avoid the risk* of being eliminated on a later leg or the final event."[3] In other words, a player would accept the buy-out offer as a way of avoiding the risk of losing his bet. He'd be hedging his bet.

---

[2]   *Bilski v. Kappos*, 561 U.S. 593, 611-12 (2010).

[3]   ('439 patent, col. 2:48-53 (emphasis added))

Indeed, today, Plaintiff[s] did [not] seriously contest the notion that a buy-out offer is a means of hedging financial risk. That has to be true.

Next, is this part of the claim[—]the part relating to the buy-out offer[—]what the claim is really directed to? Again, the Court concludes that the answer is yes. As Defendant notes, the fact that the method includes the ability of one or more players to accept a buy-out offer or part[i]al buy-out offer is a prominent part of the claim's preamble.[4] Column 2 of the patent underscores that this really is the key to the claim. There, the patent explains that a "*unique differentiator* of the product of the present disclosure may be that at any desired time after the initiation of an event . . . any desired number of players who remain eligible for a prize . . . or to win or have correct [(]win[)] predictions for each of the events or legs that are completed, *may be offered a [']buy-out['] or an opportunity to sell their tickets* . . . to the game operator" or others.[5] That [this] is the key aspect of the claim is further underscored by Plaintiff[s'] allegation in paragraph 12 of the [A]mended [C]omplaint, where Plaintiffs allege that "the specific inventive feature claimed in each one of the [a]sserted [p]atents is the *ability to present multiple players with a 'buy-out' option* before the completion of the final wagered-upon event."[6]

In light of these portions of the record, and particularly what the patent tells us, the Court agrees with Defendant that claim 1 is directed to the abstract idea of hedging financial risk.

Now, in pushing back and arguing the claim is not in fact directed to an abstract idea at step one, Plaintiff[s] make[] a few different arguments, which the Court will now address in turn. None are availing.

For example, in [their] briefing, Plaintiff[s] assert[] that the claims are directed to a method that is "rooted in computer networking and specifically online gaming technology" or that the claims "focus on unique technical functionality[.]"[7] Yet the idea that

---

[4]    (D.I. 17 at 8)

[5]    ('439 patent, col. 2:32-44 (emphasis added))

[6]    (D.I. 14 at ¶ 12 (emphasis added))

[7]    (D.I. 20 at 7-8 (internal quotation marks, emphasis and citations omitted))

claim 1 is directed to or "rooted in" any particular computer technology is simply not correct. To be sure, claim 1 does include utilization of certain computer-based hardware. The claim explains, for example, that one or more "wagering input devices" communicate with a "system controller" through which the player or players participate in the wagering event[,] and that the system controller is adapted to allow for the method in the claim.[8] But the patent makes clear in column 4, lines 6 to 10, that a "system controller" is simply any hardware device or devices that include a processing device and associated memory. And in column 4, lines 1 to 6, the patent tells us that a "wagering input device" can be a wagering station, a wagering terminal, an internet-connected computing system, smart phones, tablet computers, televisions, or any other similar devices. There[ is] nothing about claim 1 or the patent that suggests that any *particular* technology, any *particular* type of hardware, or any *particular* type of software process is what this claim is about. Instead, the Court agrees with Defendant that claim 1 "[is] not 'rooted' in technology; [it] simply use[s] generic computer components to implement the abstract idea of hedging [financial] risk."[9]

Plaintiffs also asserted that the claims are not directed to the abstract idea at issue because they "have the capability to process data from multiple sources in *real time* to *continuously* generate an accurate value for [each] cash out offer that best represents the effect of *instantaneous* odds on the *real time* value of a bettor's ticket."[10] Yet while it may be that some asserted claims across the other patents include certain of these emphasized requirements, claim 1 clearly does not. Indeed, today, Plaintiff[s] acknowledged as much. And as the [United States Court of Appeals for the] Federal Circuit made clear in cases like *ChargePoint, Inc. [ vs.] SemaConnect, Inc.*, "ultimately, the [Section] 101 inquiry must focus on the language of the [a]sserted [c]laims themselves[.]"[11] For example, claim 1 does not require the method must generate a buy-out offer in "real time." To the contrary, the buy-out offer or the part[i]al buy-out offer must simply be initiated "at any time

---

[8]     ('439 patent, col. 29:4-7)

[9]     (D.I. 27 at 5)

[10]     (D.I. 20 at 8 (internal quotation marks and citation omitted) (emphasis added))

[11]     *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 769 (Fed. Cir. 2019) (internal quotation marks and citation omitted).

before the multi-outcome wagering event has been completed."[12]
The claim, in fact, never uses the words "real time," like the
claims, for example, in the '779 patent do.  Nor does claim 1
require that data must be processed "continuously" or that
"instantaneous" odds must be generated.  Again, other claims like
those in the '779 patent might require this, but claim 1 clearly does
not.

Plaintiffs next suggest that Defendant's analogizing of claim 1 to
the type of gaming that could occur in the non-computer,
brick-and-mortar world is wrong.  To this end, Plaintiffs asserted
in the[ir] brief and in the [A]mended [C]omplaint that "the
collection and processing of this volume of information from a
multitude of sources[,] accurately in real time[,] is not possible
outside of the technological environment of an online sports
wagering system and cannot be performed by human operators in a
brick-and-mortar casino."[13]  The Court will put aside the reference
to "real time" collection and processing for reasons I[ ha]ve
already explained.  With regard to Plaintiff[s'] reference to
collecting information from a "multitude of sources," it[ is] worth
noting that claim 1 requires that only one player participate in the
method and that only one wagering event be at issue.  But to the
extent that [] [P]laintiffs suggest that the method is non-abstract
because it collects and more quickly processes a "volume of
information" that cannot be processed [(]or processed as quickly[)]
by a human, that cannot save the claim.  The Court does not
understand Plaintiffs to assert, nor could they, that humans are
incapable of making a buy-out offer to a bettor in order to allow
the bettor to hedge risk as part of a multi-leg bet.  Thus, to the
extent that the claim here is simply [to] using a computer to
increase the "volume of information" that is taken into account [in]
making that buy-out offer[,] or to help ensure that the offer is more
efficiently made or more accurately made than one that a human
might make, that would, as the Federal Circuit taught in
*Intellectual Ventures I LLC [vs.] Capital One Bank (USA)*, amount
to "merely adding computer functionality to increase the speed or
efficiency of the process[,]" which cannot confer patent eligibility
on an otherwise abstract idea.[14]

---

[12]     ('439 patent, col. 29:27-32)

[13]     (D.I. 20 at 10 (internal quotation marks, emphasis and citation omitted))

[14]     *Intellectual Ventures I LLC v. Captial One Bank (USA)*, 792 F.3d 1363, 1370
(Fed. Cir. 2015).

So having concluded that Defendant is correct at step one, the Court now moves on to step two.

Again, step two of the *Alice* framework requires a Court to assess what else there is in the claim beyond the abstract idea to determine whether the additional elements transform the nature of the claim into a patent-eligible application of the abstract idea. Plaintiff[s'] step two arguments regarding claim 1 fare no better than their step one arguments.

At step two, Plaintiffs cite to their [A]mended [C]omplaint for the proposition that permitting bettors to accept a buy-out offer was helpful to the online gaming industry specifically and that it solved problems in that industry. For example, Plaintiffs allege that by permitting this option, first, player confidence improves; second, more bettors who were offered buy-outs would re-wager all or some of those earnings; third, bettors were thus more engaged in their betting experience; and, fourth, that they thus continue gaming online longer than they might have and increased their loyalty to online platforms; which, [fifth], benefitted the online gaming industry by increasing wagering site "'stickablity.'"[15] Of course, none of these things, including the concept of ["]stickablity,["] are claimed in claim 1. Plaintiffs are simply arguing that the use of claim 1 helped to generate these benefits in the online gaming wor[ld]. In making this argument in their briefs, [] [P]laintiffs analogize this case to that of *DDR Holdings, LLC[ vs.] Hotels.com, L.P.*,[16] which Plaintiffs say is the most comparable case to our facts.

To the contrary, however, the Court agrees with Defendant that not only does *DDR Holdings* not support Plaintiffs' case, it helps make Defendant's argument for it as to why claim 1 is ineligible. In *DDR Holdings*, the representative claim addressed by the Court recited a system that, among other things[ (1)] stored "visually perceptible elements" corresponding to numerous host websites in a database, which each of those host websites displayed at least one link associated with a product or service of a third-party merchant; [(2)] on activation of the link by a website visitor, automatically identifies the host; and, [(3)] instructed an [I]nternet web server of an "outsource provider" to construct and serve to the visitor a new, hybrid web page that merged content associate[d] with the third-party merchant's products with the stored visually-

---

[15]   (D.I. 20 at 13-14)

[16]   *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014).

perceptible elements from the host website.[17]  It is true that the
Federal Circuit noted, in explaining why the claim was not
directed to an abstract idea, that the claim solved a problem that
specifically arose in the realm of computers and the [I]nternet.
That is[:]  the problem of retaining website visitors that otherwise
have been transported away from the host's website when they
clicked on an advertisement and activated a hyperlink.  But what
was key to the *DDR Holdings* Court's *Alice* decision was that the
claim was not directed to an abstract idea because the claimed
solution was "*rooted in computer technology* in order to overcome
a problem specifically arising in the realm of computer
networks."[18]  That is, the claim specified how "interactions with
the internet are manipulated to yield a desired result[—]a result
that *overrides the routine and conventional sequence of events*
ordinarily trigged by the click of a hyperlink."[19]  This was the fact
that the claim created a *new composite web[page]* that combined
the look of the host website with the product information of the
merchant.

Here, in contrast, even if it[ is] so[—]and the Court assumes it[ is]
so[—]that claim 1 provides certain benefits to entities in the online
gaming industry that might not be relevant or applicable in the
human world, the reason why claim 1 fails the *Alice* test is that it is
directed to the abstract idea of risk hedging itself, and in that [in]
computeriz[ing] risk hedging, or performing risk hedging in the
online context, the claim does not in any way improve how
computers function or [] override the routine or conventional ways
that computers can be used[,] so as to provide an inventive concept
sufficiently distinct from the abstract idea itself.  As Defendant
notes, "a new electronic or software technique specific to the
abstract concept of 'cash out' or 'buy out' of a bet is not
claimed."[20]  Instead, claim 1 simply takes an abstract idea and does
it on a computer, and in doing so, the computer could help process
information for the hedging process faster or more accurately or in
a more complex form than a human might.

Lastly, on pages 17 through 19 of their answering brief, Plaintiffs
suggest the patents disclose an inventive concept at step two

---

[17]     *Id*. at 1249-50.

[18]     *Id.* at 1257 (emphasis added).

[19]     *Id*. at 1258 (emphasis added).

[20]     (D.I. 17 at 18)

because they disclose a "nonroutine and nonconventional series of technical steps[,]" in that they "offer *continuous* cash-in ability as soon as it is technically possible" or because the generation and communication of buy-back or partial buy-back offers "occurs in *real time*" or because the[ claims] provide a "*specific mid-tier server architecture*" that permits all of this to occur.[21]  For reasons the Court has already expressed, the Court does not see how these limitations are part of what is claimed in claim 1, so it does not see how they can save the claim at step two.

For all the reasons set out above, the Court recommends that the District Court find that claim 1 of the '439 patent [is] ineligible for patenting.

The Court has also reviewed the four other currently asserted claims of the patent[:]  claims 20 to 22 and claim 26.  Claim 26 is merely the system analogue to claim 1's method claim, with the limitations of those two claims essentially mirroring each other. Claim 20 adds only that this wager comprises a list that is at least one of printed on a ticket, printed on a voucher, and displayed via one or more of the wagering input devices.  Claim 21 simply notes that the one or more wagering input devices comprises one of a number of possible such devices.  And claim 22 adds only that the wagering event comprises a fixed, variable, or guaranteed pool or is progressive.  The Court cannot see how any of these claims add anything that would alter its decision as to eligibility.  These other four claims are cabined in number and they are in the same patent that was the focus of the representative claim discussion herein and in the briefing.  And thus[,] the Court also recommends that the District Court find these claims ineligible and that it therefore grant Defendant's motion as to each of the asserted claims related to the '439 patent.

However, as I noted earlier, Defendant also wishes its motion to be granted as to all other asserted claims of all seven other asserted patents.  The Court recommends that the motion be denied in that respect, without prejudice to renew at a later stage of the case[,] because Defendant has not sufficiently demonstrated that claim 1 is truly representative of all of those other asserted claims.

To start, I will note that I [have] been reviewing Section 101 motions like these for most of my entire 11 years as a judge[;] during that time, I have resolved many, many such motions.  But I cannot recall ever having seen an attempt by a defendant to assert

---

[21]   (D.I. 20 at 17-19 (certain emphasis added, certain emphasis omitted))

representativeness across such a broad array of claims and broad array of patents in one set of briefing as in this effort by Defendant here.

The [D]efendant's motion would implicate 27 other asserted claims across the seven other patents[—]patents that together include a total of 376 claims.  And in its briefing, Defendant specifically addressed only a very small number of asserted claims, none with any great specificity.  Although Defendant asserts that any differen[ce] between claim 1 and those various claims are "minor" and "immaterial,"[22] it[ has] given the Court almost no argument or way to meaningfully analyze whether those statements are truly correct.

Defendant attached as Exhibit A to its opening brief a chart that purported to show how certain[—]though nowhere near all[—]of those asserted claims bore some relation to claim 1.  But that chart was incredibly hard to read, and it used a color-coded key that was very difficult to decipher.  What was plain was that Defendant was straining to cram in argument about a huge smorgasbord of claims that could not responsibly be argued in just one motion like this.

It is true that in *Berkheimer [vs.] HP Inc.*, the Federal Circuit noted that [c]ourts may treat a claim like claim 1 as representative of other claims in certain situations, such as if the "patentee does not present any meaningful argument for the distinctive significance of any claim limitation[s] not found in the representative claim[.]"[23] But here, in its answering brief, Plaintiffs *did* present meaningful argument that one could not use claim 1 as a cudgel to eliminate 27 other asserted claims across seven other patents in the absence of any real substantive argument in support.  Plaintiffs noted, for example, that some of those other claims include limitations that claim 1 does not . . . such as "real time buy-out offers" or that controllers "continuously" retrieve or evaluate data.  Certain of the additional other asserted claims implicate certain combinations of hardware and software components that did [not] come up in our discussion of claim 1 today.  The Court is not sure if these types of limitations would ultimately make a difference in the Section 101 analysis, but they might.  And it believes it[ is] fundamentally unfair to Plaintiffs to invalidate all of these claims without having a better process before doing so.

---

[22]   (D.I. 27 at 1)

[23]   *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365 (Fed. Cir. 2018).

Of course, it [is ]not like [] [P]laintiffs themselves listed out all 27 other of those asserted claims in their answering brief or provided pages of detailed argument as to why those claims were all meaningfully different than claim 1.  But who could blame Plaintiffs?  It would be functionally impossible to do that in a 20-page brief, and the Court cannot see how Plaintiffs were required to do so here.

In the end, if the District Court adopts the Court's decision as to the '439 patent, the Court has little doubt that this will provide some guidance to [the] parties as to whether other asserted claims of the other asserted patents really are meaningfully different than the '43[9] patent's asserted claims.  That may in turn help the parties figure out whether those other claims are thus likely to survive any future permitted Section 101 challenge, and in turn, the Court's decision today might help streamline the case[.]  [B]ut that will have to be enough for now.

Therefore, the Court recommends that Defendant's motion be granted[-]in[-]part and denied[-]in[-]part in the manner set out here.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R.

Civ. P. 72(b)(1), and D. Del. LR 72.1.  The parties may serve and file specific written objections

within fourteen (14) days after being served with a copy of this Report and Recommendation.

Fed. R. Civ. P. 72(b)(2).  The failure of a party to object to legal conclusions may result in the

loss of the right to *de novo* review in the district court.  *See Sincavage v. Barnhart*, 171 F. App'x

924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R.

Civ. P. 72, dated March 7, 2022, a copy of which is available on the District Court's website,

located at http://www.ded.uscourts.gov.

*Christopher J. Burke*
Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE

11